UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION


UNITED STATES OF AMERICA,          :      Docket No. 12-00146
                                   :
                Plaintiff,         :
vs.                                :      May 2, 2013
                                   :
ALEXANDER DERRICK REECE, ET AL.,   :
                                   :
                Defendants.        :      Lafayette, Louisiana
_____


REPORTER'S OFFICIAL TRANSCRIPT OF THE HEARING

BEFORE THE HONORABLE PATRICK J. HANNA

UNITED STATES MAGISTRATE JUDGE


LARAE BOURQUE, RPR, CRR
United States Court Reporter
800 Lafayette Street, Ste. 3103
Lafayette, LA  70501

A P P E A R A N C E S

FOR THE PLAINTIFF:

JOHN LUKE WALKER
U.S. Attorney's Office
800 Lafayette St., Ste. 2200
Lafayette, LA  70501


FOR DEFENDANT ALEXANDER DERRICK REECE:

TODD ALAN FOSTER
Todd Foster Law Group
1881 W. Kennedy Blvd.
Tampa, FL  33606

MICHAEL D. SKINNER
Skinner Law Firm
P.O. Box 53146
Lafayette, LA  70505


FOR DEFENDANT CURIOUS GOODS, LLC:

JOHN KEVIN STOCKSTILL
Doucet-Speer
P.O. Drawer 4303
Lafayette, LA  70502-4303


FOR DEFENDANT RICHARD JOSEPH BUSWELL:

IAN FRANCES HIPWELL
ANDRE R. BELANGER
Manasseh Gill, et al.
8075 Jefferson Hwy.
Baton Rouge, LA  70809


FOR DEFENDANT DANIEL JAMES STANFORD:

DANIEL J. STANFORD
Stanford Law Office
812 Johnston St.
Lafayette, LA  70501

A P P E A R A N C E S   C O N T I N U E D


FOR DEFENDANT DANIEL PAUL FRANCIS:

                    JOSEPH N. LOTWICK
              Office of Joseph N. Lotwick
              8048 One Calais Ave., Ste. A
                 Baton Rouge, LA  70809


FOR DEFENDANT BARRY L. DOMINGUE:

                    BARRY L. DOMINGUE
                    Attorney at Law
                    P.O. Box 80112
                  Lafayette, LA  70598

                   DONALD W. WASHINGTON
                       Jones Walker
                    P.O. Drawer 3408
                  Lafayette, LA  70502


ALSO PRESENT:

                   WILLIAM L. GOODE
                    Goode Law Firm
                   P.O. Drawer 3366
                 Lafayette, LA  70502

                   RANDAL P. MCCANN
              Law Office of Randal P. McCann
                 1005 Lafayette St.
                 Lafayette, LA  70501

```
                        I N D E X
```

WITNESSES:                                    PAGE:

DONALD DESALVO
     Direct Examination by Mr. Stanford...........   8
     Cross Examination by Mr. Hipwell............. 167
     Cross Examination by Mr. Walker.............. 174
     Redirect Examination by Mr. Stanford........ 205
     Recross Examination by Mr. Hipwell.......... 217

```
 1                    P R O C E E D I N G S
 2                    (Call to order of the court.)
 3            THE COURT:  This is United States vs. Alexander Reece,
 4    12-cr-146, for the continuation of the evidentiary hearing on the
 5    motion for prosecutorial misconduct.
 6            Before I let you make your appearances, I wanted to
 7    bring to the attention of counsel what I received by way of
 8    e-mail correspondence.  I am of the opinion that perhaps
 9    Judge Foote may have received the same e-mail.  I'm going to give
10    you a copy of it.  I have not read this.  I don't intend to read
11    it.  The front page looks the way it does because I took out my
12    personal addresses.  It's from a person named Paula Andrews.  If
13    Paula Andrews is a lawyer, it's an inappropriate contact with the
14    Court.  If Paula Andrews is not a lawyer, it's meaningless.  I'm
15    going to put it in the record in the event Ms. Andrews turns out
16    to be a lawyer and needs to be turned in to her respective bar
17    association.  All of you folks can have it, but I have not read
18    this nor do I intend to read it.
19            MR. WALKER:  Do you want me to pass it around?
20            THE COURT:  Yes.
21            And if I learn that Ms. Andrews is a member of the bar
22    somewhere, I will turn her in to the bar association.
23            All right.  Let me have appearances, please.
24            MR. WALKER:  Luke Walker on behalf of the
25    United States.
```

1              MR. STANFORD:  Daniel Stanford, pro se.

2              MR. HIPWELL:  Your Honor, Ian Hipwell and

3     Andre Belanger on behalf of the defendant, Richard Buswell.

4              MR. FOSTER:  Good morning.  I'm Todd Foster along with

5     Michael Skinner on behalf of Mr. Reece who is present in court.

6              MR. DOMINGUE:  Barry Domingue with Don Washington.

7              MR. LOTWICK:  Good morning, Judge.  Joe Lotwick for

8     Daniel Francis whose presence we wish to waive this morning.

9              THE COURT:  Granted.

10             Mr. Goode, I have to ask you a question.  Do you

11    represent Mr. Stanford?

12             MR. GOODE:  No, Your Honor, I do not.

13             THE COURT:  Thank you.

14             All right.  Mr. Stanford, are you ready to call your

15    next witness?

16             MR. STANFORD:  Yes, sir.

17             THE COURT:  We still have the rule of sequestration in

18    effect.  That was Mr. Paul Buswell and Agent DeSalvo.  So who's

19    your next witness?

20             MR. STANFORD:  Agent DeSalvo, Judge, and I call

21    Agent DeSalvo under Rule 611(c).

22             THE COURT:  All right.  Mr. Buswell, remember you can't

23    talk to anybody about your testimony.

24             MR. PAUL BUSWELL:  Yes, sir.

25             THE COURT:  All right.  Let the record reflect

1    Mr. Stockstill has entered the courtroom on behalf of

2    Curious Goods, LLC.  Am I correct?

3              MR. STOCKSTILL:  Yes, sir.

4              MR. STANFORD:  Your Honor, with the Court's permission,

5    I'd like to conduct my examination from the table, and as I need

6    to use the ELMO, I'll walk up to the podium.

7              THE COURT:  That's fine.

8              THE COURTROOM DEPUTY:  Do you solemnly swear that the

9    testimony you will give in this case will be the truth, the whole

10   truth, and nothing but the truth, so help you God?

11             THE WITNESS:  Yes, I do.

12             THE COURTROOM DEPUTY:  Thank you.

13             THE COURT:  Agent DeSalvo, give us your name and the

14   town in which you reside.

15             THE WITNESS:  Donald DeSalvo.  I reside in

16   Dallas, Texas.

17             THE COURT:  All right.  And please give my gratitude to

18   your supervisor for letting you come back here today.

19             THE WITNESS:  Yes, sir.

20             THE COURT:  All right.  Mr. Stanford, you may proceed.

21             MR. STANFORD:  Thank you, Your Honor.

22   Whereupon,

23                     DONALD DESALVO

24   was called as a witness; after having been first duly sworn, was

25   examined and testified as follows:

```
1                     DIRECT EXAMINATION
2    BY MR. STANFORD:
3    Q     Good morning, Agent DeSalvo.
4    A     Good morning.
5    Q     I have lots of questions to ask you and I'm going to try to
6    be very clear in my questions, but if you don't understand me for
7    any reason, just ask me to repeat the question and I'll be glad
8    to do that.  I'll be between this table and the podium.  I'll go
9    to the podium if I need to put something on the ELMO, and, to
10   that extent, I'll try to speak only when I'm at a microphone for
11   the court reporter and so you can understand.  Okay?
12   A     Yes.
13   Q     Agent DeSalvo, you were the DEA case agent in this case from
14   the beginning of this investigation, I guess, until your transfer
15   to Dallas?
16   A     I was the supervisor of the investigation.  I did assign a
17   case agent to the investigation.
18   Q     Who was the case agent that you assigned?
19   A     Will White.
20   Q     When did you assign Will White as the case agent?
21   A     Well, Will White was initially assigned to DEA for a special
22   case, so he wasn't a full-time task force agent.  During the
23   middle of this investigation -- at the beginning of it
24   Kane Marceaux was a representative from the Lafayette Police
25   Department.  Kane Marceaux was pulled from the task force.
```

1    Within weeks Task Force Agent White was his replacement.  There's

2    a period of background checks and there's a process where it

3    doesn't happen overnight where he gets approved to become a task

4    force agent.  He was sort of in limbo, but he had been working

5    the investigation as a metro narcotics agent as well, so he was

6    the case agent, but officially didn't become the case agent until

7    much later.

8    Q    When was that?

9    A    That was probably when he was deputized, and I don't recall

10   that date, but it was probably the spring of 2012.

11   Q    Would it have been prior to April -- I mean, April 5th,

12   2012, that he was deputized?

13   A    It could have been, yes.  I don't know the exact date.

14   Q    And during this investigation either you or agents working

15   under your supervision interviewed over 40 witnesses.  Would that

16   be accurate?

17   A    About 40 witnesses.  I don't have the exact amount.  I don't

18   know exactly, but about 40 witnesses, maybe more, maybe a few

19   less.

20   Q    And some of the people that were debriefed pursuant to your

21   investigation were Drew Green; is that correct?

22   A    That's correct.

23   Q    Thomas Malone?

24   A    Correct.

25   Q    Boyd Barrow?

```
 1   A    Yes.

 2   Q    Josh Espinoza?

 3   A    Yes.

 4   Q    Paul Buswell?

 5   A    Well, Paul Buswell wasn't necessarily debriefed, but, yes,

 6   we spoke to Paul.

 7   Q    Well, when I say "debriefed," I'm also using it in a generic

 8   sense meaning interviewed as well.

 9   A    Yes.

10   Q    Barry Domingue?

11   A    Yes.

12   Q    Richard Buswell?

13   A    Yes.

14   Q    And were DEA-6s prepared specifically for Mr. Green, Malone,

15   Barrow, and Espinoza's debriefings?

16            MR. WALKER:  I would object as to relevance for this

17   hearing.

18            THE COURT:  What is the relevance of this,

19   Mr. Stanford?

20            MR. STANFORD:  Judge, later it may become important.  I

21   just want to determine at this point generally whether or not

22   these debriefings were documented by a DEA-6 or not given

23   Agent White's testimony that he had an encounter with Mr. Buswell

24   April 24th that was not documented.  I'm just trying to

25   determine which interviews that I'm going to be dealing with were
```

1    or were not documented.

2                THE COURT:  The objection is overruled.

3                You can answer.

4                THE WITNESS:  I'm sure there were DEA-6s completed.  I

5    would have to verify that, but generally I believe so.

6    BY MR. STANFORD:

7    Q    And were you also aware and were you given copies of

8    Agent White's recorded interviews that he did on

9    December 8th of 2011?

10   A    Was I given copies of -- I don't recall getting copies.

11   Q    Are you aware that there are recorded -- tape recorded or

12   audio recorded interviews of numerous witnesses on that date?

13               MR. WALKER:  Again, Your Honor, I object to relevance.

14               THE COURT:  You can answer.

15               Overruled.

16               THE WITNESS:  There were two investigations that were

17   being run parallel.  The first investigation was metro narcotics.

18   We weren't involved in that investigation initially.  And they

19   continued their investigation, so there may be numerous

20   recordings as part of their investigation that I didn't

21   necessarily receive.

22   BY MR. STANFORD:

23   Q    Okay.  But I'm only specifically interested in the ones

24   Agent White, who was working for you, conducted.  Did Agent White

25   tell you that he recorded the recorded interviews of a number of

1    witnesses on December 8th?

2    A    Well, he wasn't working for me December 8th.

3    Q    I understand that, but --

4    A    That was your question.  You asked if December 8th -- he

5    wasn't.  He was working for metro narcotics and he did do some

6    recordings.  I don't have access.  I didn't have access.  That's

7    probably in the metro narcotics case file.

8    Q    Okay.  So you don't have those?

9    A    Right now I would have to look through the case file to see

10   if he subsequently put those in the case file.  I don't know.  I

11   can't answer that.

12   Q    Now, you were also present at the detention hearings for

13   Mr. Barrow and Mr. Espinoza as well as the initial appearances

14   and the guilty pleas, correct?

15   A    I believe so, yes.

16   Q    And the same for Mr. Green and Mr. Malone?

17   A    Yes.  I believe I was there for them.  I may have missed

18   one.

19   Q    Now, in the beginning of the investigation, and I believe

20   you testified previously, you were aware that Richard Buswell and

21   others purchased Curious Goods from Jack Leblanc; is that right?

22   A    Yes, I believe so.

23   Q    And you were also aware that Curious Goods and/or

24   Jack Leblanc had been selling a potpourri product for a number of

25   years prior to 2010; is that correct?

1    A    I didn't say that, no.

2    Q    I'm asking you are you aware of that.

3    A    No.

4    Q    You didn't know that?

5    A    I did not know that.

6    Q    You make reference in the February 15th, 2012, interview

7    of Paul Buswell.  Do you remember being at a February 15th,

8    2012, interview of Paul Buswell with Agent White?

9    A    I remember being in an interview with Paul Buswell, yeah, a

10   few of them.  I don't recall.  It could have been the 15th.

11   Q    Were all of Mr. Buswell's interviews recorded?

12   A    I don't believe so.

13            THE COURT:  Now, Mr. Stanford, because we have two

14   Mr. Buswells, I'm going to ask you, when you say that, to

15   indicate Paul versus Richard.

16            MR. STANFORD:  You're correct, Your Honor.

17            THE COURT:  Thank you.

18   BY THE COURT:

19   Q    Do you know if all the interviews of Paul Buswell were

20   recorded?

21   A    I don't believe all of them were recorded, no.

22   Q    Some of the phone calls to Paul Buswell and the

23   February 15th interview with you and Agent White were recorded?

24   A    The 15th, yes.  The interview -- if it was at the -- there

25   was one at the Lafayette Police Department that Mr. Buswell came

1   to.

2   Q     During that meeting there was a third person present.  Who

3   was that?  Another agent besides you and Agent White.

4   A     I believe it was Ryan Shanahan.

5   Q     And early in the investigation, I would say December of

6   2011, you and Agent Marceaux were involved with some of the

7   search warrants and working side by side with metro narcotics in

8   December of 2011?

9   A     No.  No, sir.  We were actually not invited to that search

10  warrant.  Kane Marceaux was told that he needed to assist the

11  police department, the metro narcotics, and he was –– which is a

12  normal procedure.  Many times there's special occasions where the

13  police department overrules DEA because that's the parent agency

14  and says you need to assist us for manpower purposes, but

15  actually DEA was not invited on that search warrant and we did

16  not participate.

17  Q     Were you involved in any of the search warrants?

18  A     No, I was not.

19  Q     Were you aware that Agent Ryan Shanahan was the agent for

20  the Lafayette Metro Narcotics investigation in December, January,

21  February, March?

22  A     Yes.  He could have been.

23  Q     Were you present for a meeting and a search on

24  December 16th of the warehouse at 310 Pinehurst in Lafayette?

25  A     On the 16th, yes, I was.

```
1    Q    So you did participate in some of the search warrants?

2    A    Not on the 8th.  I participated after that.  We were not

3    invited to that search warrant.  We received no calls from metro

4    asking us to participate.  Subsequent to that they asked for our

5    assistance on a few matters relating to the synthetic drug

6    industry and this happened after the search warrants.  I sort of

7    invited myself to that search warrant on Pinehurst after the fact

8    to gather more facts for them, for their investigation.  Also, I

9    started to take an interest in the investigation as well.

10   Q    Well, the case report indicates that you were present for a

11   debriefing on the 16th that was conducted by Captain Vincent.

12   Do you remember that?

13   A    Yes.

14   Q    And I'm also going to show you a copy which is with the

15   application -- or the affidavit for the search warrant.  You can

16   see where I have it highlighted.  It shows Agent Ryan Shanahan,

17   assigned case agent for the operation.  So there was no mystery

18   that Agent Ryan Shanahan was the case agent for the state case?

19   A    Correct.

20   Q    And you had some involvement as early as mid-December in

21   this case?

22   A    Well, immediately after the search warrant there were

23   some -- they asked for some information, and they started to show

24   me some of the evidence gathered in the search warrants that were

25   on the 8th.  That's when I started to get involved.
```

1    Q    Okay.  And when did you first determine AM-2201 was a

2    controlled substance analogue under the Analogue Act?

3            MR. WALKER:  I'm going to object.  I don't know the

4    relevance of this for the prosecutorial misconduct motion.

5            THE COURT:  I have the same question.

6            MR. STANFORD:  I'm sorry, Judge?

7            THE COURT:  I have the same question.  What's the

8    relevance of this?

9            MR. STANFORD:  Well, Judge, it goes to partly the

10   *Garcia* hearing for purposes of whether anybody with the

11   Curious Goods operation knew that AM-2201 was a controlled

12   substance analogue, and I'm asking Agent DeSalvo because he

13   testified that he knew at some point in time that it was.

14   I wanted to question him when specifically did he know and how

15   did he know that.

16           MR. WALKER:  And, Your Honor, I would object to that.

17   It's not relevant for the purpose of this hearing.

18           THE COURT:  I'm going to let him answer, but I don't

19   really see the relevance.  I remember the testimony from the

20   *Garcia* hearing very well.

21           You may answer.

22           THE WITNESS:  The date exactly I don't recall.  What I

23   did was once I was told the chemical in question, which was going

24   to be after December 8th, I contacted DEA chemists and said can

25   you tell me what you know about AM-2201.  That's when they

 1    advised it was an analogue.

 2    BY MR. STANFORD:

 3    Q     Do you remember which chemist you spoke to?

 4    A     I spoke to a lot of chemists.

 5    Q     With the DEA?

 6    A     Yes.

 7    Q     Prior to December 8th had you received anything in your

 8    field office from the DEA advising you which substances the DEA

 9    considered to be controlled substance analogues?

10             MR. WALKER:  I again object.  It's not relevant.

11             THE COURT:  Sustained.

12    BY MR. STANFORD:

13    Q     You testified --

14             MR. STANFORD:  And, Judge, just for the record, I'm not

15    trying to rehash the Garcia hearing, but I am making a new record

16    in these proceedings.

17             THE COURT:  I understand that.

18             MR. STANFORD:  The Court may be aware of what was said.

19    If another tribunal has to review it, they won't know it, so...

20             THE COURT:  Part of the reason we're having this

21    hearing, Mr. Stanford, as I told you before, was that a lot of

22    your allegations come from another criminal proceeding, so I am

23    going to give you some leeway to create that record in this

24    proceeding, but we're not going to sit here and have an

25    examination of Agent DeSalvo on the issue of whether something is

1     or isn't a controlled substance analogue or when they became

2     aware of it because it's not relevant to the issue of

3     prosecutorial misconduct.

4     BY MR. STANFORD:

5     Q    You stated -- you testified in May at the last hearing that

6     a ban was passed due to serious concerns and public safety

7     concerns?

8     A    Which hearing?  You said last hearing.  Which hearing?

9     Q    I'm sorry.  The May 14th hearing, the *Garcia* hearing.

10    A    Okay.

11    Q    Do you remember testifying that the emergency ban was

12    enacted due to serious concerns and public safety concerns?

13    A    It was a long time ago.  I would have to see a transcript.

14    I don't recall exactly what I said.

15               THE COURT:  I've got one.

16               THE WITNESS:  Thank you, Your Honor.

17    BY MR. STANFORD:

18    Q    At page 11, lines 22 to 25.

19    A    Okay.  I see that.

20    Q    Okay.  Now, in talking to witnesses, specifically

21    Mr. Paul Buswell and Mr. Richard Buswell, you also mentioned

22    serious safety concerns and issues that the DEA had regarding

23    synthetic cannabinoids; isn't that true?

24               MR. WALKER:  Again, I object to relevance.

25               THE COURT:  Overruled.

```
 1              You can answer it.
 2              THE WITNESS:  Yes.
 3  BY MR. STANFORD:
 4  Q    And you made comments to Mr. Paul Buswell and
 5  Mr. Richard Buswell -- Mr. Paul Buswell on February 15th and
 6  Mr. Richard Buswell on April 5th -- that you had received
 7  information directly about instances of serious injury or deaths,
 8  emergency room visits.  Is that true?  Do you have any
 9  information from anyone in the Lafayette or Louisiana area
10  regarding ER visits, deaths, serious injuries from the use of
11  Mr. Miyagi?
12  A    Well, I don't know if I recall saying it was for Mr. Miyagi.
13  From this industry, yes, I do have information.
14  Q    Okay.  I'll narrow it.
15              Do you have any information regarding Mr. Miyagi, that
16  Mr. Miyagi has caused any injuries, slight or otherwise?
17  A    I believe so, but not in particular.  I don't know if it was
18  in Louisiana.  I don't recall exactly.  I generally was speaking
19  going the industry itself.
20  Q    And not Mr. Miyagi?
21  A    Not necessarily Mr. Miyagi.  I didn't personally know of a
22  individual that was smoking Mr. Miyagi that had those instances.
23  Q    Okay.  And since those instances, you don't have any
24  additional information, do you?
25  A    No.
```

1  Q    Now, you were aware during the course of your investigation

2  that JWH-018, which is one of the five banned substances, was

3  never in the Mr. Miyagi product?

4  A    Honestly not that I know of, correct.

5  Q    Well, you interviewed Mr. Thomas Malone and Mr. Drew Green,

6  correct?

7  A    Will White interviewed them.  I participated in part of the

8  interviews.

9  Q    Okay.  And you are Mr. White's supervisor?

10  A    Correct.

11  Q    Did you interview here in Lafayette or in Georgia?

12  A    I talked to him in Lafayette, I believe.

13  Q    When you say "him," Mr. Malone and -- both Mr. Malone and

14  Mr. Green?

15  A    Yes.

16  Q    Okay.  And on July 19th, 2012, you also interviewed

17  Mr. Boyd Barrow in Atlanta; isn't that correct?

18  A    I'm sorry?

19  Q    In Georgia.

20  A    Boyd Barrow?

21  Q    Boyd Barrow.

22  A    No, I don't think so.

23  Q    There's a GBI investigative report -- actually an affidavit

24  where GBI Agent Ken Howard is noting an interview with Mr. Boyd

25  Barrow of July 19th, 2012, in which you and Agent White

```
 1   participated?
 2   A    It wasn't in Georgia.  It was at Tim Meche's office in
 3   New Orleans.
 4   Q    Okay.  My apologies.
 5   A    If that's the one that we interviewed.  I recall an
 6   interview in New Orleans.
 7   Q    Okay.  Now, as far as Mr. Malone and Mr. Green, you were
 8   aware, after interviewing them and receiving documents concerning
 9   their involvement in NutraGenomics, that they were also involved
10   in a number of other companies besides NutraGenomics?
11           MR. WALKER:  And I would object again, Your Honor, to
12   relevance.
13           THE COURT:  What's the relevance of that, Mr. Stanford?
14           MR. STANFORD:  Judge, part of my motion for
15   prosecutorial misconduct is selective prosecution, vindictive
16   prosecution, and misstatement of facts.  For me to be able to get
17   into those specific areas later, I need to lay a foundation.
18           And under the definition of relevant evidence, it means
19   any evidence having any tendency to make the existence of any
20   fact that is of consequence to the determination of the action
21   more probable or less probable than it would be without the
22   evidence.
23           Specifically I think this evidence is probative of the
24   proposition that I'm attempting to prove up, and the proposition
25   is of consequence to the determination of the issues that have
```

 1    been presented in my motion.

 2            MR. WALKER:  And, Your Honor, I would submit that a

 3    motion to dismiss and a hearing on a motion to dismiss is not a

 4    fishing expedition.  It should be narrowly tailored to the

 5    matters that were submitted in the motion.

 6            THE COURT:  Mr. Stanford, I'm not following this.

 7    Mr. Malone and Mr. Green were both prosecuted in this case, and

 8    if you're saying it's a selective prosecution or a vindictive

 9    prosecution, I'm not following your analysis because both of

10    those gentlemen were prosecuted.

11            MR. STANFORD:  They are being prosecuted, Judge, but

12    selectively, and for me to get what I need to prove to the Court,

13    I need to lay a foundation with this witness.  And I'm not going

14    to belabor the point.  I'm just asking him general background

15    questions and not getting into the specifics, but I need that as

16    a foundation.

17            THE COURT:  Overruled.

18            Go ahead, Agent DeSalvo.

19    BY MR. STANFORD:

20    Q     You are aware that Mr. Malone and Mr. Green primarily

21    operated out of NutraGenomics Corporation –– or LLC.  Is that

22    accurate?

23    A     That's accurate.

24    Q     And under that general company they had at least eight or

25    nine other companies that they also ran in conjunction with

```
 1   NutraGenomics?
 2   A    Eight or nine.  I'm not aware of exactly how many companies.
 3   Q    Would it be Nature's Euphoria, Nature's Science, Blue Moon
 4   Holding?
 5   A    It could be, yes.
 6   Q    Bottom Line Marketing?
 7   A    It could be.
 8   Q    Coalition for Cognitive Liberty, GTM Management, Biogenics,
 9   Dungeon Family?
10   A    Several of those I've never heard of before.
11   Q    Okay.  And the last question on that is, during the course
12   of the investigation you learned through looking at various
13   transactions that approximately $10,000,000 were shuffled between
14   a number of these companies between January of 2011 and May of
15   2012.  Is that accurate?
16   A    I recall $10,000,000 on some tax forms, but whether or not
17   it was actually shuffled between companies, I honestly -- that
18   part of the investigation was handled by Special Agent Harbourt.
19   Q    Okay.  You were aware in conducting your interviews that
20   NutraGenomics and/or Mr. Malone and Mr. Green were responsible
21   for creating Mr. Miyagi?
22   A    Yes.
23   Q    Were you told the first substance that was used or the first
24   chemical used in the Mr. Miyagi product?
25   A    I do not recall.
```

1    Q      But you do know that it was not JWH-018?

2    A      Honestly I don't recall that.

3    Q      And NutraGenomics began manufacturing, labeling, and

4    packaging Mr. Miyagi sometime in April or May of 2010?

5    A      That's possible.  I don't recall exactly.

6    Q      And in talking to Mr. Malone and Mr. Green and looking at

7    the records, there's no evidence that I've ever had any contact

8    with NutraGenomics, is there?

9    A      No.

10   Q      And there's no evidence that I had anything to do with the

11   formulation of Mr. Miyagi, is there?

12   A      No, sir.

13   Q      Or the manufacturing of Mr. Miyagi?

14   A      No.

15   Q      Or the packaging of Mr. Miyagi?

16   A      No.

17   Q      Or the distribution of Mr. Miyagi?

18   A      At some point in time I think you were involved in part of

19   that toward the tail end of this investigation.

20   Q      What do you consider the tail end?

21   A      After Mr. Buswell, Mr. Richard Buswell, was jailed on the

22   revocation hearing, you got involved.

23   Q      So you're talking after December 15th?

24   A      That's correct.  Well, before and after, but I know for a

25   fact after you were involved in discussions as far as the

1    marketing and sales.

2    Q    Okay.  After Mr. Buswell -- after the raid of

3    December 8th, 2011, was the Mr. Miyagi product ever again sold

4    in Curious Goods, northside or Kaliste Saloom?

5              MR. WALKER:  And, again, Your Honor, I object to

6    relevance.

7              THE COURT:  That's overruled.

8              THE WITNESS:  I don't know if it was or not.  It may

9    not have been.

10   BY MR. STANFORD:

11   Q    Would it be fair to say as far as you know, based on your

12   investigation, after December 8th it was not sold?

13   A    Well, go back to your question.  It may not have been

14   Mr. Miyagi.  It may have been the next product that was going to

15   be called -- that was going to be the new product for

16   Curious Goods.  That's what I'm referring to as far as the

17   marketing and sales.  Mr. Miyagi, I don't know.  I don't have

18   that answer.  I'm sorry.

19   Q    Okay.  So you don't know if Mr. Miyagi was ever sold again

20   at Curious Goods after December 8th, 2011.  Is that your

21   answer?

22   A    I don't believe it was, but I don't know that for a fact.

23   Q    And in conjunction with your investigation, no other

24   potpourri or incense product like Mr. Miyagi was sold in

25   Curious Goods, northside and Kaliste Saloom, the corporate

1    stores, after December 8th, 2011, also?

2    A    No.  They were trying to get a new product.

3    Q    I'm sorry.  My question is not if they were trying, but --

4         THE COURT:  He answered the question.  He said, "No.

5    They were trying to get a new product."

6         MR. STANFORD:  Thank you.

7    BY MR. STANFORD:

8    Q    Now, in conjunction with your investigation, you also

9    interviewed Mr. Pat Chauvin who was an owner of Curious Goods,

10   correct?

11   A    That's correct.

12   Q    And you interviewed him sometime in January of 2011?

13   A    That's possible.

14   Q    Do you recall if you recorded that interview?

15   A    I believe it was recorded, yes.

16   Q    And was a DEA-6 prepared?

17   A    I don't recall.

18   Q    Based on what Mr. Chauvin told you, you learned that he and

19   Mr. Buswell had visited NutraGenomics in January of 2011?

20   A    That's possible.  I honestly do not recall the interview

21   that well.  He was interviewed.  There were so many interviews, I

22   honestly just can't recall exactly what each person stated.

23   Q    Now, when you interviewed Mr. Boyd Barrow in July at

24   Mr. Meche's office in New Orleans, that would have been the

25   summer of 2012 after he was indicted on the first indictment, but

1    before the superceding indictment.  Do you remember that

2    interview?

3    A     Yes, I do remember the interview.

4    Q     Okay.  Mr. Barrow also confirmed to you that JWH-018 was

5    never a substance in Mr. Miyagi.  Isn't that true?

6    A     Honestly I do not recall exactly what he stated in that

7    interview.  I would have to have --

8    Q     Was a DEA-6 prepared?

9    A     I'm sure it was, yes.

10    Q     Was a recording made of that interview?

11    A     No, it was not.

12    Q     And during that interview Mr. Barrow told you that he had

13    contacted -- his criminal lawyer in Atlanta was a man named

14    Jim Peters.  Do you remember that?

15              MR. WALKER:  I object, Your Honor, to relevance.

16              THE COURT:  What's the relevance of this, Mr. Stanford?

17              MR. STANFORD:  I'm getting to -- the relevance is,

18    Judge, it regards an Attorney General letter or notice of the

19    Attorney General, which I think the agent was confused and

20    misstated at the *Garcia* hearing and perhaps at the Grand Jury,

21    and I just -- I want to -- there's two things that I need to go

22    over with this agent to make sure that -- what I'm trying to

23    determine is whether he knew this information and whether he

24    perhaps misstated this information at the hearing or to the

25    Grand Jury.

```
 1              THE COURT:  Objection overruled.  You can answer it.
 2  BY MR. STANFORD:
 3  Q    Did you learn that Mr. Barrow had a lawyer in Atlanta by the
 4  name of Jim Peters?
 5  A    Yes.
 6  Q    And that Mr. Barrow asked Mr. Peters to contact the
 7  Georgia Attorney General's Office regarding the sale of
 8  Mr. Miyagi, the Mr. Miyagi product, to determine whether he could
 9  or he couldn't?
10  A    I vaguely recall something about that, yes.
11  Q    And also in your interview with Paul Buswell on
12  February 15th you brought up the question of whether or not
13  there was an Attorney General letter that was ever circulated
14  around and specifically whether or not I had an Attorney General
15  letter.  Do you remember asking Mr. Paul Buswell that?
16  A    Yes.  Several individuals said you did have a letter.
17  Q    Okay.  And Mr. Buswell told you that the Attorney General
18  letter was referring to Dan Francis.  Do you recall when he told
19  you that?
20              THE COURT:  Which Mr. Buswell?
21              MR. STANFORD:  Mr. Paul Buswell.
22              THE WITNESS:  Mr. Paul Buswell could have said that.  I
23  don't recall if he said Dan Francis.  He may have, but several
24  individuals said you had the letter.
25              MR. STANFORD:  Judge, I had the February 15th, 2012,
```

```
 1    interview with Mr. Paul Buswell transcribed.  I don't know if the
 2    Court will allow me to use the transcription that I've made,
 3    which is by the same person who made the April 5th, 2012,
 4    transcription of Mr. Richard Buswell's interview that I think the
 5    Court has read, but I was going to give a copy to Mr. DeSalvo so
 6    that he could follow along on some key points that I'm going to
 7    make during this part of the examination.
 8                THE COURT:  Any objection, Mr. Walker?
 9                MR. WALKER:  I haven't seen the transcript.  I haven't
10    been able to review the transcript, and so --
11                MR. STANFORD:  I just got it yesterday.
12                MR. WALKER:  Can the defense tell me who it is that
13    made the transcript?
14                MR. STANFORD:  Ms. Amber Taylor.  She's the same
15    transcriptionist who did the April 5th, 2012, interview with
16    Agent DeSalvo and Agent White that I provided to the
17    U.S. Attorney's Office.
18                MR. WALKER:  Your Honor, my issue is I just haven't
19    been able to review it, so I can't say.
20                THE COURT:  Why don't we take it question by question
21    and see how it goes.
22                MR. WALKER:  Sounds good.
23                THE COURT:  Ms. Taylor did the other one.  I've already
24    read that one.  So we'll take it question by question.
25    BY MR. STANFORD:
```

1   Q    Could you turn to page 25.  Do you see in the middle of the

2   page where it says -- you're saying, "He had a letter from the

3   State of Louisiana?"  And Paul Buswell said, "We were told that."

4   A    Yes.

5   Q    And Mr. White said, "It was not Stanford, it was Francis?"

6   And Paul Buswell said, "Francis."

7   A    Yes.  He was surprised because everyone else told us it was

8   you.

9   Q    And no one has ever said that they actually saw this letter?

10  A    No.  Mr. Domingue explained that you told them or others

11  that you had the letter, and as everyone was arrested, it became

12  that it was a phone call.  Then Mr. Domingue said he believed

13  that it probably wasn't a phone call.

14  Q    Okay.  Now, the next individual I'm going to talk to you

15  about is Preston James Ackerman.  Do you remember being involved

16  in an interview of Mr. Ackerman on July 25th, 2012, in Georgia?

17  A    July 25th?

18  Q    Yes.

19  A    In Georgia?

20  Q    That would be the day they did the search warrants at

21  NutraGenomics.

22  A    Yes, yes, yes.

23  Q    Okay.  And you were -- you, Agent White, and Agent Howard --

24  yeah, Ken Howard -- interviewed Mr. Preston James Ackerman on

25  that date, correct?

1    A    Yes.

2    Q    Was that interview recorded?

3    A    Not to my knowledge.

4    Q    Was a DEA-6 made of that?

5    A    I believe so.  If not, there was a GBI report.

6    Q    And one of the discussions with Mr. Ackerman was the fact

7    that you discussed lab reports, that NutraGenomics maintained lab

8    reports on all products, correct?

9    A    I honestly do not recall the conversation.

10   Q    And Mr. Ackerman also confirmed for you and Agent White that

11   JWH-018 was never used in Mr. Miyagi?

12   A    I don't even recall what Preston Ackerman looks like to be

13   honest with you.

14   Q    Did you or Agent White or any of the federal investigators

15   working the Curious Goods case, did you ever issue a subpoena for

16   Mr. Drew Green or Thomas Malone to their internet provider for

17   all of their e-mails to business associates and whomever for a

18   certain time frame?

19           MR. WALKER:  Objection to relevance.

20           THE COURT:  Mr. Stanford?

21           MR. STANFORD:  Judge, I'm trying to find out if the

22   government is in possession of these lab reports.  I have one

23   e-mail from Thomas Malone to Mr. White where there's a DEA-6 note

24   that Agent DeSalvo saw where he's contacted the RTP Labs,

25   Alston Sykes, and attached 22 lab reports, but those are not in

```
 1    our discovery packet.

 2               MR. WALKER:  Your Honor, this is not a discovery

 3    motion.  This is a motion to dismiss.  The questions he's asking

 4    are not relevant for the purpose of this.

 5               MR. STANFORD:  The question I asked was did they issue

 6    a subpoena to the internet provider for the e-mails of Mr. Malone

 7    and Mr. Green.

 8               THE COURT:  And am I correct, Mr. Stanford, the purpose

 9    of this question is to see whether or not there is information

10    out there that has been withheld from you?

11               MR. STANFORD:  Relevant information that is being

12    withheld, yes, sir.

13               THE COURT:  Answer the question.

14               THE WITNESS:  It depends on the date.  There were some

15    subpoenas sent, but I left right after the indictment.  The

16    investigation continued.  They may have issued subsequent

17    subpoenas without my knowledge.  I have been out of the loop for

18    a good part of six, eight months.

19               THE COURT:  Let me ask you this, Agent DeSalvo.  When

20    were you no longer involved in the investigation in this case?

21    When did your involvement stop other than having to come here and

22    testify?

23               THE WITNESS:  Probably the end of last year.  I

24    received the orders for my transfer in September of 2012.  At

25    that point I started to wind things down and kind of move out of
```

1    the role I was in prior to that, but the end of the year -- the

2    end of December were my last days here.

3    BY MR. STANFORD:

4    Q    December of 2012?

5    A    Yes, about December of 2012, the beginning of 2013.

6    Q    I'm going to show you a DEA-6.

7         THE COURT:  Mr. Stanford, do you know how to make that

8    a little bit bigger so that we can see it?  Agent DeSalvo has

9    great eyes, but the old guy up here doesn't.

10        MR. STANFORD:  Do you want me to zoom in, Judge?

11        THE COURT:  Just a little bigger so I can read it if

12   you don't mind.

13        Thank you.  There you go.

14        THE WITNESS:  Okay.  Yes.  I may have approved that

15   report, yes.  That was about two weeks after I received my

16   orders.

17   BY MR. STANFORD:

18   Q    Okay.  So is it usual for the DEA to allow defendants and

19   defendants who have pled guilty to decide what information or

20   evidence they want to turn over to the DEA after the fact?

21   A    If he's cooperating, he's going to provide information over

22   to us pursuant to his agreements with the U.S. Attorney's Office.

23   Q    And this kind of dovetails back into -- it's a five-page

24   document and it makes reference to the fact that he's attached

25   22 lab reports, but it kind of dovetails into did your agency --

1    if you're interested in this information, did you do a subpoena

2    to his internet provider to capture all of his e-mails to

3    whomever he would have sent, including Mr. Sykes, and received

4    during the relevant time period of the indictment?  Did you do

5    that?

6    A    I believe there was a search warrant on Mr. Sykes' computers

7    and I believe there was a search warrant -- not that we

8    conducted, but there was a search warrant on NutraGenomics'

9    e-mail accounts.  I recall that, but I wasn't a part of the

10   discovery process whatsoever, so I don't know what was turned

11   over or not.

12   Q    Well, I understand that, and I'm not asking you to guess at

13   what was turned over or not, but I'm merely questioning you

14   about --

15   A    There were certain -- there were subpoenas sent to

16   NutraGenomics, Pinnacle, a variety of e-mail accounts, yes, and

17   there was information that was recovered.  That part of the

18   investigation was handled by Agent Erol Catalan, so I didn't see

19   everything that was recovered.  There was so much information, I

20   didn't review everything, but I know that there was a lot

21   recovered from NutraGenomics, Pinnacle, all those accounts which

22   had e-mails from Drew Green and Tommy Malone.

23            MR. STANFORD:  At this time, Judge, I'd like to offer,

24   file, and introduce this DEA-6 which is in globo.  It's a

25   five-page document that I've marked as S-4.  My prior exhibits

```
 1    were S-3, then S-5 and 6, so I'm going to fill in the gap with

 2    S-4.

 3                  THE COURT:  Any objection, Mr. Walker?

 4                  MR. WALKER:  No, Your Honor.

 5                  THE COURT:  Without objection, let it be admitted.

 6    BY MR. STANFORD:

 7    Q    And for ease of reviewing, Agent DeSalvo, I'll provide you

 8    with a copy.  Did the DEA issue a search warrant and/or receive

 9    all of the lab reports from RTP Labs that deal with

10    NutraGenomics, Pinnacle Products?

11                  THE COURT:  Those are two questions, Mr. Stanford.

12                  MR. STANFORD:  I'll break them down one at a time.

13                  THE COURT:  Thank you.

14    BY MR. STANFORD:

15    Q    Did you do a search warrant and receive lab reports from RTP

16    Labs -- do a search warrant on RTP Labs and receive lab reports

17    from RTP Labs regarding NutraGenomics?

18    A    Yes.  We didn't, not this office, no.

19    Q    Which office did that?

20    A    It was out of the office based wherever Triangle Park Lab is

21    located, which is in, I think, the Carolinas.

22    Q    Did that office share that information with you, with your

23    office?

24    A    I believe so.

25    Q    Okay.  And if you look at the third page, three of five, at
```

1    the bottom Mr. Malone is -- he's sending you an e-mail from

2    Alston that had 22 lab reports attached.  Did you receive the 22

3    lab reports?

4    A    I personally, no.  Agent White probably received them.

5    Q    Okay.  And you assume that they were turned over to the

6    government?

7    A    I honestly don't know.

8    Q    I'm going to show you an e-mail.  Here's the cover page.

9    It's submitted by Drew Green on August 28th of 2012 and it's

10   invoices from NutraGenomics to Pinnacle Products and

11   Richard Buswell.  On August 28th, 2012, Mr. Green had not pled

12   guilty yet; isn't that true?

13   A    I don't know the date that he pled guilty.

14   Q    He was indicted September 4th of 2012, so on this date he

15   would not have already pled guilty?

16   A    He was indicted when?

17   Q    September 4th, 2012, in the superceding indictment.

18   A    Okay.  That's possible.

19   Q    So was Mr. Green and Mr. Malone cooperating with DEA prior

20   to his indictment?

21   A    Yes, he was.

22   Q    And is it common for the DEA to allow cooperating witnesses

23   who are targets to provide information to your agency on, I

24   guess, an as needed or need to know basis from them to you?

25   A    I do not understand your question.

1   Q    Well, it appears that -- let me talk about NutraGenomics.

2   Did you do a search warrant of NutraGenomics and capture all of

3   the invoices, paperwork, that NutraGenomics did between

4   NutraGenomics and whomever their customer base was around the

5   country, but specifically with Pinnacle and Curious Goods?

6            MR. WALKER:  And, again, Your Honor, I object to

7   relevance for this motion.

8            THE COURT:  Relevance, Mr. Stanford?

9            MR. STANFORD:  Judge, I'm trying to lay a foundation to

10  determine, based on this e-mail and other e-mails, what this

11  agent knew prior to the indictment with regards to Mr. Miyagi and

12  the practices and procedures of NutraGenomics and

13  Pinnacle Products.

14           MR. WALKER:  And for the purpose of this motion, that's

15  not relevant, Your Honor.  Beyond that, the argument that he's

16  simply laying groundwork, if he wants to direct his attention to

17  a specific e-mail, that's one thing, but he's attempting to get

18  background information that goes beyond the motion.

19           THE COURT:  I agree.

20           MR. STANFORD:  I'm talking about --

21           THE COURT:  I agree.  Objection sustained.

22  BY MR. STANFORD:

23  Q    I'll show you the third page of this document which is one

24  evidencing the August 28th, 2012, Drew Green e-mail providing

25  invoice orders for Pinnacle Products and Richard Buswell.  And

1    now I'm at the bottom here.  That would be your signature on it;

2    is that correct?

3    A   Yes.

4          MR. STANFORD:  I'd like at this time to offer, file,

5    and introduce that as S-7.

6          THE COURT:  Any objection, Mr. Walker?

7          MR. WALKER:  Your Honor, I don't see the relevance of

8    the document, so I would object.

9          THE COURT:  Overruled.  Let it be admitted.

10   BY MR. STANFORD:

11   Q   The next documents I'm going to show you, Agent DeSalvo, are

12   the actual invoices that were provided to your office by

13   Mr. Green on August 28th of 2012.  It's an in globo offering.

14   There were a number of invoices that were provided, but it

15   appears from the batch that I got, the earliest invoice between

16   NutraGenomics and Pinnacle was August 25th of 2010.  Can you

17   see that?

18   A   Yes.

19   Q   And it was for the Mr. Miyagi product?

20   A   Yes.

21         MR. WALKER:  And, Your Honor, absent there being

22   something to justify its introduction, I don't see how these

23   invoices are in any way relevant to the defense motion.  They

24   weren't in any way noticed in this motion and they don't in any

25   way demonstrate misconduct.  Clearly we turned them over to him,

```
 1   so he can't argue it wasn't in discovery.

 2           MR. STANFORD:  Well, I just have a specific question

 3   concerning these.

 4           THE COURT:  I understand where you're coming from.  The

 5   objection is overruled.

 6   BY MR. STANFORD:

 7   Q    Now, given the invoices and the background, you established

 8   that Pinnacle Products began handling Mr. Miyagi as early as

 9   August 25th of 2010, correct?

10   A    Yeah, but just because those are the documents we have

11   doesn't mean that it didn't happen prior to that.  Those are a

12   certain batch of documents that --

13   Q    But if that's the earliest date we have, we know for sure

14   that at least by August --

15   A    At least by that, yes.  According to those documents, yes.

16   Q    And based on your investigation, were you able to determine

17   the active ingredient or chemical that was being utilized in the

18   Mr. Miyagi product in August of 2010?

19   A    Based on that document?  If I could see it, I would tell

20   you, but I cannot see it.  This monitor isn't working.  I don't

21   see anything on this monitor.

22   Q    And while you have all the copies, I would ask that you look

23   through them, and the same question would apply to the other

24   invoices as well.

25   A    And your question is -- I'm sorry.
```

1    Q     Do you know what the active ingredient or the chemical

2    substance in Mr. Miyagi was back in August of 2010?

3    A     I do not.

4    Q     Did you ever question Mr. Malone or Mr. Green specifically

5    about that topic?

6    A     I didn't.  Mr. White may have.

7    Q     Did you review any information regarding that topic?

8    A     Not prior to this hearing, no.  He may have said it to me

9    and I may have asked the question, but I do not recall if that

10   question was posed or answered.

11   Q     And the reason I ask these questions, for the relevancy, is

12   that the government is alleging in the indictment that at some

13   point -- and in the plea agreements of Mr. Malone, Green, Barrow,

14   and Espinoza -- that they stopped using JWH-018 and began using

15   AM-2201 in an attempt to circumvent the law.  Do you follow me?

16   A     Yes.

17   Q     Okay.  Based on the information you gathered through witness

18   interviews and documents, you know, number one, JWH-018 was never

19   used in Mr. Miyagi, right?

20           MR. WALKER:  I would object, Your Honor.  That

21   mischaracterizes his prior testimony.

22           THE COURT:  He's called under cross.  You can handle

23   that question.  The objection is overruled.

24           THE WITNESS:  I honestly do not recall if that

25   statement was made, if JWH was used.  I know JWH was found in

1    some of the products that we recovered, but whether or not they

2    used that -- the industry used -- many of them used JWH and moved

3    to AM-2201.  I do know that.

4    BY MR. STANFORD:

5    Q    Okay.  Well, I'm trying to be very specific.  It's not the

6    industry, but these companies and the issues that are before this

7    Court on this motion.

8    A    And I don't know.

9    Q    So it would be fair to say you have never received any

10   information from anyone that JWH-018 was ever used in Mr. Miyagi.

11   That's a fact, isn't it?

12   A    I'm not saying it's not a fact.  I'm saying we may have

13   received that information.  I just don't recall if we did or not.

14   There were so many interviews conducted, so many individuals we

15   spoke to, I just don't recall.

16   Q    Well, Mr. Malone and Mr. Green were the creators of

17   Mr. Miyagi at its inception.  They never told you -- more

18   specifically, they did tell you that JWH-018 was never, ever used

19   in Mr. Miyagi.  Isn't that a fact?

20   A    I don't recall them saying that.

21        MR. STANFORD:  At this time, Judge, I would like to

22   offer, file, and introduce the NutraGenomics invoices for

23   Pinnacle Products marked as S-8 into the record.

24        THE COURT:  Any objection, Mr. Walker?

25        MR. WALKER:  No, Your Honor.

 1              THE COURT:  Without objection, let it be admitted.

 2    BY MR. STANFORD:

 3    Q     Do you know if any of Drew Green's assets, including money,

 4    bank accounts, property, was seized pursuant to this

 5    investigation?

 6              MR. WALKER:  Objection to relevance.

 7              MR. STANFORD:  That goes to the selective and

 8    vindictive portion of my motion, Judge, because it appears that

 9    just me and Mr. Domingue are charged with money laundering.  And

10    I'm specifically charged with a specific count of forfeiture that

11    I'm going to dive into in more detail a little bit later, but I'm

12    asking this agent, just in overview, does he know whether or not

13    any of Drew Green's bank accounts, personal assets, property,

14    were seized as a result of this investigation.

15              MR. WALKER:  And I still submit it's not relevant for

16    this hearing.

17              THE COURT:  Well, I see his point, Mr. Walker, on the

18    selective prosecution.

19              But isn't it true, Mr. Stanford, that there is a

20    forfeiture count against Mr. Green?

21              MR. STANFORD:  There's a forfeiture count, yes, against

22    everyone, Judge.  My question was up to now has anything been

23    seized.

24              THE COURT:  All right.  And you're familiar with

25    Mr. Green's plea agreement?

 1              MR. STANFORD:  Right.

 2              THE COURT:  You've read all of that?

 3              MR. STANFORD:  Yes, sir.

 4              THE COURT:  So do we need to ask this question?

 5              MR. STANFORD:  I just want to have it on the record if

 6    this agent knows the answer to that question.

 7              THE COURT:  All right.  I'm going to let him answer it.

 8              THE WITNESS:  I think Mr. Green agreed to -- I think

 9    those assets will be sought by the government.

10    BY MR. STANFORD:

11    Q    When you said "agreed to," that Mr. Green is going to do

12    what?  He is going to decide what assets he's going to turn over

13    to you at some point in time?

14    A    That's between -- that was between the attorneys, the

15    U.S. Attorney and his attorney.

16    Q    I'm not asking for you to speculate about that.  I'm only

17    asking about what you know specifically because you were involved

18    in debriefings with Mr. Green before he pled and after he pled,

19    right?

20    A    Yes.

21    Q    Were there any discussions about seizing any of his assets

22    during any of those meetings you had with him?

23    A    I'm not sure.  I don't know if there were any discussions

24    regarding that.  I believe he did have some assets seized.  I

25    think there were a number of agencies around the country looking

1      to seize his assets, including the State of West Virginia who

2      filed suit against him.  I think at that point most of his assets

3      were hidden I believe is what occurred, so we had to -- and

4      Special Agent Harbourt was looking at those assets, but we fully

5      intend to seize those assets, forfeit those assets.

6      Q      Whatever assets you're able to locate?

7      A      That's exactly correct.  And Mr. Malone.  It goes for

8      Mr. Malone as well.

9      Q      Did you or any of your agents, the agents working with you

10     in conjunction with this investigation, attempt to seize or

11     freeze any of Mr. Green's or Mr. Malone's bank accounts?

12     A      I think the GBI agents had identified some of those bank

13     accounts, and I don't think we -- and Special Agent Harbourt.  I

14     don't think there was anything significant in those bank

15     accounts.  Again, I think they were basically playing a shell

16     game at that point.  They knew that time was limited and there

17     was a nationwide push on this.  It was called Operation Log Jam.

18     Many people knew what was going on.  Certainly it wasn't

19     created -- Operation Log Jam with all the arrests and all the

20     seizures wasn't created for the purpose of selective prosecution.

21     We, as an agency, this was our big push --

22              THE COURT:  All right.  Agent DeSalvo, that was a

23     pretty short question calling for a pretty short answer, so I'm

24     going to ask you -- we'll be here for days and days at this rate.

25              The question was, "Did you or any of your agents, the

```
1   agents working with you in conjunction with this investigation,
2   attempt to seize or freeze any of Mr. Green's or Mr. Malone's
3   bank accounts?"  I don't want to know what happened in West
4   Virginia or anywhere else.
5           THE WITNESS:  At the time if there were assets to be
6   seized, we would have seized them.  We were unable to find or
7   locate assets.  We did attempt to.
8           THE COURT:  Okay.  Next question.
9           MR. STANFORD:  Thank you, Your Honor.
10           THE COURT:  You're welcome.
11  BY MR. STANFORD:
12  Q    Based on reports that I reviewed of your investigation, the
13  only assets seized were actually Preston Ackerman's two bank
14  accounts and one E-Trade account in July of 2012; isn't that
15  true?
16  A    Yes.
17  Q    For a total of $227,535.26?
18  A    That's correct.
19  Q    Has Mr. Ackerman been charged -- he hasn't been charged in
20  this indictment, correct?
21  A    Not in this indictment, no.
22  Q    Are you aware if he's charged in any other jurisdiction?
23  A    I don't know.
24  Q    Now, I want to talk to you about some other e-mails between
25  your office and Mr. Malone.  Can you read this, Agent DeSalvo, on
```

1    your monitor?  I noticed earlier —

2    A    My monitor is not working, no.  I can squint.

3              THE COURT:  We're putting in a new phone system today,

4    so our IT guys are a little busy, but I'll try to get that taken

5    care of during the break.

6              THE WITNESS:  That's fine.  It's making me realize I'm

7    older than I wish.  Forty-five is when everything goes downhill,

8    I believe.

9              THE COURT:  You'd better stop while you're ahead,

10   Agent DeSalvo.

11             MR. STANFORD:  I agree with you, Judge.  He doesn't

12   have nearly as much gray in his whiskers as you or I.

13   BY MR. STANFORD:

14   Q    I'm showing you what is a DEA-6 Report of Investigation for

15   August 20th, 2012.  It looks like a proffer of Tommy Malone

16   that occurred at the U.S. Attorney's Office here in Lafayette.

17   Do you recall that event?

18   A    Yes.

19   Q    And you were present for that meeting with Mr. Malone?

20   A    Yes.

21   Q    And that was before Mr. Malone was indicted, correct?

22   A    Yes.

23   Q    And Mr. Malone provided you with minutes from the

24   Coalition for Cognitive Liberty meetings on February 14th,

25   2011, at the Las Vegas — the Royal Hotel in Las Vegas?

1    A     February 14th, 2011, yes.

2    Q     Did you turn over those minutes to the U.S. Attorney's

3    Office?

4    A     Did I?

5    Q     Or your office.  And the reason I ask is because we have the

6    DEA-6, but not the actual minutes.

7    A     I didn't personally turn it over, no.  It could have been

8    turned over, but not by me.

9    Q     Now, when you met with Mr. Malone, he told you that

10   February 14th of 2011 in Las Vegas was the CHAMPS convention,

11   correct?

12   A     He may have.

13   Q     And can you tell the Court what the CHAMPS convention is?

14   A     I think the CHAMPS convention is just the industry, the

15   synthetic drug industry, where they sell their -- where they

16   market their goods.

17              THE COURT:  Is it C-H-A-M-P-S?

18              THE WITNESS:  I think it is.

19              MR. STANFORD:  And I'm not sure what it's an acronym

20   for.  I've just always heard it referred to as CHAMPS.

21   BY MR. STANFORD:

22   Q     When you're talking about the industry, it's basically what

23   we would call head shops for my generation, smoke shops, those

24   types of stores that sell a multitude of products, not merely

25   synthetic cannabis.  Would that be accurate?

1    A    My understanding is it's the synthetic drug industry, but

2    I've never been to one.  Honestly I didn't think it was head

3    shops.  I thought it was the -- the videos that I saw, they

4    weren't selling pipes.

5    Q    Okay.  Now, you also received -- and I'm going to show you

6    on the monitor -- minutes from a December 10th and

7    11th Coalition for Cognitive Liberty meeting, the first meeting

8    that was held in Roswell, Georgia.  Do you remember reviewing

9    that as part of your investigation?

10   A    I never reviewed that, but Agent White may have.

11   Q    And in reviewing the minutes, it appears that it was a

12   two-day meeting, that it was pretty detailed, and there were a

13   number of lawyers involved in that meeting.  It appears that they

14   were discussing, for lack of a better word, industry standards,

15   regulations, new laws coming out, so on and so forth.  Is that

16   characterization accurate?

17   A    That could be.

18   Q    Would you take a moment and just look at the -- did I give

19   you a copy of this?

20   A    No.

21         MR. WALKER:  Your Honor, while he's reviewing it, I'm

22   assuming we're getting to something relevant.  I don't see what

23   the relevance of this line of questioning is at all.

24         THE COURT:  I'm running with you, Mr. Walker.  I'm not

25   sure I see the relevance either, but we'll see what the question

 1    is.

 2              THE WITNESS:  I think I do recall seeing this.  I may

 3    have glanced at it.  I didn't read the whole thing.  And I don't

 4    know who created this document.  I don't know if it's accurate.

 5    I mean, it's someone who put together minutes of a meeting.  I'm

 6    guessing it's an accurate depiction.

 7    BY MR. STANFORD:

 8    Q    And my question is not as to its accuracy, but it appears to

 9    depict that there was a two-day meeting where numerous

10    individuals attended, including several lawyers.

11              MR. WALKER:  If we could just get to the relevant part.

12              THE COURT:  I know what it is now.  Go ahead.

13    BY MR. STANFORD:

14    Q    And they discussed products, laws, regulations as it relates

15    to -- one thing is specifically synthetic cannabinoids, correct?

16    A    Yes.

17    Q    There's also references to lab tests, DEA-approved

18    chemicals, and things like that?

19    A    Correct.

20              MR. STANFORD:  At this point in time, Judge, I would

21    like to offer, file, and introduce these two documents.  The

22    first one, the DEA-6, is S-9, and the December minutes is S-10.

23              THE COURT:  Any objection, Mr. Walker?

24              MR. WALKER:  Apparently you see the relevance that I've

25    missed.

```
 1                  THE COURT:  Well, let me see if I can articulate what I
 2    see the relevance to be.  There is an allegation in the
 3    superceding indictment that Mr. Stanford had attended a meeting
 4    in December of 2011.  It is not the clearest -- it's not as clear
 5    to me as perhaps it is to others why that is particularly in
 6    there, but I suspect his point is there were other meetings and
 7    he doesn't think any of those folks are being prosecuted for
 8    having attended a meeting.
 9                  Am I right, Mr. Stanford?
10                  MR. STANFORD:  You hit the nail on the head, Judge.
11                  THE COURT:  How about that?
12                  MR. WALKER:  Then I don't object to the document.
13                  THE COURT:  Let it be admitted.
14                  MR. STANFORD:  And the marked copy that I have for
15    introduction, Agent DeSalvo is currently looking at.
16                  MR. WALKER:  Can you tell me the defense exhibit number
17    on that?
18                  MR. STANFORD:  The minutes are S-10.
19                  THE COURTROOM DEPUTY:  S-9.
20                  MR. STANFORD:  The DEA-6 is S-9.
21                  MR. WALKER:  And 10 is the minutes?
22                  MR. STANFORD:  And 10 is the minutes.
23                  THE COURT:  Mr. Stanford, let me know when we get to a
24    stopping point so I can give Ms. Bourque a break.
25                  MR. STANFORD:  This would be good.
```

```
 1              THE COURT:  All right.  Let's take a ten-minute recess.
 2                         (RECESS)
 3              THE COURT:  All right.  Court will come to order.
 4   Please be seated.
 5              Mr. Stanford, you may proceed.
 6              MR. STANFORD:  Thank you, Your Honor.
 7   BY MR. STANFORD:
 8   Q    Agent DeSalvo, I want to talk to you for a minute about an
 9   organization that I'm sure you've heard before called the
10   Coalition for Cognitive Liberty.
11   A    Yes.
12   Q    And were you aware that Mr. Drew Green was the founder of
13   that organization?
14   A    I knew he was a part of the organization.  I wasn't clear if
15   he was the founder.
16   Q    And we had just a minute ago looked at the minutes from the
17   Coalition for Cognitive Liberty and some e-mails.  I'm going to
18   show you what I've marked as S-11 for record purposes which is
19   the entire State of Georgia, Secretary of State, incorporation
20   filing.  And if you look on the front page, can you see right
21   over here where it says it was created November 16th, 2010?
22   A    Yes.
23   Q    And I'm going to turn the page real quickly where it says
24   CEO, CFO, and Secretary, Drew Green.
25   A    Yes.
```

```
1    Q    And I'll turn the page again real quickly.  It's just the
2    Certificate of Incorporation.
3              MR. STANFORD:  Just for the record to be clear, I'd
4    like to offer, file, and introduce this as S-11.
5              THE COURT:  Any objection?
6              MR. WALKER:  I object to relevance.
7              THE COURT:  Overruled.  Let it be admitted.
8    BY MR. STANFORD:
9    Q    Now, I'm going to put on the ELMO what I'm going to mark as
10   S-12, which I think is a spreadsheet.  Have you seen this
11   spreadsheet before, Agent DeSalvo?
12   A    I don't recall.  I may have.
13   Q    And I believe it was probably prepared by Agent Harbourt.
14   A    Okay.
15   Q    And it's got a Bates number on it, 38880.
16             MR. WALKER:  We don't object to its introduction.
17             MR. STANFORD:  And I'd like to offer, file, and
18   introduce that as S-12.
19             THE COURT:  Without objection, let it be admitted.
20             Mr. Stanford, can you move it over a little bit so I
21   can see the deposit list, who the deposit is from.
22             MR. STANFORD:  The bottom part, Judge?
23             THE COURT:  Yes, please.
24             Okay.  Thank you.
25   BY MR. STANFORD:
```

1    Q    And there's a second page.  This pages shows who checks were

2    issued to.  I want to direct your attention to Lipitz, Green,

3    Scime & Cambria, which I believe you've seen some documentation

4    in your investigation that they're a law firm out of Buffalo,

5    New York, who did work for NutraGenomics, the Coalition,

6    Mr. Malone, and Mr. Green.

7    A    Yeah.  I'll take your word for it.  I mean, I recall seeing

8    the name.  I don't know if they're out of Buffalo or...

9    Q    And here's another check issued to Mr. Don Wirtshafter who

10   is also a lawyer for the Coalition.  The first check went to the

11   law firm Lipitz, Green in the sum of $88,000.  The second check

12   to the law firm is -- it looks like it's $28,000 to

13   Mr. Wirtshafter.

14   A    Yes.

15   Q    Did you or any of your agents or agents involved in this

16   investigation interview or talk to anybody at the Liptiz, Green

17   firm concerning NutraGenomics or the Coalition?

18   A    No, sir.

19   Q    How about Mr. Wirtshafter?

20   A    No.

21   Q    When you spoke with Mr. Malone and Mr. Green in your

22   interviews, they advised you that they had sought and received

23   legal counsel regarding, I guess, the sale and distribution of

24   their products, correct?

25   A    Yes.

1    Q     And those documents evidence that?

2    A     Yes.

3    Q     Thank you.

4          The next thing I want to talk to you about is

5    Pinnacle Products and specifically Count 4 of the indictment,

6    which is the money laundering count, alleging that on

7    October 28th, 2011, Pinnacle Products and/or Boyd Barrow paid

8    me a 12,500-dollar retainer.  That's kind of a summary of

9    Count 4?

10   A     Correct.

11   Q     Okay.  And that's a 1957 money laundering count.

12         Now, during the course of your investigation of

13   Pinnacle, you discovered that Pinnacle was funneling money to a

14   number of other companies, one of them being Marmalade Skies;

15   isn't that true?

16   A     Yes.

17   Q     And Marmalade Skies is a company that was operated by

18   Mr. Barrow's wife, Kristen Barrow?

19   A     That's correct.

20   Q     And I'm going to show you a summary based on the detailed

21   work that -- I would assume that it's Agent Harbourt who prepared

22   this summary as well.

23   A     It was.

24   Q     And it shows deposits -- if you go down to the bottom -- of

25   $544,094 all from Pinnacle deposited into Marmalade Skies'

1  Wells Fargo account and the account number is right up here?

2  A    Yes.

3  Q    Okay.  Now, if we go down to the bottom, it shows that on

4  September 12th of 2011, that from the Marmalade Skies account,

5  $200,000 was transferred to Heritage Bank to pay off Jim and

6  Eva Barrow's mortgage.  Do you know who Jim and Eva Barrow are?

7  A    I'm assuming Mr. Boyd Barrow's parents.

8  Q    Okay.  And on that same date, $188,413 was transferred to

9  PNC Mortgage to pay off Boyd Barrow's mortgage?

10 A    Correct.

11 Q    And based on this document prepared by Agent Harbourt,

12 there's no question that these monies were generated from

13 Pinnacle funneled into Marmalade Skies and subsequently used to

14 pay off mortgages on two residences?

15 A    Correct.

16        MR. STANFORD:  Okay.  I'd like to offer, file, and

17 introduce this as S-13.

18        MR. WALKER:  No objection, Your Honor.

19        THE COURT:  Without objection, let it be admitted.

20 BY MR. STANFORD:

21 Q    Now, in your investigation, were you aware that after the

22 raid, which is -- I'm using the generic term "raid" for

23 December 8th and I'm not trying to use it in a disparaging way,

24 but after December 8th is it your -- based on your

25 investigation, Mr. Barrow and Mr. Espinoza left Lafayette

1   sometime around December 8th and never returned?

2   A    That's correct.

3   Q    Now, in your investigation did you learn that on

4   January 3rd, 2012, that Mr. Boyd Barrow and his father,

5   Jim Barrow, opened up a Regions Bank account?

6   A    I'm not aware of that.

7            THE COURT:  Mr. Stanford, I want to correct the record.

8   Mr. Barrow and Mr. Espinoza both returned to Lafayette after they

9   were indicted.

10           MR. STANFORD:  You are right, Judge.

11           THE COURT:  Thank you.

12           MR. STANFORD:  It was a huge oversight on my part.

13           THE COURT:  In conjunction with the legal proceedings.

14           MR. STANFORD:  Yes, sir.

15   BY MR. STANFORD:

16   Q    I want to show you a platinum account, and that cover page

17   has the Bates number of 045098, and I believe it shows that the

18   account was opened January 3rd, 2012.  Does that look about

19   right to you, agent?

20   A    That looks correct.

21           MR. WALKER:  Have you marked that for identification?

22           MR. STANFORD:  Not yet.  I can.  It's S-14.

23   BY MR. STANFORD:

24   Q    And can you see at the top who opened that account?

25   A    It looks like Jimmy and Eva Barrow.

```
 1   Q    And based on your investigation, you learned or determined
 2   that that was Mr. Boyd Barrow's parents.  Am I right?
 3   A    Yes.
 4   Q    Okay.  And it shows that the account was opened up with a
 5   275,000-dollar deposit.  One was a check for $150,000 and it
 6   looks like there was another deposit for $125,000 or an initial
 7   deposit of $125,000.  Then a subsequent deposit of $150,000.  It
 8   looks like $50,000 at the bottom here and $100,000.  The account
 9   was opened up with $125,000?
10   A    Correct.
11   Q    Now, in your investigation did you learn that the $125,000
12   that was initially deposited into this account came from
13   Marmalade Skies?
14   A    I did not.  It could have.
15          MR. STANFORD:  At this time, Judge, I would like to
16   offer, file, and introduce this as S-14.
17          THE COURT:  Any objection, Mr. Walker?
18          MR. WALKER:  No, Your Honor.
19          THE COURT:  Without objection, let it be admitted.
20   BY MR. STANFORD:
21   Q    Now, from this account, the S-14 account, I'm going to show
22   you -- it has a Bates number.  It's a check.  It's Bates
23   Number 45094 and it's a 100,000-dollar check paid to the order of
24   Boyd Barrow.  Can you see right over here?  Can you read who that
25   check is endorsed to?  It says, "Deposit only, Allman & Peters
```

1    Trust Account."

2    A    Okay.  I can see that.

3    Q    And that would be Mr. Jim Peters, Mr. Barrow's lawyer, in

4    Atlanta, correct?

5    A    Yeah.  I don't know if -- I assume, yes.  I've never seen

6    this before.

7    Q    And here is the second page that goes with that attachment

8    showing the routing numbers and that was done on January 6th of

9    2012.

10            MR. STANFORD:  And at this time, Judge, I would like to

11   offer, file, and introduce this as S-15.

12            MR. WALKER:  No objection.

13            THE COURT:  Without objection, let it be admitted.

14   BY MR. STANFORD:

15   Q    And I'm going to show you another check from that account

16   which was paid out to Protective Insurance Company FBO on behalf

17   of -- paid to the order of Eva Barrow.  Did you learn that this

18   went to buy some type of insurance annuity?

19   A    I did not learn that, no.

20   Q    Did you know that prior to today?

21   A    No.  I don't recall ever seeing this.  Greg Harbourt with

22   the FBI was conducting the financial investigation.

23            MR. STANFORD:  I'm going to mark this as S-16.

24            MR. WALKER:  Your Honor, I object to this document

25   based on lack of foundation as well as relevance.

```
 1              THE COURT:  Mr. Stanford?

 2              MR. STANFORD:  Well, Judge, I'm showing that money from

 3    Pinnacle was moved from Boyd Barrow to his dad's bank account,

 4    and then from there it's being shuffled around to other bank

 5    accounts, and as I continue, I will be able to show the Court

 6    where the money ends up.

 7              MR. WALKER:  Again, I don't see the relevance of that,

 8    Your Honor.

 9              THE COURT:  Are you trying to make a money laundering

10    case against Mr. Barrow?

11              MR. STANFORD:  Well, Judge, part of my selective

12    prosecution argument is that there are actual money laundering

13    activities going on that the government is aware of between

14    Mr. Barrow and members of his family for a substantial amount of

15    money, probably close to a million dollars.

16              MR. WALKER:  Your Honor, that did not happen in this

17    jurisdiction, so we couldn't prosecute it if we wanted to.

18    Beyond that, as the Court is well-aware, we did forfeit the money

19    that we were able to.  This Court signed the forfeiture orders

20    forfeiting this money from Mr. Barrow and his family.

21              THE COURT:  And it's a consent forfeiture that's in the

22    record, isn't it, Mr. Walker?

23              MR. WALKER:  That's correct.

24              THE COURT:  All right.  I'm going to sustain the

25    objection.  I understand your point, Mr. Stanford, but,
```

1    under 403, at a minimum this isn't relevant.

2              MR. STANFORD:  Well, Judge, I'm going to show the agent

3    this check which I meant to introduce earlier in conjunction with

4    the Regions Bank account that was opened by Jim and Eva Barrow on

5    1/3/12 and this is the amount, $275,000, that was deposited into

6    that account to open it.

7              MR. WALKER:  And, again, Your Honor, my objection is

8    he's arguing selective prosecution.  We couldn't have prosecuted

9    this as a money laundering --

10             THE COURT:  I understand your argument, Mr. Walker.

11             The objection is overruled.  You can answer it.

12             THE WITNESS:  The question?  I'm sorry.

13             THE COURT:  The question was -- put the check back up

14   there.  You wanted to introduce this earlier when you were

15   talking about the Regions Bank and that document went into

16   evidence, which is why I'm overruling your objection, Mr. Walker,

17   because that document already went into evidence.

18             He wants to know if this check in the amount of

19   $275,000 was the deposit needed to open that Regions account.  Do

20   you remember that other document?

21             THE WITNESS:  Yes.  That looks like -- I haven't seen

22   this before, but that looks like the check that opened up the

23   account, correct.

24             MR. STANFORD:  Thank you.

25             THE COURT:  You don't know one way or the other, but

```
 1    that's your best guess, yes?
 2              THE WITNESS:  Yes, sir.
 3              THE COURT:  Thank you.
 4    BY MR. STANFORD:
 5    Q    Now, the bank account that I introduced in the record
 6    earlier, account number xxxxx9631, that account -- I'll show you
 7    what I'm going to mark as S-17.  That account was subsequently
 8    closed on April 25th and the closing withdrawal was in the
 9    amount of $125,073.11.  Can you see that?
10    A    Yes.
11    Q    And this document bears Bates Number -- that was the Jim and
12    Eva Barrow account -- Bates Number 45108.  So that account that
13    we were talking about that was opened up January 3rd is now
14    being closed April 25th, correct?
15    A    Yes.
16              MR. STANFORD:  And I would like to offer, file, and
17    introduce this document as S-17.
18              THE COURT:  And you wanted to admit S-16 as well?
19              MR. STANFORD:  Yes, sir.
20              THE COURT:  Any objection to either one of those,
21    Mr. Walker?
22              MR. WALKER:  No, Your Honor, except if I could get a
23    copy of S-17.
24              MR. STANFORD:  Sure.
25              THE COURT:  Without objection, let S-16 and S-17 be
```

1    admitted.

2    BY MR. STANFORD:

3    Q    Now, during the course of your investigation, did you learn

4    that a corporation by the name of Seventeen Group was established

5    by Mr. Boyd Barrow through his father, Jim Barrow, on or about

6    April 25th with the help of Mr. Jim Peters, his lawyer?

7              THE COURT:  April 25th of what year?

8              MR. STANFORD:  April 25th of 2012.

9              THE WITNESS:  I'm not aware of that, no.

10   BY MR. STANFORD:

11   Q    I'm going to show you what's marked as Bates Number 32442

12   which is the Certificate of Existence for Seventeen Group, LLC.

13   I will mark it as S-18 and turn the page to the fourth page.  Let

14   me see if I can zoom in where it shows Seventeen Group, LLC.  The

15   registered agent is James Peters at 1820 The Exchange, Suite 400.

16   That would be the same James Peters who is Mr. Boyd Barrow's

17   lawyer in Atlanta; is that correct?

18   A    Yes.  I've never seen this before.

19             MR. STANFORD:  I would like to offer, file, and

20   introduce this as S-18.

21             MR. WALKER:  I object to relevance.

22             THE COURT:  Let me back up one question.  Your answer

23   was, "Yes.  I've never seen this before."

24             He just showed you basically articles of incorporation.

25   So do you know that that's Mr. Boyd Barrow's lawyer in Atlanta?

```
 1                    THE WITNESS:  No.

 2                    THE COURT:  Okay.

 3                    MR. STANFORD:  Well, when you -- I'm sorry.

 4                    THE WITNESS:  I recall Mr. Barrow mentioning a Jim

 5      Peters in our interview.  I don't recall him saying he was his

 6      lawyer.  I recall him saying that he knew Mr. Peters or was a

 7      family friend or something to that effect, but I've never spoken

 8      to Mr. Peters.  I've never confirmed he was his attorney.  And he

 9      may have said it in an interview.  I'll be honest with you.  I

10      just don't recall.  Mr. Barrow, I think, had a number of

11      attorneys.

12                    THE COURT:  You have no idea what Seventeen Group, LLC,

13      is, what its purpose is, why it was formed, who formed it, any of

14      that?

15                    THE WITNESS:  I don't.

16                    THE COURT:  Objection sustained.

17      BY MR. STANFORD:

18      Q    Did you discover, during the course of your investigation,

19      that 100,000-dollar check from Allman & Peters, Jim Peters' law

20      firm, was transferred from the trust account to Seventeen Group

21      on April 25th, the date that the Seventeen Group bank account

22      was opened?

23                    MR. WALKER:  And, again, I object to relevance.

24                    THE COURT:  Well, Mr. Stanford, I sure don't see it.

25      Do you want to help me with that?
```

1          MR. STANFORD:  Well, Judge --

2          THE COURT:  I understand your general theme, but now

3    we're talking about somebody that this witness doesn't know

4    anything about, what his company is, if Mr. Peters makes a

5    transaction.  I know where your argument is coming from, but the

6    evidence of what Mr. Peters -- what he was doing for Mr. Barrow,

7    we don't have any of that and this witness can't testify about

8    any of that.

9          MR. STANFORD:  Yes, sir.  I'll move on, Judge.

10          THE COURT:  All right.  Objection sustained.

11          MR. STANFORD:  And the only caveat, Judge, the

12    relevance is that Count 4 is a money laundering count, and based

13    on this evidence, to me it evidences what would truly be money

14    laundering but is not charged or taken into account by the

15    government.

16          THE COURT:  And probably the U.S. Attorney in Georgia

17    would be able to answer that question for us, but the

18    U.S. Attorney in Georgia is not here, and the U.S. Attorney here

19    is the one that's being charged for prosecutorial misconduct in

20    your motion.

21          MR. STANFORD:  Yes, Judge, I understand, but from what

22    I understand, they are charging defendants in Georgia, Mr. Malone

23    and Mr. Green, and certainly Mr. Reece who was in Florida who had

24    no connection or had never been to Louisiana, but yet this

25    U.S. Attorney's Office exercised jurisdiction over those

1    individuals.

2          And surely if this is all part of a scheme, which it

3    appears that Mr. Barrow is funneling money through family

4    accounts and creating corporations to hide money that was derived

5    from Pinnacle which is the subject of this indictment, then this

6    U.S. Attorney's Office would in fact have jurisdiction over those

7    matters.

8          MR. WALKER:  Your Honor, respectfully, the law for

9    money laundering counts is you can charge them in the place where

10   the transaction occurred, so they could be charged if -- I don't

11   know anything about the facts of Seventeen.  It's not a subject

12   of our investigation.  This is the first time I've heard of it.

13   Assuming that it is money laundering, which is a huge assumption,

14   it could be charged in Georgia.

15         THE COURT:  There would be no venue here is what you're

16   telling me?

17         MR. WALKER:  That is correct.

18         MR. STANFORD:  Judge, I disagree.  Under 1956(h), which

19   is the money laundering conspiracy, this office has just as much

20   venue to charge the money laundering conspiracy as it does to

21   charge a drug conspiracy or misbranding conspiracy.

22         THE COURT:  So you're saying that would just be an

23   overt act?

24         MR. STANFORD:  Yes, sir.

25         THE COURT:  You don't need to nod your head,

```
 1    Mr. Foster.  I can make my own answers.
 2                All right.  Move on, Mr. Stanford.  I see your point.
 3                MR. STANFORD:  Thank you, Judge.
 4    BY MR. STANFORD:
 5    Q    Now, Agent DeSalvo, in this indictment and in your previous
 6    testimony, you referenced and brought up the Retail Compliance
 7    Association?
 8    A    Yes.
 9    Q    So I'm going to ask you some questions about that
10    organization.  Okay?
11                THE COURT:  Mr. Stanford, there are two Retail
12    Compliance Associations in this case.  There's what I'm going to
13    call the national one that we talked about in the Garcia hearing
14    and the one that was incorporated as an LLC in Louisiana.  So
15    when you reference them, would you please be specific as to which
16    one you're talking about.
17                MR. STANFORD:  I will do that, Judge.
18                THE COURT:  Thank you.
19    BY MR. STANFORD:
20    Q    Now, let's talk about the national RCA.  Do you know when
21    the national RCA was formed?
22    A    I do not.
23    Q    Do you know who formed the national RCA?
24    A    I believe Dan Francis.
25    Q    And what do you base that assumption on?
```

```
1    A    Information received in interviews.

2    Q    Did you do a documents check?  Did you verify that in any

3    way?

4    A    Possibly.  I just don't recall what the documents stated.

5    Q    Do you know about when Mr. Francis may have incorporated the

6    national RCA?

7    A    I do not know.  Maybe 2010, but that's a guess.

8    Q    Now, the national RCA, as far as your investigation

9    revealed, would you tell the Court what you -- or summarize what

10   the national RCA's purpose was and/or what it did?

11              MR. WALKER:  Objection to relevance.

12              THE COURT:  Overruled.

13              THE WITNESS:  The national RCA -- that's a pretty broad

14   question.  I'm trying to recall.

15   BY MR. STANFORD:

16   Q    But was it -- if I can, I don't want to put you on the spot,

17   but did you testify previously that the national RCA was involved

18   in lobbying efforts?

19   A    Yes, yes.  Thank you.

20              THE COURT:  Pull your microphone down, Mr. Stanford.

21              THE WITNESS:  Yes.  They were involved in lobbying

22   efforts, provided information to smoke shops and retailers on

23   ways to circumvent the laws.  They were a proponent of what they

24   termed "sensible adult legislation" which the analogy would be

25   for sort of the legalization of marijuana.  What they wanted was
```

1    they wanted their retailers to be able to sell the product and

2    have it regulated.

3    BY MR. STANFORD:

4    Q    Okay.  You threw in real quick that the national RCA was

5    trying to assist individuals in circumventing the law.

6    A    Well, again, I'm going back to 2010.  At some point in time

7    the national RCA -- based on our investigation, the intent was to

8    fold the national RCA and be one RCA which was going to be here

9    in Louisiana, based here in Louisiana.

10           So Mr. Francis and yourself, I believe, based on our

11   investigation, were going to start the RCA and have only one RCA.

12   What happened in 2010 to brainchild how it started, I don't know.

13   I'm just going from the documents that I've seen.

14   BY MR. STANFORD:

15   Q    I'll try to ask some specific questions so that we can

16   narrow the focus.  You were aware, based on your investigation,

17   that Dan Francis who founded the national RCA was actually

18   involved in lobbying efforts in Washington, D.C., on

19   Capitol Hill, correct?

20   A    I don't know if that -- I don't know that for a fact.

21   That's what I was told.

22   Q    Well, have you -- you've seen correspondence between

23   Mr. Francis and various senate committees that were basically

24   working on the legislation that later was passed in July of 2012

25   called the synthetic, I guess, cannabis law, H.R. 1254?

1   A    The correspondence in which you're speaking of is a letter

2   which doesn't show any type of official seal.  It's something

3   that is entitled "Testimony."  Honestly I don't know if he ever

4   testified in front of Congress.  That's what he was stating.  I

5   never was able to confirm that.  I did see a letter that stated

6   testimony of Dan Francis.

7   Q    And also I saw in the discovery you addressed a specific

8   e-mail to AUSA Collin Sims referring to one of Mr. Francis'

9   briefs, a May 9th brief that he submitted to Congress regarding

10  legislation of synthetic cannabis, correct?

11  A    Yes.  My understanding is it was a letter to -- or it was in

12  lieu of testimony to the subcommittee.  This was his statement,

13  his formal statement or whatever, but I never confirmed that

14  actually was received by Congress or anything like that.  It was,

15  I believe, taken from his website.

16          MR. STANFORD:  On my exhibits I'm at S --

17          THE COURTROOM DEPUTY:  Seventeen.

18          MR. WALKER:  I don't think that's correct.

19          MR. STANFORD:  I thought I was up to 19.

20          THE COURTROOM DEPUTY:  Well, I don't have 18 or 19.

21          MR. WALKER:  We're definitely up to 18 because that's

22  the document I'm holding.

23          THE COURTROOM DEPUTY:  I don't have 18 or 19.

24          MR. HIPWELL:  Eighteen was marked but not admitted.

25          THE COURTROOM DEPUTY:  I don't have anything.

1        MR. STANFORD:  I think that's where the Court cut me

2   off on the checks, and so I'll mark this as S --

3        THE COURTROOM DEPUTY:  Eighteen.

4        MR. STANFORD:  -- 18.

5   BY MR. STANFORD:

6   Q    And I'll give you a copy of this, Agent DeSalvo.  And in

7   conjunction with that e-mail, I'm going to also show you this.

8        In your e-mail you are referencing this brief by

9   Mr. Francis, which on the cover -- and I understand you haven't

10  confirmed where it went, but on the cover it has "Submitted to

11  Senate and Congress on May 9th."

12  A    Yes.  And it looks like something he put together and

13  provided to his customers because his phone number is on the

14  bottom of the document.

15  Q    Okay.  If you'd turn to the second page of that document

16  which I'm going to refer to as S-19.  Your e-mail is S-18.  He

17  begins the top paragraph with a statement by Mr. Joseph

18  Rannazzissi, Deputy Assistant Administrator of the Office of

19  Diversion Control, DEA?

20  A    Yes.

21  Q    And based on reading your e-mail, it appears that you read

22  Mr. Francis' brief and were e-mailing Mr. Sims and cc'ing other

23  individuals and somehow believed that this brief implicated

24  Mr. Francis in misbranding.

25  A    Okay.

1   Q     Could you explain that to the Court why you think this brief

2   would implicate anyone in misbranding?

3   A     Well, I mean, I'd have to read this entire thing.  Again, I

4   haven't memorized it.

5   Q     Well, I can summarize it for you.  He talks about what a

6   cannabinoid is and basically goes into talking about how

7   prohibition is ineffective and discusses ways to regulate it, to

8   tax it, to generate industries, to prevent -- I mean, to generate

9   revenues, to prevent those revenues from going underground.

10         He's actually advocating that whatever is contained in

11  the product be listed on the label and that it could be

12  scrutinized by the FDA and the DEA.  It would prevent counterfeit

13  materials from entering the market.  He's proposing a minimum

14  purchase age of 21.

15         That's pretty much the focus of this brief.  And I read

16  it and I read your e-mail.  I don't see where in his brief he is

17  discussing anything to do with misbranding as you suggest.

18         MR. WALKER:  And, Your Honor, I object.

19         THE COURT:  Wait a minute.  He hasn't asked the

20  question yet.  Is there a question on the table?

21  BY MR. STANFORD:

22  Q     The question is, do you consider it misbranding if someone

23  is advocating legislation, legalization, regulation, taxation,

24  and controlling the product and actually having a label that

25  contains exactly what's in the product on the product?  Would you

```
1    consider that to be mislabeling?

2    A     No, but he was --

3              THE COURT:  Wait.

4              MR. WALKER:  My objection is he's mischaracterizing

5    Don DeSalvo's e-mail.  In fact, he is saying it's saying exactly

6    the opposite of what it says.  So that would be my objection.

7    He's mischaracterizing the e-mail.

8              MR. STANFORD:  Agent DeSalvo --

9              THE COURT:  Wait, wait, wait.  The objection is

10   overruled.

11             Do you understand the question that he's asked you?

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.  You can answer it.

14             THE WITNESS:  Based on what you said, he's doing the

15   opposite.  They are selling it.  They are mislabeling the

16   product.  They're not labeling it properly.  They're not putting

17   the ingredients.  They're not putting that it's potentially

18   harmful.  And the packages themselves are to entice younger

19   crowds who go in there and believe that it's safe.  I would say

20   that's mislabeling.

21   BY MR. STANFORD:

22   Q    Okay.  Well, I appreciate your answer and that's what I

23   actually want to discuss.  Okay?

24             Now, the national RCA is not a retailer, distributor,

25   doesn't sell any products, does it?
```

```
1    A    No.

2    Q    And when you read Mr. Francis' brief, he is not advocating

3    or he's not putting himself out there as a seller of products,

4    but basically a supplier of information and suggestions to

5    Congress on how this industry can be regulated, taxed, and run?

6    A    No.  He's also teaching retailers how to do this without

7    doing what he really wants to do which is to sell it and regulate

8    it.  However, the government did not regulate it, so he's telling

9    them this is what you do in order to outfox the government.

10   Q    Well, this brief is addressed to the Senate and Congress on

11   May 9th.  So are you saying he is telling the Senate and

12   Congress how to outfox the government?

13   A    No.  But he's telling retailers --

14   Q    We're talking about these documents.

15   A    Yes.  But you asked me as a whole what was the point.

16   Q    No, I didn't.

17           THE COURT:  Whoa, whoa, whoa.  Now you're getting

18   argumentative.

19           MR. STANFORD:  I apologize, Judge.  I want to stick to

20   this.

21           THE COURT:  I want one specific question and one

22   specific answer, we don't argue, and keeping in mind the purpose

23   of why we're here.

24           MR. STANFORD:  Yes, sir.

25   BY MR. STANFORD:
```

1    Q    Based on your review of this document, this document and

2    your e-mail, this document in and of itself does not evidence

3    misbranding, does it?

4    A    I think it proves evidence of misbranding, yes.  I think

5    this document helps prove our case.

6    Q    Is there any -- I didn't read anywhere in this document

7    where he is advocating for mislabeling or misstating what's in

8    the product.  Your e-mail says, "They want to brand it

9    appropriately but can't."

10           MR. WALKER:  And respectfully, Your Honor, I object.

11   This goes far beyond the motion to dismiss.

12           THE COURT:  I agree.  Sustained.  And it's

13   argumentative.

14           MR. STANFORD:  I would like to offer, file, and

15   introduce S-18 and S-19 which is the e-mail and the --

16           MR. WALKER:  It's irrelevant for the purpose of this

17   motion.  I would object.

18           THE COURT:  Objection overruled.  Let it be admitted.

19           And, for the record, the relevance is once again based

20   on the selective prosecution, Mr. Stanford, which is curious to

21   me because Mr. Francis has been indicted on the exact same count.

22           MR. WALKER:  And that was my objection, Your Honor.  I

23   don't know how it can be selective if he's been indicted, too.

24           THE COURT:  That's what I said, Mr. Walker.

25           MR. STANFORD:  Well, Judge --

1              THE COURT:  That's okay, Mr. Stanford.  You won.  And

2    those documents were attached to the brief already and I had

3    already read them.

4    BY MR. STANFORD:

5    Q    So my question concerning the national RCA is, lobbying as

6    Mr. Francis did is not illegal, is it?

7    A    Lobbying, no, it isn't.  There are lobbyists for

8    legalization of marijuana.

9    Q    And writing letters to Congress or publishing information on

10   his website is not illegal, is it?

11   A    Not necessarily.

12   Q    Well --

13   A    I think he took some money on his website.  That could be

14   potentially illegal.

15   Q    I'm only -- let's talk about the information, the content of

16   the website and the content of Mr. Francis' information.

17             MR. WALKER:  And, again, Your Honor, I object to

18   relevance.

19             THE COURT:  Mr. Stanford?

20             MR. STANFORD:  Well, Judge, he's using as a predicate

21   that the Louisiana RCA that was founded on November 28th is --

22   that somehow the actual creating it makes it a rogue organization

23   simply because it's attached to or has some connection to the

24   national RCA, so I'm trying to find out what is the basis for

25   that.

1          MR. WALKER:  That is absolutely inaccurate.  We didn't

2     say the fact of the existence of RCA makes it illegal.  We have

3     charged, based on the actions of the defendants, that what they

4     did sometimes in connection with the RCA were in fact illegal.

5          THE COURT:  This is the reference to the indictment on

6     page 3, section 1 of Count 1, paragraph H.  "Retail Compliance

7     Association (RCA) was incorporated in Louisiana by Daniel James

8     Stanford.  RCA's Articles of Incorporation list Daniel James

9     Stanford as the director and Daniel Paul Francis as the

10    president.  Through the RCA, Daniel James Stanford and

11    Daniel Paul Francis trained, advised, and instructed the

12    individual franchise owners of Curious Goods, LLC, and their

13    employees, on how to store, display, and sell the Mr. Miyagi

14    products, how to detect and evade law enforcement, and how to

15    respond to customers who ask questions about how to use the

16    Mr. Miyagi products and/or the physiological effects of

17    Mr. Miyagi products."

18         There is nothing that I am aware of in the remainder of

19    this indictment that mentions anything about the national RCA or

20    how it is related to the Louisiana RCA, so Mr. Walker's objection

21    is well-taken and it is sustained.

22         MR. STANFORD:  I will therefore restrict my questions

23    to the Louisiana RCA, Judge.

24         THE COURT:  Thank you.

25    BY MR. STANFORD:

1    Q    Based on your investigation, you learned that the

2    Louisiana RCA was incorporated November 28th, 2011, correct?

3    A    That's when it was incorporated, but it was in effect prior

4    to that.

5    Q    And when you say it was in effect, what do you mean by that?

6    A    RCA was collecting dues prior to that, RCA dues, which were

7    profits from the retailers.

8    Q    Who were dues collected from?

9    A    Several individuals.  Off the top of my head, I believe

10   Josh Espinoza, Boyd Barrow, probably Richard Buswell possibly.

11            MR. STANFORD:  Just for the record to be complete,

12   Judge, this record to be complete, I'd like to offer, file, and

13   introduce the Articles of Incorporation for the Retail

14   Compliance -- Louisiana Retail Compliance Association.

15            MR. WALKER:  No objection.

16            THE COURT:  Without objection, let it be admitted.

17            MR. STANFORD:  And that's S --

18            THE COURTROOM DEPUTY:  Twenty.

19            MR. STANFORD:  -- 20.

20   BY MR. STANFORD:

21   Q    Now, I'm going to show you the fourth page of this document

22   which shows that it was incorporated as a nonprofit organization.

23   Is that accurate?

24   A    I certainly don't think it was nonprofit.

25   Q    Well --

```
 1              THE COURT:  That's not what he asked you,
 2   Agent DeSalvo.  He asked you what the document says.
 3              THE WITNESS:  Yeah.  It may be incorporated as a
 4   nonprofit.
 5              THE COURT:  The document says, "This corporation is a
 6   nonprofit corporation," right?
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  Okay.  Thank you.
 9   BY MR. STANFORD:
10   Q    Did you see any checks written by anyone to the
11   Louisiana Retail Compliance Association at any time?
12   A    Yes.
13   Q    Okay.  You saw checks that were written to the
14   Retail Compliance Association?
15   A    They were written to Daniel Stanford.
16   Q    That's not my question.  Were they written to the
17   Retail Compliance Association?
18   A    Well, let me -- what I saw was the checks were styled as RCA
19   dues.  They were written to a person, but they were styled a
20   certain way.
21   Q    When you say "styled," you're talking about what is in the
22   memo section of somebody's check, correct?
23   A    Correct.
24   Q    That the writer of the check can write in the memo column
25   whatever they want to write in reference to their check, correct?
```

1    A      Correct.

2    Q      But none of those checks were written to the

3    Retail Compliance Association.  Isn't that a fact?

4    A      That's correct.

5    Q      Okay.  Now, let's talk about from November 28th forward.

6           What actions, if any, did the Louisiana Retail

7    Compliance Association take or what conduct did they perform that

8    was illegal?

9    A      They --

10          MR. WALKER:  I would object, Your Honor.  The basis of

11   my objection is this.  We didn't charge that the

12   Retail -- the Retail Compliance Association is an organization.

13   We charged Daniel Stanford and others using the Retail Compliance

14   Association to engage in activities.

15          So if his question is what did the Retail Compliance

16   Association itself do that was illegal, it's not something that's

17   been -- it's not a part of the indictment other than the fact

18   that it lists out the day created, which has been verified.

19   Anything else for that organization is not relevant.

20          MR. STANFORD:  The first thing, Judge, is it's a

21   predicate to the next question, does he know of any action that

22   the organization took.  In this indictment, Curious Goods, the

23   organization, is charged as a defendant.  I understand the

24   Louisiana RCA is not, but as a predicate question I want to know

25   if this agent has any information that the actual organization,

1    the RCA, Louisiana RCA, did anything to -- took any action as an

2    organization that he could determine to be illegal.

3            THE COURT:  I tend to agree with Mr. Walker, but I'm

4    going to let him answer the question.

5            Do you know anything the organization did?

6            THE WITNESS:  I know just what individuals in the

7    organization did, the actual organization.  After

8    November 28th -- prior to that there were some checks received.

9    After November 28th there was a meeting held at Mr. Richard

10   Buswell's home in which individuals were trained, I believe,

11   based on the information we received, on how to sell the product

12   without being arrested.

13   BY MR. STANFORD:

14   Q    Okay.  So the Louisiana RCA, if I'm understanding you, the

15   organization didn't do anything illegal.  It's the individuals,

16   meaning -- you're talking I did something illegal through the

17   organization?

18   A    Who represented themselves to be part of the RCA.

19   Q    Well, let's break this down.

20           Prior to November 28th, as alleged in the indictment,

21   I want you to tell me specifically, first of all, which

22   individual franchise owners of Curious Goods that I trained,

23   advised, and instructed, along with their employees, on how to

24   store and display Mr. Miyagi products?

25           MR. WALKER:  And I object.

```
 1              THE COURT:  Sustained.
 2    BY MR. STANFORD:
 3    Q    Do you have any information that I did any of these overt
 4    acts prior to November 28th?
 5              MR. WALKER:  Again, I object to relevance for this
 6    motion.
 7              THE COURT:  That's sustained.
 8              Mr. Stanford, this isn't a discovery expedition.
 9    Unless you can tell me how that's relevant to your motion, I
10    don't see it.  What it is to me is it's a discovery expedition.
11              Now, if you're telling me the government created some
12    kind of misconduct by hiding information from you, then I don't
13    know about it and I need to hear about it.  It wasn't in your
14    brief.
15              MR. STANFORD:  Judge, that kind of goes to the heart of
16    my brief, the fact that I don't know what conduct they're talking
17    about.
18              THE COURT:  I have that as another motion that's before
19    me that I intend to rule on very, very shortly.
20              MR. STANFORD:  And I was merely asking the agent to
21    clarify did this conduct -- he seemed to indicate earlier that
22    this conduct occurred at a specific time and a specific place,
23    basically December 7th at Richard Buswell's house.  So I'm
24    asking him to clarify is this conduct that you're talking about,
25    did any of it occur before November 28th.  I think his answer
```

1  would be no, but I just want a clarification and ask him if he's

2  talking about December 7th.

3          THE COURT:  You can answer that question.

4          THE WITNESS:  There were -- after December 8th --

5  BY MR. STANFORD:

6  Q    The first part of the question is, before

7  November 28th did any of this conduct occur?

8  A    Yes.  I think we charged that.  I think there were some RCA

9  dues received.

10 Q    We're not talking about dues.  We're talking about conduct,

11 training, advising, instructing, that conduct.  Did any of that

12 occur before --

13 A    Yes.  I believe that you were part of the organization that

14 assisted these individuals and this is based on a number of

15 interviews.  I don't have access to all of this information.  I

16 formed an investigation -- or we formed an investigation based on

17 more than one instance.  I stand by what we charged in the

18 indictment.

19 Q    Well, then if you've developed information consistent with

20 what's charged in the indictment, the government should have that

21 information, correct?

22 A    I mean, it's based on what we plan to present in trial.

23 Q    And if I'm --

24          THE COURT:  Whoa.  I want the answer to that last

25 question.  He says, "If you've developed information consistent

```
 1    with what's charged in the indictment, the government should have

 2    that information, correct?"

 3                    THE WITNESS:  Yes.

 4                    THE COURT:  Okay.  Next question.

 5                    MR. STANFORD:  Thank you, Judge.

 6    BY MR. STANFORD:

 7    Q    And are you telling the Court that this information consists

 8    of witness interviews that you took?

 9    A    Some.

10    Q    And other than witness interviews, is there any hard

11    evidence --

12                    MR. WALKER:  And I object, Your Honor.

13                    THE COURT:  Let him finish.

14    BY MR. STANFORD:

15    Q    When I say "hard evidence," documents that I created that

16    would evidence any kind of conduct that's alleged in paragraph H?

17                    MR. WALKER:  And I object.

18                    THE COURT:  Overruled.

19                    THE WITNESS:  Yes.

20    BY MR. STANFORD:

21    Q    Documents that I created?

22    A    Not documents, but there's information that -- there's a

23    document based on information you gave to the retailers.

24    Q    I don't understand.  There's a document?

25    A    There's a written document based on a recording that one of
```

```
 1    the retailers made of you giving information and advice to these
 2    retailers.
 3    Q    You're talking about handwritten notes from the
 4    December 7th meeting?
 5    A    No, not December 7th.  I'm talking about in January.
 6    Q    Okay.  So --
 7    A    In that recording you make reference to what you did in the
 8    past for these individuals, you speaking, hey, this is what we're
 9    doing moving forward, and then you go into describing what your
10    duties were or what you were doing in the past for this
11    organization.
12    Q    Okay.  So the answer is there's no documents, that it's a
13    statement that I made to someone else that's recorded?
14    A    That's correct.
15    Q    Okay.  Now, at the December 7th meeting, did I
16    specifically train anyone or advise anyone at that meeting?
17    A    Dan Francis did.
18    Q    Did I specifically tell anyone how to detect and evade law
19    enforcement?
20    A    Dan Francis did.
21    Q    Now, you made reference in the Garcia hearing that somehow a
22    December 6th check that I wrote to Dan Francis for contract
23    consulting connects whatever Dan Francis did to me.  Is that
24    accurate?
25    A    I think it said RCA contract consulting.  I think it was the
```

1    day before the meeting.

2    Q    Right.

3    A    Yes.

4    Q    Are you saying that that check in and of itself evidences

5    wrongdoing on my part?

6              THE COURT:  Sustained.

7              MR. WALKER:  Thank you.

8    BY MR. STANFORD:

9    Q    At the *Garcia* hearing you specifically testified to the fact

10   that that December 6th check showed some type of connection

11   between whatever Dan Francis may have said and me.  Do you

12   remember saying that?

13   A    Well, you were part of the same organization.

14             THE COURT:  No.  The question was, "Do you remember

15   saying that?"

16             THE WITNESS:  Yes, I do.

17             THE COURT:  Okay.

18   BY MR. STANFORD:

19   Q    Okay.  Now, do you know what a contract consultant is?

20             MR. WALKER:  Again, Your Honor, at this point I object.

21   It goes beyond the motion.

22             THE COURT:  I agree.

23             Are you suggesting that something that he said at the

24   *Garcia* hearing regarding that is untrue, Mr. Stanford?

25             MR. STANFORD:  Yes, Your Honor.

```
 1                    THE COURT:  All right.  You can answer the question.

 2                    THE WITNESS:  Repeat the question.

 3                    THE COURT:  Do you know what a contract consultant is?

 4                    THE WITNESS:  You pay someone to consult.

 5     BY MR. STANFORD:

 6     Q    A contractor is independent of the person who's paying him.

 7     Isn't that true?

 8     A    Not based on the information we received.  We received

 9     information that you were collecting all the fees for the RCA and

10     then you would pay Dan Francis certain amounts.  You were in

11     charge of the RCA, the new RCA, the Louisiana which was now

12     folded into the old RCA -- or from the old RCA.  That's the

13     information we received.

14     Q    And I'm assuming once you received this information, you

15     attempted to corroborate it, correct?

16     A    I'm sure we did.

17     Q    Okay.  Was there ever an RCA bank account?

18     A    No.

19     Q    Did I ever write any RCA checks?

20     A    No.

21     Q    And the checks that you referenced that were written out to

22     me were deposited in my accounts and were payment directly to me,

23     correct?

24     A    With some saying RCA dues, correct.

25     Q    And there's no showing in the record or in the documents
```

 1    that those funds somehow found their way back to the RCA,

 2    correct?

 3              MR. WALKER:  The RCA is a corporation.  I'm not -- I

 4    object to the form of the question.

 5              MR. STANFORD:  I'll rephrase it.

 6              THE COURT:  It's overruled.

 7              Can you answer that?

 8              THE WITNESS:  I'll try.

 9              THE COURT:  If you don't understand it, ask him to

10    rephrase it.

11              THE WITNESS:  Yeah.  If you're in charge of the RCA and

12    you're receiving the money, I would say it's the same thing.

13    BY MR. STANFORD:

14    Q    Okay.  You would say.  Now, first of all, what evidence do

15    you have to show that I'm in charge of the Louisiana RCA?

16    A    You're listed as the --

17    Q    Director?

18    A    -- director.

19    Q    And who's listed as the president?

20    A    Dan Francis.

21    Q    But my question was -- your, I guess, proof is the fact that

22    people wrote checks to me individually, but in the memo section

23    referenced RCA dues.  My question specifically to you is, do you

24    have any evidence that that money, those checks, or the money

25    from those checks somehow went back to either the Louisiana RCA

1    or to Dan Francis individually?

2    A    Other than the check that you wrote as a consultant?

3    Q    Right.

4    A    I think that was the only check that I saw.

5    Q    Okay.  You don't have any information, do you, in your

6    investigation that either I or Dan Francis spoke with any

7    franchise owners ever about dues?

8              MR. WALKER:  Again, Your Honor, I object.  I don't see

9    the relevance of it.

10             MR. STANFORD:  Judge, he is --

11             THE COURT:  Wait, wait, wait.  Overruled.

12             You can answer it.

13             THE WITNESS:  It was represented by a number of

14   individuals that the retailers were to pay a portion of the

15   profits from their stores to the RCA, and these -- the two

16   individuals that were -- from what I recall, the two individuals

17   that were presented as members of the RCA were you and

18   Dan Francis at the meeting.

19   BY MR. STANFORD:

20   Q    Okay.  Let's discuss that.  My question was, have I or

21   Dan Francis ever talked or directed any franchise owner about

22   dues?  You don't have any evidence of that, do you?

23   A    Yes, we do.

24   Q    Okay.  That we spoke directly to a franchise owner?

25   A    To Boyd Barrow; not a franchise owner, but to Boyd Barrow.

1    Q    Okay.  My question is to a franchise owner.

2    A    Richard Buswell is the one who did that, not you.

3    Richard Buswell did speak to the franchise owners and told them

4    they would be paying these dues.

5    Q    And, according to you, Richard Buswell has nothing to do

6    with the RCA if I'm the head of it, right?

7    A    This was a pretty well commingled group of individuals and

8    businesses.  One relies on the other.  In my opinion one relies

9    on the other to move forward.

10         THE COURT:  I have a question, Agent DeSalvo.  Was

11   Richard Buswell a franchise owner?

12         THE WITNESS:  Yes, he was.

13   BY MR. STANFORD:

14   Q    Which franchise did Richard Buswell own?  Wasn't Richard

15   Buswell the owner of the corporate stores, the northside store

16   and the Kaliste Saloom store?

17   A    I would consider that an owner of one of the stores.

18         THE COURT:  That's why I was asking, but I didn't

19   remember which it was.  There wasn't anything loaded about my

20   question, Mr. Stanford.

21         MR. STANFORD:  Thank you, Your Honor, but there's

22   a distinction between the corporate store that sells

23   franchises and the franchise stores that buys them.

24         THE COURT:  That's why I asked.  I didn't

25   remember.

1    BY MR. STANFORD:

2    Q    So the two are separate and distinct; isn't that right,

3    Agent DeSalvo?

4    A    Yes, but they sell the same products.

5    Q    I understand that, but there's the corporate store and the

6    franchise stores.  Getting back to my original question.  I never

7    had a conversation nor did Dan Francis with any franchise owners

8    about dues.  Isn't that true?

9    A    As far as I know, not you personally.  Individuals were told

10   they would have to pay RCA dues.

11   Q    Well, my question is either me or Dan Francis, we never had

12   any --

13         MR. WALKER:  I would object.  It's been asked and

14   answered about three times.

15         THE COURT:  Move on, Mr. Stanford.

16   BY MR. STANFORD:

17   Q    You don't have any evidence that any franchise owners ever

18   wrote a check to me, do you?

19   A    Not yet because the raids occurred the day after they were

20   told they would have to pay.

21   Q    And you're saying that they were told this by

22   Richard Buswell?

23   A    I believe it was Richard Buswell, yes.

24   Q    And do you remember testifying at the *Garcia* hearing that

25   you said, based on your information, the franchise owners had no

```
 1    option, that they had to do it, correct?
 2    A    That's correct.
 3    Q    And do you remember I pointed out to you and I asked you had
 4    you read the franchise agreement.  Do you remember that question?
 5    A    Yes.
 6    Q    Have you read the franchise agreement?
 7    A    Yes.
 8    Q    Does the franchise agreement itself allow the corporate
 9    store to order a franchisee to join any third party organization
10    and pay any type of dues or fees?
11    A    Regardless of whether or not it does, that's what they were
12    told, and that's what Richard Buswell told me as well.
13              THE COURT:  Please answer his question.
14    BY MR. STANFORD:
15    Q    The franchise agreement does not allow the corporate store
16    to do that, does it?
17    A    Honestly, I've read some over the franchise agreement.
18    There may be some legal wiggle room that I'm not aware of because
19    I'm not an attorney.  Generally I read over it and I'll take you
20    for your word on that.
21              THE COURT:  Well, Agent DeSalvo, let me just make it
22    easy for you.  If the answer is I don't know, the answer is I
23    don't know.
24              THE WITNESS:  I don't know.
25              THE COURT:  There you go.
```

```
1    BY MR. STANFORD:

2    Q    Okay.  You did testify at the Grand Jury, correct?

3    A    Yes.

4    Q    More than once?

5    A    Yes.

6    Q    And you did testify regarding the RCA dues and my role in

7    the Louisiana RCA; isn't that correct?

8              MR. WALKER:  I object, Your Honor.  He hasn't put

9    forward anything to demonstrate that -- one, the Court has the

10   Grand Jury testimony which you've been given for in camera

11   review.  Unless he's submitting something to demonstrate that he

12   testified falsely in front of the Grand Jury, which he has not

13   done so far, now he's simply trying to find out what things were

14   testified and I don't think that's appropriate.

15             MR. STANFORD:  Judge, I'm asking a general question.

16   How can I compare one thing to another unless I first establish

17   that he did testify at the Grand Jury and he did testify about

18   this topic and these issues that we're now discussing?

19             THE COURT:  It is one of the problems inherent in the

20   6(e)(3)(E)(ii) dilemma.

21             Have you got that, LaRae?

22             So we're just going to call it 6(e)(3)(E)(ii) from here

23   on out.

24             MR. STANFORD:  Well, Judge, I'm not --

25             THE COURT:  Hang on.  I want to rule on his objection.
```

```
 1              You can answer carefully the question that he asked.
 2   He asked, "Did you testify regarding the RCA dues and my role in
 3   the RCA to the Grand Jury?"  Did you do that?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Okay.  Next question.  I'm not going to let
 6   you go very far because I can't, Mr. Stanford.  That's what the
 7   law is.  I'm not saying whether it's fair or not.  I don't
 8   understand how it ended up that way, but it's that way.
 9              MR. STANFORD:  Okay, Judge.
10   BY MR. STANFORD:
11   Q    Now, let's talk about your testimony at the Garcia hearing.
12   At the Garcia hearing you testified under oath that -- or made it
13   appear that these franchise owners had no choice, that they were
14   given a directive that they had to follow as far as paying dues;
15   isn't that right?
16   A    That's correct.
17   Q    And at the Garcia hearing I pointed out to you that the
18   franchise agreement in and of itself, a contract between the
19   corporate store and the franchise owners, would not allow for
20   that.  Didn't that happen?
21   A    Yes.
22   Q    Prior to testifying before the Grand Jury, did you read the
23   franchise agreement for yourself to determine for yourself
24   whether or not what I was telling you then is in fact correct?
25   A    Can I answer?
```

1          THE COURT:  Yes.

2          THE WITNESS:  Just because there's a franchise

3     agreement doesn't mean that they weren't told, and the

4     individuals advised me, that I spoke to, some of the franchise

5     owners and Richard Buswell, that they had no choice in the

6     matter.  Regardless of what the contract said, that's what we

7     were advised.

8          THE COURT:  Okay.  I'm going to cut you off.  I've

9     heard that I think about eight or nine times now.  He asked a

10    very specific question and he's asking it for a very specific

11    reason.

12         The question was, prior to testifying before the Grand

13    Jury, did you read the franchise agreement for yourself to

14    determine for yourself whether or not what he, Mr. Stanford, was

15    telling you at the *Garcia* is in fact correct, so this is a yes or

16    no.  Did you read it?

17         THE WITNESS:  I didn't read the entire thing.

18         THE COURT:  Okay.  Next question.

19         MR. STANFORD:  Thank you, Judge.

20    BY MR. STANFORD:

21    Q    So is it your understanding that just because someone makes

22    a general statement that may be legally enforceable, that it has

23    effect just because you believe that it has effect?  Is that your

24    position on this issue?

25         MR. WALKER:  I object, Your Honor.  He's trying to get

1    this witness to give a legal conclusion and I don't think that's

2    appropriate.

3              MR. STANFORD:  Not really, Judge.  I would think that

4    prior to testifying about a significant matter, he would read the

5    document that was brought to his attention and try to understand

6    the document to determine, number one, whether or not what he is

7    presupposing could even in fact be possible.

8              THE COURT:  Well, no, Mr. Stanford, I don't agree.

9    What he has said over and over is that witnesses said that they

10   were told that they had no choice but to pay these RCA dues.

11             Right?

12             THE WITNESS:  That's correct, Your Honor.

13             THE COURT:  All right.  Now, I've heard all I need to

14   hear on that subject.  I understand that you disagree, but what

15   we're about right now is did he tell me something under oath at

16   the *Garcia* hearing that is inconsistent with what he told the

17   Grand Jury at the time this indictment was returned.  It's a very

18   narrow inquiry.  And whether he thinks it's legally enforceable

19   or not, you know what?  It doesn't matter to me.  I'm trying to

20   find out if he committed perjury.  That's what you're suggesting,

21   that he committed perjury, that he committed perjury in front of

22   the Grand Jury, presumably that that happened with the knowledge

23   and participation of the prosecutor.  Am I right?  That's the

24   standard you have to meet, right?

25             MR. STANFORD:  Yes, sir.

```
 1              THE COURT:  Okay.  Well, let's go to that.
 2              MR. STANFORD:  And that's why -- Judge, I asked him if
 3    you're going to testify to a material fact and have a belief that
 4    that material fact is correct, you would want to first
 5    corroborate it.
 6              Am I right, Mr. DeSalvo?
 7              MR. WALKER:  Again, Your Honor, my objection is -- the
 8    Court absolutely correctly stated the standard which is he
 9    intentionally committed perjury.  The fact that he didn't read
10    that document doesn't mean he committed perjury.
11              THE COURT:  I'm going to overrule.
12              Would you want to corroborate something that was told
13    to you in your interviews with witnesses?
14              THE WITNESS:  Well, yes, and part of the corroboration
15    process is many individuals telling you that.
16              THE COURT:  Next question.
17    BY MR. STANFORD:
18    Q    Now, after the December 8th raid, you and Agent White
19    began conducting what I would just say were a lot of witness
20    interviews, correct?
21    A    And also metro narcotics.  They had their investigation as
22    well.  Many of the times we conducted them together.
23    Q    Okay.  Well, to the extent that you and Agent White were
24    doing it as part of this investigation, that's going to be the
25    focus of my inquiry.
```

1    A    Okay.  But they were parallel investigations, so we went on

2    some interviews that metro narcotics wanted to do to further

3    their investigation that may not have had any impact on our

4    investigation.

5    Q    And on those interviews that you went on and the main focus

6    was metro narcotics, would you or Agent White have documented or

7    taken notes of that interview and reduced it to a DEA-6 or some

8    type of report?

9    A    Agent White may have, yes.

10   Q    Is it the practice of your office in conducting an

11   investigation -- if you attend an interview or a meeting of a

12   witness, whether you're initiating it or another law enforcement

13   agency is, the fact that you're attending and participating in

14   it, is it your practice to reduce that interview to some type of

15   DEA-6 or Report of Investigation?

16   A    Yes.

17   Q    Okay.  So then every interview that you would have attended,

18   whether you initiated it or another law enforcement agency

19   initiated it, there would be a report?

20   A    Not every interview.  I won't make that statement.  I'm not

21   saying every interview.

22            THE COURT:  What would be the criteria?

23            THE WITNESS:  For a report to be written?

24            THE COURT:  Yes.

25            THE WITNESS:  Well, it just depends.  It may be a

1    casual conversation.  You're meeting with someone and you're

2    talking to them about various things.  If it doesn't get into an

3    area where you think it needs to be documented, you necessarily

4    won't document it.

5              THE COURT:  Is that a policy somewhere?

6              THE WITNESS:  I'm not sure.  If there's an informant

7    that's involved and you're potentially trying to recruit an

8    informant initially, that may not be documented right away.  It

9    depends on how it goes.  Then you would document that individual

10   as an informant later.

11             THE COURT:  Is that left to the discretion of the

12   agent?

13             THE WITNESS:  Yes.

14   BY MR. STANFORD:

15   Q    I'm going to ask you about the DEA policy on recording

16   witness interviews.  Okay?

17   A    Yes.

18   Q    Can you tell the Court what is the DEA policy on recording a

19   witness interview?  Is there a policy, number one?

20             THE COURT:  Let's clarify that, please, Mr. Stanford.

21   Are we talking about a tape recording?

22             MR. STANFORD:  Any kind of audio or video recording of

23   a witness interview.

24             THE WITNESS:  Generally, yes, we do not.

25   BY MR. STANFORD:

1    Q    Generally you do not?

2    A    Yes.

3    Q    Isn't there a policy in the DEA, the agents operational

4    manual, which essentially prohibits agents from recording audio

5    or video recordings of interviews unless they have some type of

6    approval from a higher-up or a supervisor?

7    A    I wouldn't necessarily say that.  I mean, I could be

8    mistaken.  There's a lot of policies within the government, but

9    generally you can record an interview.  Certainly in the

10   beginning of this investigation we were conducting a joint

11   investigation with metro narcotics.  Their policy was to record

12   and I can't tell them not to.

13   Q    Okay.  When you met with Paul Buswell on February 15th,

14   2012, where did that meeting take place?

15   A    At the Lafayette Police Department.

16   Q    And that was a DEA investigation that you and Agent White

17   were conducting on that day; isn't that true?

18   A    No.  Also, Ryan Shanahan was there.  I think he's the one

19   who recorded it.

20   Q    Did Agent Shanahan record it or Agent White?

21   A    It could have been both.  Many times each of them will have

22   their recorder, but we're in that gray area because at that time

23   Agent White was part of metro narcotics.  He wasn't with the

24   DEA Task Force agent at that time.  I believe Kane Marceaux may

25   have left.  I'm not sure if he was officially assigned.

```
 1              So I accompanied Agent White and Agent Shanahan, like I
 2   said before, because we had an interest in the case, because DEA
 3   had an interest in this nationwide.  I just don't recall who
 4   recorded.  I didn't wear a recorder.  But if you wanted to
 5   record -- many times we do joint investigations where they do
 6   want to record.  We can't tell them not to.
 7   Q    I understand that, but the fact that you, a DEA agent, was
 8   cooperating or involved in that interview, I'm sure you would
 9   have been told that the interview was going to be recorded,
10   right?
11   A    Yes.
12              MR. WALKER:  And, Your Honor, I object to this.  I
13   don't see the relevance of whether they recorded the interview or
14   not.
15              THE COURT:  Well, I agree with you.
16              Your answer was yes?
17              THE WITNESS:  I believe so.
18              THE COURT:  Well, is your answer yes?
19              THE WITNESS:  What was the question?
20   BY MR. STANFORD:
21   Q    The question is, prior to the interview --
22              THE COURT:  No.  I'm going to read the question now
23   because he actually answered.  You said, Mr. Stanford, "I
24   understand, but the fact that you, a DEA agent, was cooperating
25   or involved in that interview, I'm sure you would have been told
```

1    that the interview was going to be recorded, right?"

2              THE WITNESS:  Oh, yeah.  I knew that it was going to be

3    recorded, yes.

4    BY MR. STANFORD:

5    Q    Okay.  Now, prior to that interview, the conversations

6    Mr. Paul Buswell had with Agent White, the telephone

7    conversations were also recorded.  Were you aware of that?

8    A    I believe so.  Some of them, yes.

9    Q    And prior to those telephone calls being recorded, there's

10   an individual that I'm sure you're familiar with.  His name is

11   Johnny Cosper, correct?

12   A    Yes.

13   Q    And Mr. Cosper is a franchise owner or was a franchise

14   owner?

15   A    Yes.

16   Q    And did either you or Agent White have Mr. Cosper call

17   Paul Buswell and record a conversation with him sometime in

18   January?

19   A    Yes, I believe so.

20   Q    Okay.  Prior to having Mr. Cosper call Mr. Paul Buswell and

21   record that interview, did you give him, for lack of a better

22   word, a script or questions that you wanted Mr. Cosper to ask

23   Paul Buswell in that recorded conversation?

24   A    I did not.  I don't think I participated in that.  I don't

25   recall being there when that recording was -- I know I wasn't

1    there when the recording was made.

2    Q    Was Agent White present?

3    A    Agent White was probably.

4            THE COURT:  Do you know?

5            THE WITNESS:  I know he was there, yes.

6            THE COURT:  All right.

7            THE WITNESS:  And Agent Shanahan I believe as well.

8    BY MR. STANFORD:

9    Q    So Agent White and Shanahan, while in the presence of

10   Mr. Cosper, Mr. Cosper made a consensual telephone call to

11   Paul Buswell that was recorded?

12   A    Yes.

13   Q    Okay.  Now, you've had an opportunity to listen to that

14   call; isn't that true?

15   A    I don't think I've listened to it.  I may have heard an

16   excerpt of it, but I don't recall listening to that conversation.

17   Q    Agent White who was working under your supervision would

18   have reported back to you at some point in the investigation, for

19   sure prior to February 15th when you sat down with Mr. Buswell,

20   to relay to you that this is what was said between Cosper and

21   Paul Buswell on this date.  Would that be fair?

22           MR. WALKER:  Objection to relevance.

23           THE COURT:  I'm going to overrule it.

24           Mr. Stanford, I'm going to let you make a record, but

25   not much more.  All right?  This is not that relevant.

1           You can answer it.

2           THE WITNESS:  I'm sure that Agent White generally gave

3    me an overall idea of what happened in the recording, but I don't

4    remember verbatim what was stated.

5    BY MR. STANFORD:

6    Q    But specifically for purposes of Paul Buswell's interview,

7    you would have known that Mr. Cosper and Paul Buswell discussed

8    the fact that I was not representing any of the franchise owners.

9    I was not even representing Paul Buswell.  I was only

10   representing Richard Buswell individually pursuant to his arrest

11   in the state drug charges and handling whatever forfeiture

12   matters that came up with regards to Curious Goods.  That was

13   discussed in that conversation.  Am I right?

14   A    I do not know exactly if that was discussed or not.  I

15   honestly do not know.  I would have to listen to the recording or

16   review a transcript.

17   Q    Okay.  And let's fast-forward to February 15th of 2012

18   when you met with Mr. Paul Buswell.

19   A    Yes.

20   Q    During that interview Mr. Buswell told you very specifically

21   that I represented Richard Buswell on the state drug charge,

22   state drug case, and was also handling any pending forfeiture

23   matters; isn't that right?

24   A    And that you were part of the RCA.

25   Q    Well --

```
1              THE COURT:  Answer the question first.

2              THE WITNESS:  I'd have to look at the transcript or

3    listen to it.  He may have said that.  I just don't have that

4    type of memory that I can recall those exact words.

5    BY MR. STANFORD:

6    Q    Okay.  Did I give you a copy of the --

7    A    Yes.  I do have a copy.

8              THE COURT:  Of what?  Y'all are communicating real

9    well.  You already know what he gave you a copy of.  What are you

10   talking about?

11             MR. STANFORD:  We're talking about the transcript.

12             THE COURT:  Of?

13             MR. STANFORD:  Of the February 15th, 2012, interview

14   of Paul Buswell.  Do you have a copy of that, Judge?

15             THE COURT:  No.  They've got my monitor working,

16   though, so if you want to just put it on the ELMO, that will be

17   fine.

18   BY MR. STANFORD:

19   Q    If you look at the bottom of page 58, Agent White is asking

20   Paul directly -- he's saying, "Would Richard be willing to talk

21   about this?"  So Agent White is the one initiating that inquiry.

22   Am I right?

23   A    I can't answer that because there was a lot going on.  There

24   were phone conversations that occurred prior to this that I

25   wasn't privy to, including this transcript.  There are a lot of
```

1    things that are said in here that if -- you're picking out one

2    small, little part.  I can't answer that.  I would need to read

3    this entire thing to get a better understanding of what was said

4    overall.  If you're stating that in one little part of this he

5    makes this statement, I can't answer that because this was a

6    continuing process.  I know that Will White spoke to him several

7    times prior to this.  I can't accurately give you an answer.

8    Q    Okay.  February 15th of 2012, was that the first time you

9    met Paul Buswell?

10   A    I think it was the first time I met him, yes.

11   Q    Okay.  And, again, I'm going to direct you to here.

12   White said, "Let me ask you this.  Not saying that it's going to

13   happen, but would Richard be willing to talk about this?"

14        Now, the prior conversation that you had with

15   Mr. Buswell on that date was regarding Curious Goods franchises,

16   Mr. Miyagi, those types of issues, correct?

17   A    The prior conversation that I had with him?

18   Q    That is recorded.

19   A    Yes.

20   Q    Okay.  So right here Will White, Agent White, is asking him,

21   asking Paul, "Would Richard be willing to talk to us about this?"

22   And Paul responds, "I would think so.  Really we have nothing to

23   hide.  What I'm telling you is what happened."

24        And then the last paragraph, Mr. White says, "We would

25   have to get some approvals.  He has got representation.  I mean,

1    clearly he has some representation.  We would have to run it by

2    the prosecutors if he would be willing to talk about his legal

3    representation being there.  If you talk to him or talk to your

4    mom or whoever is talking to him, I'm sure that he is making

5    phone calls from the jail."

6    A    Okay.

7    Q    Okay.  Now, if you go to the next page, which is page 59,

8    Paul asks -- Paul says, "I'm not saying that he would be willing

9    to help at all, but could it help him at all?"  And you said,

10   "I don't know."  Then the third party there you're saying is

11   Agent Shanahan?

12   A    I believe so.

13   Q    He says, "It can't hurt him"?

14   A    Yes.

15   Q    And then you say, "There's going to be some issues because

16   he has got representative and we have to get their okay and such.

17   Let me ask you something.  Is it possible that Richard may not

18   have told you everything, that he may have known that this is

19   vague, that this is not going to be a problem?"

20          In the first sentence you acknowledged that Richard

21   does have representation, correct?

22   A    Yes.

23   Q    And you knew that I represented Richard?

24   A    In the securities fraud case, yes.

25   Q    Well, are you saying that you didn't know that I represented

1  him on the pending state drug case?

2  A    No.   I think I testified to that, that I assumed you were

3  going to represent him because there were statements made that

4  you were going to represent everyone, including all franchise

5  owners.  Everyone involved, ten, fifteen individuals, told me

6  that Stanford is our attorney.

7  Q    Okay.  Let's talk about what you just said.  I'm assuming

8  that these conversations would have happened -- these interviews

9  were after the December 8th raid or the search warrants and

10  arrest warrants of Richard Buswell and others, correct?

11  A    Some of them.  Some of them were part of the metro narcotics

12  investigation.

13  Q    But the interviews would have started, at the earliest, on

14  the 8th and moved forward, correct?

15  A    Correct.

16  Q    Okay.  Now, you were aware through metro narcotics that

17  Richard Buswell self-surrendered at my office to Agent -- I think

18  it's Karry Falcon and another agent?

19  A    Yes.  I don't know if he self-surrendered.  I think he was

20  arrested.

21  Q    Well, he was at my office.  Agents came -- I'm sure they

22  told you -- and asked me if he was here.  I said yes.  I had

23  Mr. Buswell come out where he was taken into custody.

24  A    Yeah, but I think they located him there.  I don't think he

25  self-surrendered.  I don't think he called and said,

1    Scotty Melancon, you know, I'm here.  I think some information
2    was passed on to them.
3    Q    Okay.  But my point is at that point in time I advised
4    Agent Karry Falcon that I represented Mr. Richard Buswell on this
5    arrest for these pending charges and advised him not to discuss
6    or not to even attempt to try to interview Mr. Buswell.  You were
7    told that?
8    A    No, I was not.
9    Q    Well, subsequent to this you were aware that, at a minimum,
10   on that day everybody who was arrested that day was interviewed,
11   correct, either arrested or detained?  Milo Granger and
12   Roosevelt Jones were not arrested.  They were detained and later
13   released.  Correct?
14   A    We weren't part of that investigation.  I wasn't out there.
15   I wasn't even involved in any of that on that day.
16   Q    Agent White was?
17   A    Yes.
18   Q    He was the one interviewing them and recording it?
19   A    And he was working for Lafayette Metro Narcotics at the
20   time, not for DEA.
21   Q    And my point is after the first of the year or sometime
22   shortly thereafter he went to work for you, correct?
23         THE COURT:  We know that.  He's already answered that
24   when we started off this morning.
25   BY MR. STANFORD:

```
 1    Q    Okay.  My point is everyone that was either arrested or
 2    detained was interviewed and questioned, it was recorded,
 3    everyone except Richard Buswell.  Isn't that a fact?
 4    A    I do not know that to be a fact, no.  I have no idea who was
 5    interviewed.  I don't even honestly know who was arrested.  I
 6    couldn't name off who -- you could show me 15 names and I may
 7    know one or two of them, but we weren't involved in arresting or
 8    interviewing people that were working at the stores.
 9    Q    Well, you have testified consistently that you were working
10    in conjunction with metro narcotics?
11    A    After that date.  I was not invited.
12    Q    I'm not saying that you were there that day.  I'm saying
13    after that day you learned that this is what happened.
14    A    No, I did not learn.
15    Q    You didn't know?
16    A    I did not learn that, no.  I didn't go back and say, hey,
17    tell me every little fact of this investigation and who was
18    interviewed and who was advised accordingly.  I just didn't do
19    it.
20              THE COURT:  All right.  Are we at a stopping spot,
21    Mr. Stanford?
22              MR. STANFORD:  Yes, sir.
23              THE COURT:  Okay.  Let's take a lunch recess
24    until 1:15.
25              Agent DeSalvo, don't talk about your testimony.
```

1          MR. WALKER:  Your Honor, in all likelihood

2   Agent DeSalvo is going to come to our office to eat, but we're

3   not going to talk about any testimony.

4          MR. FOSTER:  Judge, if I may interject, do you intend

5   to go until we finish today?

6          THE COURT:  I'm going to try my best to go until we

7   finish.

8          MR. FOSTER:  All right.  Thank you.

9          THE COURT:  It depends on my girl here.  If she says

10   I've had enough, y'all have had enough.

11                          (RECESS)

12          THE COURT:  All right.  Good afternoon, everyone.

13          Court will come to order.

14          Mr. Stanford, can you give me some ballpark on how much

15   longer you will have with Agent DeSalvo?

16          MR. STANFORD:  I'm going to try to wrap it up in an

17   hour.

18          THE COURT:  Let's try to wrap it up in 45 minutes.  How

19   about that?  Do your best.

20          Mr. Stockstill, you rise to speak.

21          MR. STOCKSTILL:  Yes, sir.  As the Court is aware, I

22   represent Curious Goods.  We've merely filed a motion to adopt

23   the motions that are pending before the Court.  It wasn't my

24   intention to ask questions or make arguments.  We're leaving that

25   to the lawyers who actually filed the motions.

 1           So with that being said, I'd like to notify the Court

 2   that we'd like to waive our appearance for this afternoon's

 3   matter and ask the Court to please excuse us.

 4           THE COURT:  That's fine with me.  This is your

 5   representative, Mr. Paul Buswell?

 6           MR. STOCKSTILL:  Mr. Paul Buswell or Ms. Buswell who is

 7   the majority owner of Curious Goods.

 8           MR. WALKER:  And Paul Buswell is represented --

 9           THE COURT:  Hang on.

10           Mr. McCann, you rose to speak?

11           MR. MCCANN:  I represent Paul Buswell.

12           THE COURT:  Individually?

13           MR. MCCANN:  That's correct.

14           THE COURT:  You're staying?

15           MR. MCCANN:  Yes, sir, I am.

16           THE COURT:  All right.  Ms. Buswell, are you staying?

17           MS. BUSWELL:  Yes.

18           THE COURT:  Okay.  So you're the only one leaving?

19           MR. STOCKSTILL:  Yes, sir.

20           THE COURT:  One less lawyer.  That's not a bad thing.

21   Have a good afternoon.

22           MR. STOCKSTILL:  Thank you, Your Honor.

23           THE COURT:  Mr. Walker?

24           MR. WALKER:  I was simply going to tell the Court that

25   Randy McCann represents Paul Buswell individually.

```
1              THE COURT:  All right.  Are you ready to proceed,
2    Mr. Stanford?
3              Just so that you know, I absolutely want to finish this
4    today because tomorrow at noon I will be going to the circuit
5    conference and I will not be back until a week from today, so if
6    we don't finish today, we've got a long delay and I don't want to
7    do that.  I want to leave here today giving everybody pretty much
8    my idea of where things are going to come out.  Most of the
9    opinions are written or at least are in draft form with the
10   exception of the ones we're hearing today.
11             You may proceed, Mr. Stanford.
12   BY MR. STANFORD:
13   Q    Just for a point of clarification, Agent DeSalvo, can you
14   approximate for me -- we talked about whether or not Agent White
15   was certified and when he was certified.  Can you give me an
16   approximation of when he was certified to work as a DEA task
17   force agent?
18   A    Well, he was working one case prior to December 8th.
19   That's why we were -- that one case is an ongoing case.  I can't
20   mention specifics.  In that case he basically is loaned to us by
21   his agency to work a specific case because there's only one
22   allotted spot, which Kane Marceaux had that spot from
23   Lafayette PD where he was the task force agent.
24             So Agent Marceaux, I believe, left at some point in
25   time in January, maybe the beginning of February.  Once he moved,
```

1    there was a process in which a replacement was provided to us for

2    Kane Marceaux.  That took a little bit of time for the two

3    captains to decide who would be that replacement.

4              And the reason I'm trying to build a time line, I think

5    the decision was made probably in the February, March time frame,

6    but once he's been committed to take part in the task force, then

7    there's a process where he has to undergo a background

8    investigation where he's able to get clearance to actually have

9    access to our documents and various things.  I don't think that

10   actually happened probably until May or June.  And like our

11   report writing system, he didn't have access to that.  So he was

12   in a limbo stage for probably a good part of the spring.  That's

13   the best of my recollection.

14   Q    Thank you.

15             You indicated earlier in your testimony -- and I just

16   want one question and then move on -- that no assets were seized

17   of Mr. Malone or Green and you felt they were hiding it in

18   anticipation of being charged.  Has your agency or any other

19   agency that you're aware of attempted to track where their assets

20   went?

21   A    Yes.  I believe Agent Harbourt.

22   Q    Okay.  Now, we've identified that Mr. Malone and Mr. Green

23   began cooperating with your agency before they were formally

24   charged or indicted; is that correct?

25   A    That's correct.

1   Q    And do you recall approximately -- would it be in August?

2   We know that we have a DEA-6 that shows an August 20th meeting

3   with Mr. Thomas Malone here in Lafayette.  Were there meetings

4   with Mr. Malone or Mr. Green prior to August 20th?

5   A    I don't believe so.  There may have been because his

6   attorney -- their attorneys I recall meeting with the prosecutors

7   here, possibly before an actual -- with them possibly, but I

8   don't know if we interviewed them initially or there was an

9   agreement made where we then were able to interview them.  I

10  don't recall, but there were a series of meetings between

11  Mr. Sadow and I don't recall Mr. Green's attorney's name.

12  Q    And although they hadn't been formally charged or arrested,

13  they were not interviewed without their lawyers being present; is

14  that correct?

15  A    Well, I think for Mr. Malone, when he was interviewed, I do

16  recall his attorney being present.  Mr. Green I think so as well.

17  Q    Now, you testified quite a bit this morning that everyone

18  you talked to said I would be representing anyone who was

19  represented -- anyone who was arrested with regards to

20  Curious Goods; is that correct?

21  A    If I stated everyone told me that, that was -- that's not

22  correct.  I know some individuals told us that, that their

23  understanding was that you would represent everyone.

24  Q    Okay.  And it was your understanding -- and I think you

25  testified -- I counted 11 times -- at the *Garcia* hearing that you

1    testified that I was the criminal attorney for Curious Goods and

2    that you were told that Richard Buswell had hired me to be the

3    criminal attorney for Curious Goods; is that correct?

4    A    Yes.

5    Q    And we know that you interviewed Patrick Chauvin who was a

6    co-owner of Curious Goods in January of 2012, correct?

7    A    Correct.

8    Q    And Patrick Chauvin also told you that I was the criminal

9    attorney for Curious Goods or that's what you testified to at the

10   *Garcia* hearing; is that right?

11   A    That's correct.

12   Q    Now, when you met with Paul Buswell in February of 2012,

13   February 15th, Richard Buswell was in jail, right?

14   A    Yes.

15   Q    And you are aware that I had been visiting with Richard

16   Buswell while he was in jail, correct?

17   A    Yes.

18   Q    And you and/or Agent White were monitoring Richard Buswell's

19   telephone calls from the jail, correct?

20   A    I didn't monitor every call, no.

21   Q    But you were monitoring most of the calls?

22   A    Some.  Others were monitoring, so I didn't monitor every

23   call.

24   Q    And if you listen to the calls between Richard Buswell and

25   family members or whomever, it was stated numerous times that I

1   was representing him on the state case, the pending charges, and

2   working on trying to get his property and Curious Goods' property

3   back for him, right?

4   A    Yes.

5   Q    So by the time you met with Paul Buswell on the 15th,

6   Paul Buswell told you and Agent White that I was handling the

7   forfeiture case for sure, correct?

8   A    I'd have to look over the transcript and see if he makes the

9   statement, if you'd point that out for me.  I mean, that may be

10  possible.  I just don't recall.

11  Q    Did Agent White tell you prior to going to New Iberia on

12  April 5th that he had called Paul Buswell and asked

13  Paul Buswell who he should serve forfeiture paperwork on?

14  A    He may have, yes.

15  Q    And didn't you also know on that day that -- or didn't you

16  know by April 5th that Richard Buswell had been removed as an

17  owner or interest holder in Curious Goods?

18  A    I knew that they -- I knew that his name was taken off of

19  some paperwork, yes, I think pursuant to his revocation hearing.

20  Q    So you were aware at the revocation hearing that one of the

21  things that Magistrate Hanna was concerned about was that he not

22  have any involvement with Curious Goods?

23  A    Yes, but I knew that not to be the case.  I knew that he was

24  still involved.

25        MR. STANFORD:  What's my next exhibit?

1          THE COURTROOM DEPUTY:  Twenty-one.

2    BY MR. STANFORD:

3    Q    Okay.  I'm going to show you what I've marked as S-21.  This

4    is a document filed with the Secretary of State on

5    January 21st, 2012.  And I'm going to turn to the third page.

6    It shows on this document that Richard Buswell has been removed

7    as of January 21st as having any ownership interest or anything

8    to do with Curious Goods as well as Patrick Chauvin?

9    A    Yes.

10   Q    And Paul Buswell was replaced as a member?

11   A    Yes, I see that.

12          MR. STANFORD:  Okay.  I would like to offer, file, and

13   introduce this as S-21.

14          MR. WALKER:  I have no objection.

15          THE COURT:  Let it be admitted.

16   BY MR. STANFORD:

17   Q    And I'm going to show you what I've marked as S-22 which is

18   another document filed with the Secretary of State on

19   March 2nd, 2012.  I'm going to turn to the third page.  And it

20   shows that Attorney Barry Domingue has been removed as an agent

21   for service of process and that Paul Buswell is now listed as the

22   agent for service of process.

23   A    Yes.  This is March 2nd, correct?

24   Q    Correct.

25   A    Yes.

1          MR. STANFORD:  I'd like to move this into evidence as

2    S-22.

3          THE COURT:  Any objection, Mr. Walker?

4          MR. WALKER:  No, Your Honor.

5          THE COURT:  Let it be admitted.

6    BY MR. STANFORD:

7    Q    So prior to April 5th when Officer White or Agent White

8    called Paul Buswell, you were aware that Paul Buswell was an

9    owner of Curious Goods as well as an agent for service of process

10   for Curious Goods?

11   A    Yes.

12   Q    And by April 5th you were also aware that I represented

13   Richard Buswell on the pending state case as well as any pending

14   forfeiture matters?

15   A    At that point I think I believed that you represented him

16   when he was arrested, yes.

17   Q    When he was arrested on the state charges?

18   A    Yes.

19   Q    Did you see anything or -- see anything or hear anything

20   that would have tipped you off to the fact that I was no longer

21   representing him on the state charges?

22   A    No.

23   Q    As a matter of fact, you -- not you, but agents were

24   monitoring Richard's phone calls as well as my visits to Richard

25   at the Iberia Parish Jail; isn't that correct?

1   A    I'm not aware of them monitoring your visits.  I am not.  I

2   know calls were being monitored between -- as far as I know

3   between you and Mr. Buswell.

4   Q    Okay.  Now, last week Agent White testified, and I think you

5   also did today, this afternoon, that Ryan Shanahan -- he said

6   that -- and I have a copy of the transcript that has been

7   produced as to Will White and Alan Haney.  On page 58 Agent White

8   acknowledges that actually Ryan Shanahan would be the primary

9   case agent on the state case.  Is that correct?

10  A    Yes.

11  Q    And I believe you discussed some of the search warrants, and

12  I showed you one of them that actually indicated that Ryan

13  Shanahan was in fact the case agent on the metro narcotics case?

14  A    Well, I think the way he was assigned is he was the case

15  agent.  They basically divided the case into different sections.

16  Ryan Shanahan was the case agent.  I think Will White was the

17  agent in charge of the asset part of the case.

18  Q    Okay.  The document I showed you this morning, the affidavit

19  for the search warrant, only says that Ryan Shanahan is the case

20  agent for the Curious Goods investigation.

21  A    Yeah, but many times in cases there's more than one case

22  agent.  I was told by metro narcotics that Will White was to

23  handle exclusively the case for the assets.

24  Q    And who told you that with metro?

25  A    I believe one of the captains, Captain Ted Vincent or

1    Captain Babin.

2    Q    Okay.  Now, at some point --

3    A    Can I clarify one thing?  Going back to Mr. Buswell's phone

4    calls in the jail, the monitoring, there were calls indicating

5    when you visited.  There were calls, but I did not -- me in

6    particular, I did not give an order or any type of instruction

7    for the jail to report when -- there may have been some inquiries

8    on who visited, but I didn't state, hey, I need to know when.  I

9    wasn't monitoring his attorney visits.  We did come into contact,

10   many of them through Richard's phone calls and subsequent through

11   information, that you guys were visiting.

12   Q    Okay.  Thank you for clearing that up.

13        Now, at the *Garcia* hearing when I was talking to you

14   about serving Richard -- or actually interviewing Richard, you

15   testified at page 45, line 22 -- I asked you, "Why did you go and

16   interview Mr. Buswell without first contacting counsel?"  You

17   said, "Well, we didn't.  We went over there to serve paperwork as

18   it relates to forfeiture."  Do you remember saying that?

19   A    That's correct.

20   Q    Now, prior to that, according to Agent White, he had the

21   forfeiture paperwork in hand and went to you and said, I need to

22   serve this.  Alan Haney is telling me I need to serve it on

23   Richard Buswell.  Is that how it happened?

24   A    I don't recall if he had the paperwork.  I know that he told

25   me -- he approached me and said, Alan Haney told me to serve

1    Richard Buswell with this paperwork or with paperwork.  I don't

2    recall if he had it in his hand.  He may or may not have.

3    Q    Now, do you recall approximately when this occurred?  If you

4    went to see him April 5th, when did you and Agent White first

5    have this conversation?

6    A    It was prior to that.  I would be guessing.  It could have

7    been a week.  It could have been two weeks.  It could have been

8    about -- between one and two weeks prior.

9    Q    Okay.  But it was surely sometime in the mid to end of

10   March, 2012, correct?

11   A    Yes.

12   Q    And I believe you testified earlier that by mid-February or

13   the beginning of March that Agent White, at least at the

14   Lafayette Police Department level, had been approved to work as a

15   task force agent with the DEA, correct?

16   A    He was the replacement.  I was told he would be the

17   replacement.

18   Q    So when he approached you and said he had to serve

19   paperwork, did you ask him what kind of paperwork and why do you

20   need to serve it?

21   A    Yes.

22   Q    Because you knew then that Ryan Shanahan was also a case

23   agent on that case and was capable of serving any paperwork,

24   right?

25   A    No.  What was advised when Task Force Agent White was

1    transferred to the DEA by his captains was -- and there were some

2    issues.  Obviously there were some issues with Kane being pulled.

3    We did not want Kane to be pulled from the task force.  So it's a

4    very complicated issue with some other internal dealings that had

5    nothing to do with this.  So when -- and we wanted a replacement

6    for Kane Marceaux.

7            When White was determined to be the replacement, his

8    captain told me the conditions of -- there were new conditions

9    where he would be the replacement, one of which is Agent White

10   will handle all the assets involved in this case.  He's been

11   involved in it.  We want him to continue as a metro agent to

12   continue with this process.

13           Like I said, it was divided.  Shanahan was a case

14   agent, so was Will White.  He was specifically geared toward

15   assets.  And I agreed to it.

16   Q    Okay.  So if I'm following you, one of the conditions of

17   Agent White being assigned to you was that he would continue to

18   handle all of the asset or forfeiture issues as it relates to

19   Curious Goods?

20   A    In the state case, yes, sir.

21   Q    In the state case.  Thank you.  I'm glad you pointed that

22   out.

23           Now, Agent White testified in his testimony at page 75

24   that when Assistant District Attorney Alan Haney asked him to

25   serve Mr. Buswell personally, and I'm paraphrasing, he was a

 1   little apprehensive because he knew Mr. Buswell had a lawyer, and

 2   thereafter he approached you and told you that, you know,

 3   Alan Haney wants me to serve this paperwork, this forfeiture

 4   paperwork, but Mr. Buswell -- Daniel Stanford represents him on

 5   this, kind of what should I do.

 6   A    You said page 75 of what?  I'm not clear on what transcript

 7   you're referring to.

 8            THE COURT:  Friday's hearing.

 9            THE WITNESS:  Okay.  Could you repeat what was said or

10   let me take a look at it?  Can I do that?

11            THE COURT:  Yes.

12   BY MR. STANFORD:

13   Q    At the top of the page, I don't know if you can read that.

14   A    Yeah, I can read it.

15   Q    I said, "You knew that Mr. Buswell had a lawyer, you had

16   been told that, and you were trying to clarify who the

17   appropriate party was to serve, correct?"  And he said, "Yes."

18   And he's saying, "There's some hesitation on my part because he

19   has representation.  I've never been in a situation like that,

20   but the DA was insisting this is how we've done it in the past.

21   You personally serve them.  So I reached out to Mr. DeSalvo and

22   we had conversations with Alan Haney just to confirm as far as

23   what avenues he wanted to proceed."

24            So did you and Agent White have a conversation with

25   Assistant District Attorney Alan Haney about serving this

1    paperwork?

2    A    Yes.  Initially Agent White told me what Alan Haney directed

3    him to do, and I'm not involved -- I had never been involved in

4    the state forfeiture process.  I didn't know that they actually

5    did that.  As a federal agent, we don't -- we don't do things the

6    same way they do them, so I was a little confused.  So basically

7    what I wanted was to talk to Alan Haney and clarify what exactly

8    he wanted -- what he wanted Will to do as a metro agent and so we

9    called him.

10   Q    Okay.  And by that time, if Alan Haney is wanting Will White

11   to personally serve certain documents on Mr. Buswell, as his

12   supervisor, because now he's working as a task force agent, you

13   would have looked at the documents for yourself, correct?

14   A    I don't think I looked at them, no.  We talked to Alan and I

15   asked him what's this all about and why do we have to serve

16   Richard personally.  I questioned that.

17   Q    What did Mr. Haney tell you?

18   A    He said he wanted it done personally.  He said that -- I

19   think he said based on his understanding of the process, the

20   state forfeiture process, and for no issues to be raised later,

21   he wanted it personally.  I asked him can we serve someone else

22   and he said no.

23   Q    Okay.

24   A    And I mentioned your name and Mr. Domingue's name to him.

25   Q    You raised that to ADA -- to Assistant District

1   Attorney Haney that he's got a lawyer?

2   A    Well, no.  What I said was -- I said that Mr. Domingue is

3   associated with the company.  He's the franchise attorney.  And

4   Mr. Stanford was also associated with the company.  I was doing

5   it just for ease just because we were busy.  I said can we just

6   serve them quickly and he said no.  I said okay.

7   Q    Okay.  Now, right over here Agent White is saying that you

8   had issues as to whether or not it could be done and would this,

9   I guess, be an opportunity or -- be an opportunity as far as if

10  Richard were to approach us and begin talking, because listening

11  to the phone conversations while Mr. Buswell was in jail, he

12  mentioned several times that he wanted to speak specifically to

13  me.

14          Okay.  Did you also see this as an opportunity to get

15  in front of Mr. Buswell and possibly interview him?

16  A    Without Alan Haney directing us to do that, I didn't want to

17  go talk -- not necessarily want to, but I didn't seek to

18  interview Mr. Buswell.

19          When this happened, I knew this would present a

20  situation that I wasn't real comfortable with, that I needed to

21  talk to the prosecutor.  So I spoke to Haney and then I talked to

22  the U.S. Attorney as well and said this is the issue.  He's

23  telling us to serve him, not to serve Daniel Stanford, not to

24  serve Barry Domingue.  He may talk.  He may not talk.  We can go

25  in there, throw the paperwork down and walk out, or if he wants

1    to talk, what do we do in that situation?

2    Q    But Agent White uses the words "I guess be an opportunity."

3    My question is, did you see this as an opportunity to get in

4    front of Mr. Buswell and interview him?

5    A    No, you know, not necessarily to interview him.  I did see

6    it as an opportunity.  What I saw was happening was that

7    Mr. Buswell was repeating things, or at least I was told that he

8    was repeating things, and I heard some of those things, regarding

9    Special Agent Harbourt and that the government was the big bad

10   wolf and all of this good stuff.

11         We had obviously spoken to Paul Buswell and built a

12   rapport and we were aware that Richard Buswell wanted to talk to

13   us about Pinnacle Products and about the Georgia part of the

14   investigation.  So at a minimum I wanted to put -- we serve this.

15   He sees that we're not bad guys.  Put a face with the name.

16   We're not the big bad wolf.  At some point later on if he wants

17   to talk to us, he can talk to us because he sought a desire to

18   talk to us.

19   Q    Well, again, the way that Agent White couched it, he said it

20   would be an opportunity as far as if Richard were to approach us

21   and began talking.

22         First of all, Richard was in jail.  Richard could not

23   approach you or Agent White or anybody else.  Correct?

24   A    That's correct.

25   Q    You would have had to initiate contact and approach him,

1    which is what happened, correct?

2    A    Possibly.

3    Q    And so prior to April 5th Agent White also states that you

4    and he met with Assistant U.S. Attorney Collin Sims to discuss

5    this situation?

6    A    That's correct.

7              MR. WALKER:  Your Honor, I'm not objecting to the line

8    of questioning.  I'm objecting to the form of the question by him

9    reading what Agent White testified.  I think that's an

10   inappropriate way to use a transcript of another witness.

11             THE COURT:  That is correct, Mr. Stanford.  Either give

12   him the transcript with page and line reference or ask the

13   question another way.

14             MR. STANFORD:  Yes, sir.

15   BY MR. STANFORD:

16   Q    At some point prior to April 5th you and Agent White met

17   with Assistant U.S. Attorney Collin Sims?

18   A    That's correct.

19   Q    Was anybody else at that meeting?

20   A    Yes.

21   Q    Who was that?

22   A    AUSA Uebinger.

23   Q    Anyone else?

24   A    Greg Harbourt.

25   Q    Anyone else?

```
1    A    I don't think so.  I think that was it.

2    Q    And the issue then was you had -- or you knew that

3    Agent White had been directed to serve this paperwork.  You had

4    pretty much given your word to Captain Vincent that you would

5    allow Agent White to continue handling the forfeiture matters.

6    So you met with the Assistant U.S. Attorneys to discuss, I guess,

7    kind of a sticky situation.  You knew that Mr. Buswell had a

8    lawyer, but the Assistant District Attorney is telling you to

9    serve these papers.  When you met with the Assistant District

10   Attorney -- I mean, the U.S. Attorneys, did you have the

11   documents in your hand that you were supposed to be serving?

12   A    I don't believe so.

13   Q    Is there a reason why you would go to a meeting with them

14   about serving case specific documents regarding a forfeiture

15   matter and not have those documents with you to show the

16   Assistant U.S. Attorneys that this is what we're talking about?

17   A    We explained to them what it was.  I don't even know if

18   Will White had the documents at the time.  I don't recall.

19   Q    Well, what did you explain to them?  What did you explain to

20   them with regards to the documents?

21   A    Alan Haney wanted us to serve documents.  Personal service

22   is what I knew.  I had never seen any of those documents before.

23   I don't recall seeing them before the day we served them.  I was

24   accompanying Agent White because we were having issues with -- we

25   were having issues with -- we were having issues with metro
```

```
 1    narcotics at the time and I didn't want to go back and say we
 2    can't handle this.  So I was looking, just out of ease, to
 3    initially serve you or Mr. Domingue.  We had conversations about
 4    it, but I wasn't familiar with the process.  I didn't take the
 5    time to -- other than just talking to Mr. Haney, I didn't take
 6    the time to research it.
 7    Q    Okay.
 8    A    I took him for his word that these have to be served, and
 9    from what I understood, they're served on everybody.  Once
10    someone is arrested, assets are seized.
11    Q    So one question.  You don't know as you sit here today
12    whether prior to April 5th Agent White had the documents in
13    hand or in his possession?
14    A    Well --
15    Q    Do you know if he had them or don't you?
16    A    I don't know.  I don't know.  He may have had them.  Like I
17    said, he may have had them.  I know there were some other
18    individuals that were being served at about the same time,
19    because, again, when Will White approached me, he was -- he had
20    dual roles, so the time he approached me was when I became aware
21    of it.  He did do some things on his own that were part of what
22    they normally do in metro narcotics.  I didn't ask him to report
23    to me every little thing he did.  I did as much as I could
24    handling part of this case and a pretty large caseload of other
25    cases that were going around my office with nine task force
```

1    agents and two special agents.  I don't know.  He could have had

2    them.  We could have actually brought them to the meeting with

3    Collin Sims and Ms. Uebinger.  I just don't recall.

4    Q    Okay.  That's fair.

5           Now, April 5th, that's the day you went to

6    New Iberia.  At what point in time had you been notified by your

7    superiors that DEA was to formally get involved in this

8    investigation or the investigation of the synthetic cannabis?

9    A    Well, I'm not informed by my superiors.  That decision is up

10   to me whether or not we're going to get involved in the case and

11   it's done in conjunction with the United States Attorney's

12   Office.  It was an ongoing thing.  It was probably late spring

13   until we decided to charge this case.  There was a very good

14   chance it wasn't going to be charged federally.

15   Q    Well, when you met with Paul Buswell February 15th, 2012,

16   you told him unequivocally this case is going to be prosecuted

17   federally?

18   A    Yeah.

19   Q    You had already talked to the U.S. Attorney's Office and you

20   had, I guess, gotten the green light from Ms. Finley that there

21   was no question about it, it was going federal; is that correct?

22   A    Well, certainly, I mean, there's a lot of cases that we

23   would like to go federally and many times we're told move forward

24   with it, but, from my experience, until I see that indictment or

25   a Grand Jury scheduled, many times it just doesn't happen.

```
 1              You can ask Mr. Hipwell the same thing.  As a
 2    prosecutor, it's not up to them.  It's up to the management.  It
 3    has to go through an indictment review committee.  I've had many,
 4    many occasions where I planned on moving forward with it and it
 5    was turned down.
 6              MR. STANFORD:  Judge, I don't think that I have at this
 7    point introduced the transcript of Paul Buswell.
 8              THE COURT:  You have not.
 9              MR. STANFORD:  At this point I would like to offer,
10    file, and introduce it.  I know that I've given copies to
11    everyone.
12              MR. WALKER:  I don't object.
13              MR. STANFORD:  This is S-23.
14              THE COURT:  Let it be admitted.  This would be the
15    February 25th?
16              MR. STANFORD:  February 15th.
17              THE COURT:  15th.  Excuse me.
18    BY MR. STANFORD:
19    Q    On page 23 at the top, you made a statement that you talked
20    to state prosecutors, the DA, and you talked to the federal
21    prosecutors, and they have all been told by their bosses that
22    it's going to get prosecuted.
23              By February 15th had you talked to the
24    U.S. Attorney's Office about this case being prosecuted
25    federally?
```

1    A    Well, part of the context of this -- and you need to go back

2    a little bit -- is Paul was trying to convince me that he wanted

3    to go back out and sell these products in his stores.  Really

4    what I was trying to do was convince him that it would be bad for

5    him to do this and that federal cases are being pursued and state

6    cases are being pursued.

7              And I told him if he goes and sells this -- he said he

8    wanted to sell it for 90 days to get his money back that he lost

9    and get out of the business, and I tried to assure him, Paul,

10   this is not a good -- if you look at what I say, "We don't want

11   someone who has a career in law enforcement to ruin that

12   facing -- and we are not saying that, obviously, there is some --

13   there is always..."

14             I'm trying to explain to him.  I'm trying to convince

15   him that it would be a bad idea for him to move forward with

16   selling this product.  I believe that was the context of it.  So

17   did I exaggerate to try to benefit him?  Yes.  I was honestly

18   trying to tell him it would be a bad idea for him to sell this,

19   but I can tell you I had no assurances from the U.S. Attorney's

20   Office that this would ever be prosecuted, to the contrary.

21   Q    Now, you said earlier -- and I'm not sure if I got that

22   right -- that you were the one who was going to make the decision

23   about whether or not the DEA was going to pursue this case?

24   A    Yes.

25   Q    Okay.  Well, do you know when you made the decision to move

1    forward or all in as far as the DEA investigating this case?

2    A    Well, again, I'm going back to if it's going to be

3    prosecuted on a state level, which I didn't have a whole lot of

4    confidence in, well, then I wouldn't -- I would move forward in

5    my investigation parallel with their investigation and at some

6    point in time we'd have to make a decision.

7              What I was interested in was -- and I had these

8    discussions -- was anything out of the reach of the state

9    investigation, Pinnacle Products, Boyd Barrow, NutraGenomics.  If

10   they weren't going to prosecute them, I would prosecute that part

11   of the case, and so I was moving forward on that part of the case

12   for sure, whether that would be prosecuted, because there were

13   hundreds of offices, or maybe less than hundreds, but many

14   offices that were pursuing NutraGenomics and various companies

15   around this country because they were supplying several states.

16   Q    Okay.  I understand all of that, but my question simply is,

17   do you recall when you made the decision to move forward with

18   this?

19   A    What do you mean by move forward?

20   Q    I mean prosecute it.

21   A    I have no decision in the prosecution.  I investigate it and

22   turn over the investigation, but many, many times my

23   investigations are turned over, and because there may be a state

24   prosecution or because it doesn't meet their guidelines, it

25   doesn't get prosecuted, so all I can do is move forward in my

1    investigation and hope for the best.

2    Q    Okay.  So at the meeting with the Assistant U.S. Attorneys,

3    was it discussed that you were going to record the meeting with

4    Richard Buswell?

5    A    Yes.

6    Q    And who brought that up?

7    A    At first I think I had stated that we probably wouldn't

8    record it, and it was advised that we probably should record it

9    for our own protection and so I agreed.

10   Q    And who was it specifically that advised you that you should

11   record it for your own protection?

12   A    I think it was a combination of Collin Sims and

13   Ms. Uebinger.

14   Q    Okay.  Now, did the Assistant U.S. Attorneys ask you -- do

15   you recall if they asked you, okay, well, what paperwork

16   specifically do you have to serve on him because -- did it come

17   up that you could serve the corporate agent?  Did that come up in

18   the conversation?

19   A    I don't recall.

20   Q    But you knew at that time -- what you knew at that time was

21   that the asset that was in question was $19,695, right?

22   A    Yes.

23   Q    And that asset had been seized at 412 Old Settlement Road

24   and it was in a bank bag with Curious Goods deposit receipts and

25   various other things, correct?

```
 1   A     That may be the case, yes.  I don't recall exactly.
 2   Q     And the consensus was that that was the property of
 3   Curious Goods, the company, correct?
 4   A     Yes, I believe so.
 5   Q     Okay.  And you knew that if it's company property, that you
 6   could serve Paul Buswell since he's the agent for service and
 7   he's also an owner.  Since you knew that, did you bring that up
 8   to the Assistant U.S. Attorneys at your meeting?
 9   A     What I told them was what Alan Haney directed us to do.  I
10   don't recall -- he gave us no leeway.  He said he needs this
11   done.  What do we do?  What does Will or I do, if anything?
12   Q     Okay.  Did Will White tell Agent DeSalvo this is the type of
13   paperwork I have to serve, and because it's this type of
14   paperwork, it has to be done this way?  Did you have that
15   conversation with Will White or with the Assistant U.S.
16   Attorneys?
17   A     That's possible.
18   Q     Now, I'm going to show you what's already been introduced.
19   It was introduced last week in this hearing.  And I'll start off
20   with S-5.  Can you see that okay?
21   A     Yes, sir.
22   Q     Do you recognize this document?
23   A     I don't recognize it.  I mean, I've seen it, but I don't --
24   there's nothing on it that indicates to me that I had that.  I
25   mean, does it have a signature on it or anything like that for me
```

1    or --

2    Q    Let me ask you this.  Do you know who wrote "5th, April,

3    2012," and circled "personal service"?

4    A    I don't.

5    Q    Okay.  Now, if you look at the top of it, it says, "You are

6    hereby authorized and ordered to seize for forfeiture," and right

7    above that right here, "property described to be subject to

8    forfeiture under the Laws of Louisiana."

9            So the caption of this seizure warrant indicates that

10   whatever property -- and we're talking about the $19,695 -- had

11   been seized for forfeiture, correct?

12   A    Yes.

13   Q    Based on the document.  It doesn't say anything about

14   evidence.

15   A    Which I have absolutely seen this as --

16   Q    And I appreciate that, Agent DeSalvo, and I'm not trying to

17   trick you.  I'm just saying that's how it reads.

18   A    It may.  It's foreign to me basically.  I see at the top

19   "Seizure Warrant."  So I don't know.  Is that a seizure

20   warrant?

21   Q    Yeah.  That's what it says.

22   A    Okay.  Well, I...

23   Q    And turning to the second page of the document, that says

24   "Rights of Owner/Interest Holder."  Do you see that?

25   A    Yes.

```
 1    Q    Do you see where it says "Notice"?  Can you read that
 2    sentence for me?
 3              MR. WALKER:  Your Honor, my objection is this.  The
 4    witness has testified he doesn't know this document.  He's not
 5    sure he's ever seen this document before.  The document is in
 6    evidence, and so, as a result, we're just wasting time.
 7              THE COURT:  It's wasting time, Mr. Stanford.  I've read
 8    the document.  I don't need him to read it to me.
 9              MR. STANFORD:  Well, Judge, I'll just make one
10    significant point.
11    BY MR. STANFORD:
12    Q    The first sentence says that forfeiture proceedings under
13    Louisiana law have begun against property in which you are
14    believed to hold an interest as described on the Notice of
15    Forfeiture attached.
16              Was there any other document that accompanied these
17    documents when you went to New Iberia on April 5th, 2012?
18    A    I don't recall any other documents, no.
19    Q    Okay.  So according to this Rights of Owner, there should
20    have been a Notice of Forfeiture attached?
21    A    I have absolutely no idea.  I don't know.  I've never
22    handled a state forfeiture case.
23    Q    And whose signature is this?
24    A    That's mine on the right.
25    Q    This is yours?
```

```
1    A    Yes.

2    Q    This is Agent White's?

3    A    Yes.

4    Q    Is that your handwriting here?

5    A    Yes, that is.

6    Q    And this says "refused"?

7    A    Returned or refused, yes.

8    Q    Okay.

9         THE COURT:  I'm glad you have trouble reading your own

10   writing.

11        THE WITNESS:  But it was only my signature.  I didn't

12   write any of that other on the bottom.

13        THE COURT:  While he's searching over there for

14   whatever his next question is, this interview of Mr. Paul Buswell

15   on February 15th, 2012, was he aware that it was recorded?

16        THE WITNESS:  No, sir.

17        MR. STANFORD:  Your Honor, should I proceed?

18        THE COURT:  Yes.

19   BY MR. STANFORD:

20   Q    Prior to going to New Iberia to the jail, was it your

21   intention to just walk in, like you said earlier, and drop off

22   the paperwork and leave?

23   A    Yes.  That was my intention, but I knew there were other

24   possibilities.

25   Q    Okay.  You testified at the May 14th Garcia hearing that
```

1    you told Mr. Buswell you were there for the sole purpose -- the

2    only reason was to serve those documents?

3    A    Right.

4    Q    And you indicated at page 47, line 8, that the reason that

5    you engaged him was because he persisted in talking to us and we

6    talked?

7    A    Repeat that.  I'm sorry.

8    Q    At page 47 of the transcript, line 3, I asked you, "And on

9    that day you knew he had a lawyer, you knew he was represented?"

10   You said on line 5, "Yes, I did."

11   A    Let me pull up the transcript again.  Page again?  I'm

12   sorry.

13   Q    Page 47, line 3.

14   A    Page 47, line 3, is a question from you.

15   Q    Correct.

16   A    "And on that day you knew he had a lawyer, you knew he was

17   represented?"  Yes.

18   Q    And the next question at line 6, "And you nevertheless

19   continued or persisted in your attempts to interview him,

20   correct?"  And you said, "He persisted in talking to us and we

21   talked."

22   A    Yes.  I didn't try to coerce him into talking or anything

23   like that.  When we walked in there, he started talking about

24   various things as we were explaining the paperwork, so we asked

25   him to focus on the paperwork.  He continued.  From my

1    recollection -- I don't have that in front of me.  My

2    recollection is he blurted out various things related to the

3    case.  And at some point in time I said we were here to serve

4    this paperwork.  Will White is here to serve this paperwork, and

5    if you want to talk, we'll talk, but we have to advise you of

6    your *Miranda* rights.

7    Q    Now, please turn to page 76 starting at line 9.  I asked you

8    a question, "Isn't it true that soon after the raid, which

9    occurred December 8th, 2011, in your first round of interviews,

10   you were already telling individuals that I could not represent

11   Mr. Buswell because I had a conflict?"  And your response was, "I

12   didn't tell him that.  I asked them if that occurred."  And my

13   question was, "If what occurred?"  And then you explained at

14   line 15 "If -- what was stated was, speaking to Paul and Bonnie,

15   Paul was stating that you -- that Richard wanted to talk to us,

16   be interviewed about Pinnacle Products and NutraGenomics."

17            That was your testimony, correct?

18   A    Yes.

19   Q    Now, if we look at Mr. Buswell's interview of

20   February 15th, 2012, at page 58, at the bottom.  Just let me

21   know when you're there.

22   A    Yeah.  But in my testimony I don't say which date he told us

23   that.  We talked to him on the 16th as well, and he told us he

24   wanted to talk about -- specifically about Boyd Barrow and

25   Pinnacle and NutraGenomics.

1    Q    Okay.  Are you at page 58 of Paul Buswell's interview?

2    A    Yeah.  But what I'm saying is in this *Garcia* hearing I'm not

3    referring to a specific date.  I'm telling you, to clarify, there

4    were two interviews two days in a row, and he did tell me that he

5    wanted to talk on the 16th.

6    Q    Okay.  But let's look at the transcript of the 15th at

7    page 58.  At the bottom --

8    A    What page?

9    Q    Fifty-eight.

10   A    Okay.

11   Q    Where it reads by Will -- the subject was brought up by

12   Agent Will White.  He said, "Let me ask you this," speaking to

13   Paul Buswell.  "I'm not saying that it's going to happen, but

14   would Richard be willing to talk about this?"

15            So Agent White and/or the agents were the first ones to

16   bring up the topic about would Richard Buswell be willing to

17   talk, correct?

18   A    I don't know.  I don't know if -- there may have been phone

19   calls.  I know there were numerous phone calls where Richard was

20   discussing that he wanted to talk to us.  He wanted to -- he was

21   really upset with Boyd.  I just don't have access to the dates on

22   that.  I can't honestly say if that was the first time Will

23   brought that up or if he had that conversation with Paul prior.

24   Q    And you mentioned a subsequent meeting the next day on the

25   16th with Paul Buswell?

1    A    Yes.

2    Q    Was that subsequent meeting recorded?

3    A    Yes, it was.

4         MR. STANFORD:  Okay.  I have a puzzled look on my face

5    because I don't have that.

6         MR. WALKER:  He received it in discovery, Your Honor,

7    both the 15th and the 16th.

8         MR. STANFORD:  I don't have it.

9    BY MR. STANFORD:

10   Q    Now, do you have a copy of the interview, the

11   April 5th interview?  If not, I can give you one.

12   A    I do not have a copy of that.

13        THE COURT:  Was it transcribed, Mr. Walker, the 16th?

14        MR. WALKER:  The 16th was not totally transcribed.

15   There is a portion that's transcribed.  It's another long

16   interview.  I intend to introduce the transcribed portion in my

17   cross examination of this witness.

18        MR. HIPWELL:  Your Honor, I rise just to say that my

19   client tells me, who's listened to the disc that was given to us,

20   that there's about a minute and 38 second recording of his

21   brother Paul on the 16th.  And I just offer that.  My client

22   tells me that that's what's on the particular tape where the 15th

23   one is.

24        MR. WALKER:  The 16th is longer than a minute and a

25   half.

1          MR. HIPWELL:  Okay.  That's our problem.  Thank you.

2          We don't know if we have it, Your Honor.

3          MR. STANFORD:  I haven't seen or heard it, Judge, so...

4     BY MR. STANFORD:

5     Q    I have just handed you the April 5th transcript of your

6     meeting with Richard Buswell, and we can start with page 1.

7     A    Well, let me say that I -- is this the transcript that was

8     used for -- that was used in the past?

9     Q    I don't know if it was used in the past.  I had it

10    transcribed sometime in July or August.

11    A    Yeah.  I think I may have looked at this and I'm not real

12    comfortable with the accuracy of this.  I would have to go

13    through -- I did -- I have in the past looked through this and it

14    seemed to me to be somewhat inaccurate, so I would have to verify

15    that before I make any statements.

16    Q    Have you read the -- you've read the transcript prior to

17    today?

18    A    A while ago, yes.

19    Q    And you have access to the audio recording of the interview

20    from April 5th?

21    A    But I haven't listened to that.

22    Q    My question is you have access to it and you can if you want

23    to?

24    A    I haven't had -- I haven't had access to it recently.  Being

25    in Dallas, I don't have access to that file.

1   Q    This transcript was provided to the U.S. Attorney's Office I

2   think probably at the end of August when Judge Haik on

3   August 20th issued an order and ordered that it be provided to

4   the Court.  Shortly thereafter, surely before September, it was

5   provided to the U.S. Attorney's Office and to the Court.  In

6   September of 2012 you were still assigned to Louisiana, correct,

7   in this office?

8   A    Yes.  But, again, I don't think -- I don't know however it

9   was, but I thought there were some inaccuracies in looking

10  through it briefly previously.

11  Q    Okay.  Well, with that noted, let's look at page 1.

12  A    Okay.

13  Q    Prior to walking into the facility, did either you or

14  Agent White call the facility and ask them to pull

15  Richard Buswell out?

16  A    Yes.

17  Q    Was it you or Agent White who made the call?

18  A    I'm not sure.

19  Q    Okay.  Richard Buswell was pulled outside of the -- where

20  the prisoners are held into kind of an administrative section of

21  the jail?

22  A    Well, you know, we may have actually -- it may have been a

23  request done through Bert Berry who was assigned to our office at

24  the time who was with Iberia Parish, and we -- that's -- the

25  place that we interviewed him is where I interview all inmates at

1    Iberia Parish.  So I don't know if we specified it or we just

2    said pull him into where we normally interview them, but that's

3    the only location I've ever interviewed someone, in that

4    little -- it's like a classroom.

5    Q     Okay.  And you look at page 1.  If you listen to the

6    recording that I received from the government, when y'all walked

7    into the facility, the recorder was running, correct?

8    A     When we walked into the facility?

9    Q     Or was it turned on shortly after entering the facility?

10   A     Well, again, based on this transcript, I can't tell.  It

11   starts off with, "Hello, Mr. Buswell."  So is there dead air

12   before this or not?  I just don't recall.

13   Q     Okay.

14   A     If it was turned on before, my guess is you would capture a

15   conversation between me and Agent White.

16   Q     And at the bottom of the page where it says White, he's

17   explaining, "Before we go any further, I'm going to drop off the

18   asset forfeiture.  Okay?  And I'm going to explain it to you."

19   And he says, "Okay."  "It is a seizure warrant."

20          And then he says, "And this is the case number that's

21   assigned and the case number is in reference to your residence at

22   Old Settlement.  Don't hold me to a letter T on this, but I

23   believe that in talking to, I think, the captain, $19,000, I

24   think, was found in a bag with some receipts, like a deposit bag.

25   And I'm not saying that you know it or not.  I'm just telling

1    you."

2         And then there's further conversations between

3    Mr. Buswell and Agent White.  And at the bottom of the page

4    Agent White says, "Obviously they believe that the money was part

5    of Curious Goods' business itself.  Do you follow me?"

6         Do you see that?

7    A    Yes.

8    Q    And if we turn to the second page, Agent White explains that

9    the District Attorney wants Mr. Buswell personally served.  He

10   states that the $19,695 is being currently stored at LPSO in

11   evidence and the affidavit was signed on December 16th.

12        And Agent White says, "There's a lot of paperwork

13   involved in the case and we're just taking it one at a time, so I

14   may be coming back here next week or next month when they tell me

15   that, hey, we have another paper for you to deliver to him.

16   Okay?"  And right there Richard Buswell says, "Well, Dan is

17   handling this now."

18   A    Yes, I see that.

19   Q    And White says, "But the district attorney wants you

20   personally served."  Mr. Buswell said, "And the reason for that?"

21   And Agent White said, "And here is the reason."  Mr. Buswell

22   says, "Yeah."  And Agent White says, "When I talked to your

23   brother, he was initially very -- we don't need to go no

24   further."  Mr. Buswell says, "No, we do."  Agent White says,

25   "Hold on.  He wants to assure that because of that, we don't want

1    no errors.  We don't want no misconceptions whatsoever.  We

2    believe that this is the entities of Richard.  Serve him

3    personally."  Mr. Buswell says, "The entities of Richard?"

4           If you recall at the bottom of page 1, Agent White is

5    telling him that they think it's Curious Goods' money and now

6    he's saying he thinks it's Mr. Buswell's money.

7           Agent White at the bottom of the page says, "But it is

8    a Curious Goods.  It was in a deposit bag with slips in it, so he

9    specifically said to serve you with it.  Okay?  And I am going to

10   explain to you.  This is your copy and this is for you and you

11   are also going to get this.  This is the rights of ownership for

12   interest holder.  This is a step-by-step process on what you need

13   to do as far as contesting the proceedings."  Mr. Buswell says,

14   "Oh, yeah, we are going to contest that."

15          Agent White says, "The only thing I require -- you

16   don't have to.  Okay?  This is the same form.  This page 1 right

17   here, you see right here, right here?"  Mr. Buswell says, "Yeah."

18   "This is the same as right here."  Mr. Buswell says, "I don't

19   have my glasses."  Agent White says, "I could tell.  I could

20   tell."  Mr. Buswell, "Up close.  I'm sorry".  Agent White says,

21   "It is the same thing, page 1.  Rights of ownership interest

22   holder.  The only thing that we ask is that because --"

23          MR. WALKER:  Your Honor, at this point I'm objecting.

24   He's not asking a question.  He's simply reading the transcript.

25   I think the transcript speaks for itself, and we're going to be

 1    here all day if he's going to read an hour long transcript.

 2                MR. STANFORD:  I'll stop.  I'll ask a question.

 3                THE COURT:  Please do.

 4    BY MR. STANFORD:

 5    Q    At the middle of page 3 after Agent White says,

 6    "Acknowledging that you have been personally served with the

 7    paperwork," Richard Buswell says, "Not without my lawyer here.

 8    I don't understand.  I'm not trying to be..."

 9                So right there he says he doesn't want to do anything

10    without his lawyer there?

11    A    No, no.  He did not say he didn't want to do anything.  He

12    said he did not want to sign the paperwork.  He refused.

13    Q    Didn't he also say, "Not without my lawyer here, I don't

14    understand"?

15    A    As it relates to the paperwork, yes.

16    Q    Okay.  At that point, as you said earlier, why didn't you

17    just drop the paperwork off, write "refused" and turn around and

18    leave?

19    A    Because he was talking to us.  And that's what I had

20    discussed with the U.S. Attorney's Office, if he wanted to talk.

21    If I walked out of that -- if I walked out of that room right

22    there -- again, this was an opportunity to show that, hey, we're

23    not bad guys.  We are not the big bad wolf.  That would have

24    presented a very bad picture of the federal government.

25                Again, we were laying -- if we had to lay groundwork

 1    for later on that he wanted to cooperate.  He was saying vile

 2    things on the phone about the government.  I wasn't going to be

 3    rude to him.  Honestly, that's the honest truth.  Whether he was

 4    going to talk or not, I honestly didn't know.  My guess was he

 5    was, but I couldn't make that decision.

 6    Q    Okay.  At the *Garcia* hearing -- earlier we went over your

 7    testimony -- you testified under oath that you were only there to

 8    serve the forfeiture paperwork.  Do you remember testifying to

 9    that?

10    A    Yes, the initial reason for us to go there.  Without that

11    paperwork, I would not have gone to the jail.

12    Q    Well, the same question I asked at the *Garcia* hearing.

13    Wasn't this paperwork that -- you know, I'm not holding you to

14    this, but it's -- we can see today that it's not valid.

15    A    I have absolutely no idea if it was valid or not.

16    Q    I'm not saying you did, but, according to you, you were just

17    there to serve this paperwork.  You testified earlier, you know,

18    something to the effect that you would just walk in and throw

19    down the paperwork.  Well, you've had a discussion with

20    Mr. Buswell and he says he does not want to sign.  He says, "Not

21    without my lawyer.  I don't understand."

22    A    Yes.  But he indicated he wanted to talk, so it's two

23    separate issues.  I didn't want to serve him the paperwork.  I

24    asked Alan Haney -- we don't want -- I don't want to have

25    Will White go over there and serve paperwork.  I want to serve

1    Barry Domingue or Dan Stanford.  Alan Haney told me no.  At that

2    point I can't argue with him.

3    Q    Well, the reason you went there that day wasn't to serve

4    forfeiture paperwork, but it was for the opportunity to see if

5    you could interview Mr. Buswell about the Curious Goods case?

6    A    No.  We were going to serve him no matter what.

7              THE COURT:  Mr. Stanford, move on to your next

8    question.  We've had this one asked and answered at least five or

9    six times.

10   BY MR. STANFORD:

11   Q    After Mr. Buswell says, "Not without my lawyer here,"

12   there's one -- on page 5, if you'd turn to page 5, you and

13   Will White continue to try to explain the paperwork to him.  On

14   page 5 at the bottom, he says, "I am going to let my attorney

15   sign it.  I am uncomfortable with anything anymore.  Not with

16   you."  And White again says, "You are going to witness me writing

17   refused.  Okay?"

18             So he says at least six times before you read him his

19   *Miranda* rights that I am his lawyer, that I represent him, and

20   he's told you at least twice unequivocally he doesn't feel

21   comfortable with you being there?

22   A    No.  He did not say that he felt uncomfortable with us being

23   there.  He did not.  He was excited for us to be there, and, in

24   fact, in the interview he asked us if we could stay longer and

25   asked us if we could come back.  He also told us we could go

1    search his house if we wanted to.  He liked us.  We laughed with

2    him.  It was very, very casual, but he was certainly at no point

3    in time saying he was not comfortable with us.  He was chomping

4    at the bit to talk to Agent White; not necessarily me, but

5    Agent White.  He was.

6    Q    Didn't you state at the *Garcia* hearing, page 78, line 10,

7    "We went there to serve the paperwork and we told Richard he does

8    not have to say one word to us.  That's what we're here for.

9    That is it.  Richard, as you probably know, has a full

10   personality and he wanted to talk to us."

11          So having listened to the phone calls and knowing

12   Richard Buswell's personality, the opportunity that presented

13   itself to you and Agent White was you could walk in there with

14   any kind of paperwork.  As long as you get in front of Richard,

15   you felt confident that he was going to talk to you and that

16   would be an opportunity for you.  Correct?

17   A    I believed there was a chance he would talk, yes.  There was

18   a chance that he was going to tell us to get out of his face and

19   leave.  And when I say "full personality," I mean, he was

20   actually -- he's a funny guy and I knew he was joking around as

21   soon as we walked in there.  We were laughing.  No matter what,

22   there was a conversation --

23          THE COURT:  There's not a question on the table, agent.

24          THE WITNESS:  Yes, sir.

25   BY MR. STANFORD:

1  Q    Now, at the *Garcia* hearing at page 96, line 4, I was asking

2  you about interviews and whether or not you had generated DEA-6s

3  on those interviews.

4  A    Yes.

5  Q    And you said, "There are reports, yes."  I asked you, "Did

6  you generate a DEA-6 on your interviews with Mr. Buswell?"  You

7  said, "I did not."  I asked you if another agent did that and you

8  said yes.  I asked you if the notes of interview were maintained

9  and you said yes.  So did somebody take notes that day?

10 A    Notes of the interview?

11 Q    Yeah.

12 A    I don't think that was necessary.  It was recorded.

13 Q    Well, my question is, at that point in time when I'm asking

14 you whether or not you had memorialized your encounter with

15 Mr. Buswell, you didn't tell me or notify the Court that it

16 actually had been recorded and there was a recorded three hour

17 and 45 minute version of this interview, did you?

18 A    Well, you asked me if it was –– if it was –– if there was a

19 DEA-6 generated and notes were maintained, but I never recall you

20 asking me if it was recorded.

21       THE COURT:  I'm going to ask you the specific question

22 because it's bothered me from the moment I found out about this.

23       Why, on the day of the *Garcia* hearing when that

24 question was asked, wasn't Mr. Stanford told that the entirety of

25 this meeting with Mr. Buswell was recorded?  Can you answer that?

1           THE WITNESS:  I can't.

2           MR. STANFORD:  Thank you, Your Honor.

3    BY MR. STANFORD:

4    Q    Now, when you left that day, how long after April 5th did

5    you get a copy of the -- or a disc with the audio version of the

6    interview to the U.S. Attorney's Office?

7    A    I'm sorry.  Repeat that.

8    Q    How long after April 5th did you get a copy, you know, of

9    the disc with the audio version of the interview to the U.S.

10   Attorney's Office?

11   A    I don't recall exactly the date.  It was sometime after

12   that.  It could have been within a week.  It could have been a

13   little longer.

14   Q    By May 14th the U.S. Attorney's Office had a copy of the

15   interview?

16   A    Yes.

17   Q    And prior to May 14th -- actually prior to you reducing it

18   to a CD, you had notified AUSA Collin Sims that you had

19   approximately a three and a half hour audio conversation of

20   Richard Buswell?

21   A    Yes.

22           THE COURT:  Did Ms. Uebinger know?

23           THE WITNESS:  I believe so, yes.

24           THE COURT:  Are we at a good stopping place,

25   Mr. Stanford?

1      MR. STANFORD:  Yes, sir.

2      THE COURT:  Ten-minute recess.

3                    (RECESS)

4      THE COURT:  Court will come to order.

5      Wrap it up, Mr. Stanford.

6      MR. STANFORD:  Yes, sir.

7  BY MR. STANFORD:

8  Q     Agent DeSalvo, did you know that on April 24th -- prior to

9  April 24th that Agent White was going to go to the Iberia

10  Parish Jail again to see Mr. Buswell?

11  A     Yes.

12  Q     When did he tell you that?

13  A     I guess when he spoke to ADA Haney.  I don't recall the

14  exact date.

15  Q     And do you know why Agent White went to the jail on the

16  24th?

17  A     To serve him paperwork.

18  Q     Okay.  And did you direct Agent White to record that

19  conversation?

20  A     No.

21  Q     Did you have discussions with the U.S. Attorney about the

22  second -- the April 24th encounter with Mr. Buswell?

23  A     I don't believe I did, no.

24  Q     Okay.  And on April 24th -- I'm going to show you what's

25  already been marked as S-6.  The top of that document has

1   "Notice of Pending Forfeiture," and it lists Richard Buswell

2   incarcerated at the Iberia Parish Jail and $2,000 in a Rayne

3   State Bank account.  And I'm going to go to this page.  Do you

4   recognize that name at the bottom where it says "I"?  Is that

5   Ryan Shanahan?

6   A    It could be, yes.

7   Q    And, again, on the last page where it says April 24th,

8   2012, it says "Agent Ryan Shanahan"?

9   A    Yes.

10  Q    Now, on that date when Agent White went to the Iberia Parish

11  Jail, did Agent White tell you that he had a conversation and/or

12  an interview with Mr. Buswell?

13  A    Did he say -- I'm sorry.

14  Q    Did Agent White tell you that he had a conversation and/or

15  an interview with Mr. Buswell on April 24th, 2012?

16  A    What I told him was serve the paperwork and leave.

17  Q    After that happened, when he came back did he tell you that

18  he had an interview and a conversation with Mr. Buswell?

19  A    I think that he said there was a conversation, and he

20  mentioned something about Richard was trying to tell him

21  something about contraband in the jail or something to some

22  effect like that.

23  Q    Did you authorize Agent White to prepare a DEA-6 Report of

24  Investigation on the April 24th incident?

25  A    No.

1    Q    Do you know if one has been prepared?

2    A    I don't believe so, no.

3         THE COURT:  Would that be up to his discretion to do

4    it?

5         THE WITNESS:  Yes.

6    BY MR. STANFORD:

7    Q    On April 24th you were his supervisor, correct?

8    A    Yes.

9    Q    Is it, I guess, uncommon not to document an interview with a

10   represented person?

11   A    Yes.  I mean, he said he was doing that.  Again, he's doing

12   that on behalf of the direction of the District Attorney's

13   Office.

14   Q    Did you talk to Assistant District Attorney Alan Haney about

15   the second service?

16   A    I did not.

17   Q    Okay.  Now, I'm going to show you the Notice of Pending

18   Forfeiture, the caption at the top.  It's quite a bit different

19   than the document that you brought -- you and Agent White brought

20   on April 5th of 2012, isn't it?

21        MR. WALKER:  Your Honor, I'm going to object to this

22   line of questioning.  This witness has already testified he was

23   not in any way involved in this meeting.

24        THE COURT:  Mr. Stanford, do you want to respond?

25        MR. STANFORD:  Yes.  Sorry, Judge.

1          If you look at the caption, you'll see where it has
2    "Notice of Pending Forfeiture."  It has the case caption, Richard
3    Buswell, and an asset.
4          MR. WALKER:  Again, Your Honor, the document speaks for
5    itself, and the witness has testified he was in no way involved
6    in the service of this document.
7          THE COURT:  What's the relevance, Mr. Stanford, as it
8    pertains to this witness and your motion?
9          MR. STANFORD:  I'll move on, Judge.
10         THE COURT:  Thank you.
11   BY MR. STANFORD:
12   Q    I'm going to show you what's been marked as S-3.  These are
13   petitions for forfeiture on -- one of them is on the $19,000, and
14   attached as exhibits are notice of pending forfeitures starting
15   right here with an attached State's exhibit.  I'm going to ask
16   you to look at this page, the second to last page of that
17   particular document.  It has "Agent Ryan Shanahan," correct?
18   A    Yes.
19   Q    The last page, "Detective Ryan Shanahan," correct?
20   A    Yes.
21   Q    Again, the next one, "Detective Ryan Shanahan"?
22   A    Correct.
23   Q    And right here, "Ryan Shanahan"?
24   A    Yes.
25   Q    There's another one, "Agent Ryan Shanahan"?

1    A    Yes.

2    Q    "Agent Ryan Shanahan"?

3    A    Yes.

4    Q    And some of these, you'll notice that they're being served

5    on Paul Buswell?

6    A    Yes.

7    Q    Now, you testified earlier that Agent White was the

8    forfeiture -- the guy who was handling all the forfeiture stuff

9    for Curious Goods?

10   A    The assets, yes.

11   Q    The assets.  But on the documents that we have, it shows

12   that but for the April 5th document, every other document was

13   served by Agent Ryan Shanahan who is referenced in the

14   December 8th affidavit as the case agent.  Can you explain

15   that?

16   A    Yes.  What I was told by Captain Vincent was Agent White was

17   to handle that.  What they did amongst themselves when they were

18   handling this -- I know for a fact that Agent White was handling

19   the entire asset investigation.  He wrote the search warrants.

20   What was told to me as a condition of him coming to be part of

21   the task force was that Agent White was going to continue to

22   handle that.

23          Other than the one instance or maybe two instances

24   where I went with Agent White, that was metro narcotics' issues

25   that I didn't get involved with, but I can attest for a fact that

1    Agent White was the case agent.  As told to me or instructed to

2    me by Captain Vincent or Captain Babin, he was to handle the

3    assets in this investigation.  My understanding is that's why

4    ADA Haney called him as opposed to Ryan Shanahan.  That's my

5    understanding.

6    Q    Now, one last topic.  At the *Garcia* hearing you testified

7    specifically about tracking assets and/or assets that you

8    believed were being transferred or had been transferred to me

9    personally.  Do you remember testifying to those issues?

10   A    Yes.  I mean, if you could point out in the *Garcia* hearing,

11   I can --

12   Q    Yeah.  It starts at page 26, line 5.

13   A    Yeah.  And what I stated was metro narcotics and DEA at this

14   point had a parallel investigation.  They were looking for

15   assets, we were assisting them, and they subsequently seized some

16   of these assets.

17   Q    But on May 14th in your testimony, you made it -- or you

18   testified that you believed those specific assets, which were two

19   vehicles, a Mercedes car, a Firebird, and a boat and trailer,

20   were being transferred to me.  Isn't that true?

21   A    Yes.

22   Q    Okay.  Now, when you testified at the Grand Jury either the

23   first or second time, did you testify as to any of these assets

24   with regards to me?

25             MR. WALKER:  I would object, Your Honor.

```
 1              THE COURT:  He's not asking specifically.  He's asking
 2  generally.
 3              It's a very narrow question.  You got it,
 4  Agent DeSalvo?
 5              THE WITNESS:  I honestly don't recall.
 6              THE COURT:  All right.
 7  BY MR. STANFORD:
 8  Q    However, whenever you testified at the Garcia hearing, you
 9  knew from having interviewed Paul Buswell on February 15th of
10  2012 -- at page 56, you asked him about -- at that time you had
11  already taken the Mercedes, but you asked him about it, and
12  Mr. Buswell told you that it was just being parked there because
13  it was unattended at Richard's house, correct?
14  A    My statement -- what I based my answer on wasn't just on
15  what Mr. Buswell told me.
16  Q    Well, as we went over at the Garcia hearing, and I'll just
17  cover it really quickly, there was no evidence or intent on my
18  part to transfer the Mercedes, which is a movable, that you
19  found.  Isn't that true?
20  A    No.  I believe that we had evidence that it was going to be
21  transferred or was in the process of being transferred, and I
22  believe that was based on phone calls, I believe.
23  Q    Well, those same phone calls -- I'm glad you brought that
24  up.  Wasn't there discussions in the phone calls about the
25  Mercedes being transferred or given to Boyd Barrow?
```

```
1    A    I honestly don't know.

2    Q    Now, by the date that you -- by January 22nd, the date

3    that you came and seized the Mercedes, it had been parked in

4    front of my house next to the street for almost a month; isn't

5    that correct?

6    A    Correct.  Oh, I don't know if it was parked over or not.  I

7    don't know.

8    Q    But you found no paper trail evidencing any intent to

9    transfer title to anyone nor the fact that I ever had title to

10   the Mercedes?

11   A    No.  There was a specific call that I vaguely recall that it

12   was based on that discussed signing what appeared to be to us,

13   not just me, title paperwork.  It appeared to be in the process.

14   Metro was looking for assets to seize.  And I do recall a phone

15   call indicating that there was actual title paperwork possibly

16   about to be transferred.

17   Q    Now, on page 56 and 57 of Mr. Paul Buswell's interview --

18   I'm going to direct you to page 56.  And before I move on, do you

19   recall which call -- which specific call and who was discussing

20   the transfer of the Mercedes in that call?

21   A    I don't recall.  I don't recall.  Again, that's based on my

22   memory, which I've been kind of out of the loop for a while, so

23   I'm doing the best I can.

24   Q    I'm going to show you a document that was generated by --

25              MR. STANFORD:  Am I at S-23?
```

```
 1              THE COURTROOM DEPUTY:  It will be S-24.

 2   BY MR. STANFORD:

 3   Q    Do you know who authored this document?  Is it Agent White?

 4   A    I do not know who authored it.

 5   Q    But it indicates that on January 23rd, 2012, at

 6   approximately 1100 hours, you made contact with Agent White, and

 7   this is regarding the speed boat, and shortly after that the

 8   speed boat was located at Mr. Brady Becker's residence.  Agents

 9   were dispatched there.

10              And I believe the essence of the report is that

11   Mr. Becker advised you that he had title of the boat, that he had

12   title to the boat and was in the process of purchasing it from

13   Mr. Buswell for $30,000, and when the agent said that they were

14   looking to seize it, he turned it over to them immediately.

15              Is that an accurate summary?

16   A    Yeah.  I'm not sure who authored this.  I haven't seen this

17   before.  And there were supposedly -- I believe there were two

18   boats that we were looking for as well, so I'm not sure if this

19   was the boat.  Supposedly there was another boat being worked on.

20   Q    Well, on the February 15th, 2012, interview with

21   Paul Buswell, Paul Buswell tells you that there's another beat up

22   boat that's at his house and you're welcome to come and pick it

23   up whenever you want, but it's basically a dilapidated boat.  Do

24   you recall him saying that?

25   A    I don't.
```

1    Q    But my point is on this document, that by the time you

2    testified on May 14th at the *Garcia* hearing, you knew that this

3    asset, this boat, was never in the process of being transferred

4    to me?

5    A    No.  I believe that I thought it was going to be transferred

6    to you.  I think that Richard was trying to put some money

7    together to pay you and part of it was his remaining assets which

8    were three items that weren't seized.  That was my understanding

9    and that was coming from a variety of sources.

10   Q    Well, on January 23rd you spoke to Mr. Becker who told you

11   that he had the boat actually in his possession before

12   December 8th and had agreed to buy it from Mr. Buswell for

13   $30,000.  He had taken possession of the boat.  He had the title

14   to the boat.  He just hadn't written a check to Mr. Buswell for

15   the $30,000.  Correct?

16   A    Yeah.  From my understanding there was no transfer of cash

17   or check.

18        MR. STANFORD:  I would like to offer, file, and

19   introduce this as S-24.

20        THE COURT:  Any objection?

21        MR. WALKER:  No objection.

22        THE COURT:  Let it be admitted.

23   BY MR. STANFORD:

24   Q    And the last -- and I apologize.  The top part of this

25   document -- this is just how I got it -- is cut off, but it

1    appears to be some type of search or seizure warrant, and if you

2    can see down here, it's for a 2002 Pontiac Firebird and the VIN

3    number is listed below.  Can you see it?

4    A    Yes.

5    Q    And apparently the location of the vehicle, which is the

6    Firebird, is at Woodvale Avenue, the 400 block, which is

7    Ms. Bonnie Buswell's residence.  Would that be accurate?

8    A    Yes.

9    Q    And the vehicle was located at her residence I think -- it

10   looks like February.  On 2/27/12 the vehicle was located in the

11   backyard and soon thereafter agents were dispatched.  Were you

12   there with Agent White to retrieve that vehicle?

13   A    Yes.

14   Q    And the vehicle was retrieved in the backyard, and when you

15   got there, it was apparent that that vehicle hadn't been -- or at

16   least right here it says, on the 28th of February, that the

17   vehicle hadn't been moved in quite a while.  Isn't that true?

18   A    I don't recall if it had been moved or not.  I know it was

19   towed, I think.  I remember them starting it up, but my guess is

20   it hadn't been.

21   Q    And based on the phone calls from the jail, it was indicated

22   that Richard Buswell didn't want to sell this asset.  He didn't

23   want to get rid of it.  He wanted to keep the Firebird for his

24   own personal car.  Isn't that correct?

25   A    No.  I recall this was another item that was going to be

1    transferred to you.  I think we got that from a phone call, but

2    I'd have to listen to the phone calls.

3             MR. STANFORD:  Okay.  And I'd like offer, file, and

4    introduce this as S-25.

5             MR. WALKER:  No objection.

6             THE COURT:  Let it be admitted.

7    BY MR. STANFORD:

8    Q    Again, prior to testifying to that at the *Garcia* hearing,

9    you found no tangible evidence, no documentary evidence, say,

10   with the Department of Motor Vehicles, that there had been any

11   title transfers or attempted title transfers, correct, on any of

12   these assets?

13   A    No.  There was just the phone call, I believe.  There was a

14   very specific phone call, I believe, with Ms. Bonnie Buswell that

15   she was -- and I think that was one of our first questions when

16   we went there.  I don't recall who asked it.  It could have been

17   me or White or Shanahan.  That was the title transferred yet and

18   I don't recall her answer, but we had specific information that

19   that was about to be transferred to you.  That's to the best of

20   my recollection.

21   Q    And you base that on a jailhouse call?

22   A    I believe it was a jail call.

23   Q    But when you testified on May 14th at the *Garcia* hearing,

24   you testified in a way that would lead this Court to believe that

25   all of these assets that we discussed, there were attempts to

1  transfer those to myself when you knew there had never been any

2  real attempt to transfer any of the three mentioned assets?

3  A    It was parked in front of your house.

4        MR. WALKER:  I object.  The way he phrased the question

5  is argumentative.

6        THE COURT:  He can answer the question.

7        THE WITNESS:  Yeah.  I mean, we thought they were being

8  transferred, and one of the assets, probably the most expensive

9  asset, was parked in front of your house.

10 BY MR. STANFORD:

11 Q    And I asked at the *Garcia* hearing do you have any -- first

12 of all, it didn't have a license plate on it, correct?

13 A    Correct.

14 Q    And weren't you told that someone from Richard's family had

15 drove it there and parked it there where it remained unmoved

16 until you seized?

17 A    I don't recall anyone telling me that it was moved by

18 someone from Richard's family.

19 Q    Didn't you have a conversation with Paul Buswell about that?

20 A    I may have.  I don't recall that.

21        MR. STANFORD:  That's all the questions I have.

22        THE COURT:  Thank you, Mr. Stanford.

23        Mr. Hipwell?

24        MR. HIPWELL:  Thank you, Your Honor.

25        THE COURT:  I'm confident you're not going to be that

```
 1   long.

 2                   MR. HIPWELL:  I won't, Your Honor.

 3                   THE COURT:  Thank you.

 4                        CROSS EXAMINATION

 5   BY MR. HIPWELL:

 6   Q    Agent DeSalvo, I direct your attention to the time you

 7   testified about your meetings with AUSA Uebinger and Collin Sims

 8   before the April 5th, 2012, interview.  Okay?

 9   A    Yes, sir.

10   Q    Can you tell us, did the Assistant U.S. Attorneys give you

11   any advice about what to say if Richard Buswell made any mention

12   about his attorney at that interview that you were going to

13   conduct?

14   A    About his attorney?  Well, the first meeting, the meeting

15   that we had, it wasn't settled there.  Mr. Sims conferred with, I

16   think, management within the U.S. Attorney's Office.  So once

17   that was decided, as far as his attorney, I don't recall

18   honestly.  I don't recall.

19   Q    So you're telling us that you do not remember if the two

20   Assistant U.S. Attorneys or anyone else gave you any advice on

21   what to do if Richard Buswell said anything about his attorney

22   while you were asking him questions on April 5th?

23   A    His attorney in reference to the securities fraud case?

24   Q    No, sir.  His attorney in general, Daniel Stanford, who you

25   know was mentioned at least six times by my client before you
```

1    read him his *Miranda* rights.  Isn't that correct?

2    A    Right.  Well, again, to go back to it, once we dealt with

3    the issue of the forfeiture paperwork, he mentioned Mr. Stanford.

4    Q    Can I stop you for a second, sir?

5         THE COURT:  Let me interrupt.  This is a pretty

6    straightforward question and it's one I'm very interested in,

7    Agent DeSalvo.  He wants to know -- and if you don't remember,

8    you don't remember -- were you given any advice by anyone from

9    the U.S. Attorney's Office, any Assistant U.S. Attorney, as to

10   what to say if Mr. Buswell mentioned his lawyer, and the only

11   lawyer in the case at that time, whether the securities fraud

12   case or the Curious Goods case at the state level, was

13   Mr. Stanford.

14        THE WITNESS:  Right.  I think what was mentioned, any

15   advice, is if he stated he wanted to speak to his attorney before

16   he spoke to us regarding an interview, regarding speaking to him,

17   was for us to end the interview, but not necessarily in general

18   if he brought up his lawyer in reference to the -- and I think I

19   understand your question -- in reference to the forfeiture

20   paperwork.  If he brought up his attorney there, I don't recall

21   getting any advice.

22   BY MR. HIPWELL:

23   Q    Let me try it this way, Special Agent DeSalvo.  You and I

24   will agree, won't we, that after you read him his *Miranda* rights,

25   my client talked to you for over three hours, correct?

```
 1   A    Yes.

 2   Q    We can agree to that, right?

 3   A    Yes.

 4   Q    Will you also agree that on six occasions before you read

 5   him his Miranda rights, he talked about his attorney,

 6   Dan Stanford.  Would you like me to review every one of them with

 7   you or will you admit that?

 8   A    No, but --

 9   Q    Will you admit that before the Miranda rights were read,

10   that my client mentioned his attorney, Daniel Stanford, on six

11   occasions or do you want to go through them all right now?

12   A    In reference to the forfeiture paperwork, yes, he mentioned

13   Dan Stanford, yes.

14   Q    Thank you very much.

15        Then one area that I want to cover is you were talking

16   about Will White, I believe, being in charge of asset forfeitures

17   and serving asset forfeiture papers.  Isn't it true that he was

18   interviewing people early on immediately after the raids in

19   December, he was actively interviewing people, and the DEA and

20   subsequently the U.S. Attorney's Office received the fruits of

21   those interviews, and that was all part of your investigation

22   that ultimately resulted in these indictments, correct?

23   A    Agent White, among numerous agents with metro narcotics, I

24   believe, interviewed individuals subsequent to the arrests in

25   follow-up.  Whether that was turned over, I don't know.
```

1    Q     All right, sir.  You can only testify about what you know.

2                MR. HIPWELL:  Now, Your Honor, I'd like to pose these

3    two questions, but I want to do it to you first and, of course,

4    to the prosecution before you allow whether it would be answered,

5    and this will be covered in the Grand Jury area.  It's just two

6    questions.

7                My first question that I would like to ask this agent

8    is if he believed himself at the time of either of his Grand Jury

9    appearances that the Mr. Miyagi product had previously contained

10   JWH-018, but the manufacturers had switched it over to AM-2201.

11   I would like to ask him that.  Then I would like to ask him if he

12   told the Grand Jury anything about that and then let the Court,

13   of course, judge as to whether or not we get access to Grand Jury

14   testimony or paperwork because of that.  I'd like to ask those

15   two questions, Your Honor.

16               MR. WALKER:  As to the first question, whether he

17   believed that Mr. Miyagi contained JWH-018, I don't think that's

18   an inappropriate question.  As to the second question about what

19   specifically he told the Grand Jury, I think that's in violation.

20               THE COURT:  All right.  Do you want to answer the first

21   question?  Do you remember it?

22               THE WITNESS:  Repeat it, please.

23               THE COURT:  Hang on.  I'm going to read him what you

24   just told me.

25               Did you yourself believe at the time of either of your

1  Grand Jury appearances that Mr. Miyagi had previously contained

2  JWH-018, but the manufacturers had switched it over to AM-2201?

3  Did you believe that at the time you testified, either time, to

4  the Grand Jury?

5          MR. HIPWELL:  And, Judge, before he answers, I do want

6  to restrict it to NutraGenomics and Pinnacle, the factors of this

7  particular case, Your Honor, and not the industry in general.

8          THE COURT:  With that qualifier.

9          THE WITNESS:  But it's more complicated than that

10 because --

11         THE COURT:  No.  Before you get to the explanation, I

12 want the answer.

13         THE WITNESS:  I don't know.  I don't know if that was

14 the case or not, so I guess, no, I didn't necessarily believe it,

15 no, but I don't know for sure because what I did know is the

16 industry in general did go from JWH-018, and once it was banned,

17 they moved to AM-2201.

18         MR. HIPWELL:  You see, Your Honor, of course I'm asking

19 the question to know if he said anything about that to the

20 Grand Jury.  That would be probably, we will be able to

21 establish, a misstatement in this case as it relates to this

22 case.  I think there's a concession on behalf of the government

23 that they have no information that JWH-018 was involved in the

24 Mr. Miyagi product which was sold ultimately to Curious Goods.

25         THE COURT:  I understand your position.

1          MR. HIPWELL:  Yes, Your Honor.  Do I tender on that,

2     Your Honor?  I don't get to ask it?

3          THE COURT:  Ask your question and let me see if I'm

4     going to let him answer it.

5     BY MR. HIPWELL:

6     Q    Did you tell the Grand Jury anything about your -- did you

7     tell the Grand Jury that you believed that JWH-018 had been in

8     the Mr. Miyagi product which was being sold through Curious Goods

9     and that they changed it ultimately to AM-2201?

10         MR. WALKER:  And, Your Honor, I object to it.  I think

11    it's in violation of Rule 6.  It's a very specific question about

12    what was testified in the Grand Jury versus a generic question

13    which you previously allowed the witness to testify to.

14         THE COURT:  I'm not going to allow that question.  I'm

15    going to change it a little bit.

16         Agent DeSalvo, did you testify to the Grand Jury about

17    JWH-018 or AM-2201 or both?

18         THE WITNESS:  Yes.

19         THE COURT:  There you have it.

20         MR. HIPWELL:  Could I ask for clarification?  Was it

21    both, Your Honor, as opposed to just one or the other?  I believe

22    the way the Court has asked it, I humbly submit, might be a

23    little bit confusing.

24         THE COURT:  It was.

25         MR. HIPWELL:  Intentionally so.

```
1                THE COURT:  I have the transcripts, Mr. Hipwell.

2                MR. HIPWELL:  I understand.  Thank you, Your Honor.

3                I think I tender.  Thank you.

4                THE COURT:  Mr. Foster, you have not adopted this

5      motion.  You wish to speak?

6                MR. FOSTER:  Yes.

7                Judge, I had written a letter to the Court seeking

8      permission to inquire of Agent DeSalvo as to the limited point of

9      what pharmacological information he was aware of and imparted to

10     the Grand Jury as a part of his presentation.

11               THE COURT:  I could have ruled on that before we

12     started.  You're not going to get to ask him that.

13               MR. FOSTER:  All right, sir.

14               THE COURT:  Mr. Walker?

15               MR. WALKER:  Your Honor, previously you kind of joined

16     the defense and you jointly objected to the fact that I was

17     leading the previous witness.  I intend to ask narrow questions

18     of this witness so that we're not here, say, through tomorrow.

19               THE COURT:  We'll take it question by question.  You

20     know the difference.  I know the difference.  There's not a jury

21     here.

22               MR. WALKER:  That is correct.

23               THE COURT:  We'll do it this way.  Pretend these are

24     your last pennies, Mr. Stanford, on your objections on leading

25     questions, but don't hesitate to spend them if you want to spend
```

```
 1   them.
 2              MR. STANFORD:  Yes, sir.
 3                        CROSS EXAMINATION
 4   BY MR. WALKER:
 5   Q    I'm going to go back through the process leading up to the
 6   interview of Mr. Buswell, you and Will White.
 7   A    Yes, sir.
 8   Q    First of all, prior to Will White -- or prior to that
 9   interview, had you had numerous occasions in which Buswell had
10   said things on recorded phone calls that demonstrated his great
11   desire to speak to you?
12   A    Maybe not to me personally, but I think to DEA and to
13   Will White who I think he mentioned by name.
14   Q    And so you knew that.  Did you choose to act on it any time
15   prior to that?
16   A    No, sir.
17   Q    You became aware that Alan Haney had requested that
18   Will White serve the state paperwork; is that right?
19   A    That's correct.
20   Q    What was your position on whether y'all would actually serve
21   him personally?
22   A    Well, initially I said that doesn't make sense.  Why would
23   we have to do that?  Why would you have to do that, Will?  I
24   didn't understand the process, so I asked that we call ADA Haney.
25   Q    Now, at the time that he was asking to serve the paperwork,
```

```
 1    the defense kept referring to the fact that there was a criminal
 2    case going on in state court.  To your knowledge had a criminal
 3    prosecution begun in state court?
 4    A    No.
 5    Q    And in terms of the forfeiture, had there been a forfeiture
 6    action begun in court?
 7    A    I don't believe so, no.
 8    Q    Was it your understanding that the paperwork that had to be
 9    served was the thing that began the forfeiture process?
10    A    Yes.
11    Q    You testified previously that you wanted to serve
12    Daniel Stanford rather than Richard Buswell?
13    A    And/or Barry Domingue, yes.
14    Q    Okay.  Specific to Stanford, was there a reason why you
15    would have preferred to serve him?
16    A    I don't think I told Haney this, but I think Will White and
17    I had a discussion that if we serve Daniel Stanford, we would
18    have an opportunity to -- Will could have an opportunity to wear
19    a wire and record Mr. Stanford.
20    Q    At that point was he, Daniel Stanford, the subject of the
21    criminal investigation related to Curious Goods?
22    A    Partly, yes.
23    Q    Did you have information that you had collected from other
24    witnesses related to his participation in the criminal activity?
25    A    Yes.
```

1    Q    What information did you have?

2    A    We had information that he was involved in the RCA in

3    conjunction with Dan Francis.  We had information that he had

4    meetings with various individuals relating to this -- the

5    franchise owners.

6    Q    Had you been in court during the detention hearing?

7    A    I wasn't in court, no.

8    Q    Okay.  Were you made aware of statements made by

9    Daniel Stanford in the detention hearing?

10   A    Yes, I was.

11   Q    And did those statements relate to his relationship to the

12   RCA?

13   A    Yes.  I think he denied being part of the RCA.

14            MR. WALKER:  If I could have one moment, Your Honor.

15            THE COURT:  Mr. Walker, when you say the detention

16   hearing, there were actually three separate hearings.

17            MR. WALKER:  And, Your Honor, I'm speaking of the last

18   detention hearing.

19            THE COURT:  The revocation?

20            MR. WALKER:  Correct.

21   BY MR. WALKER:

22   Q    Do you remember during a *Garcia* -- were you present during a

23   *Garcia* hearing?

24   A    Yes.

25   Q    Did you testify?

```
1    A    Yes.

2    Q    Were you aware that Ms. Uebinger -- the information about

3    the RCA was again brought up at the *Garcia* hearing?

4    A    Yes, it was.  Yes, I do recall that.

5    Q    Was specifically the RCA in Louisiana, the Louisiana RCA,

6    brought up at the *Garcia* hearing?

7    A    Yes.

8    Q    Did that include the Secretary of State documents which

9    Ms. Uebinger presented to the Court?

10   A    Yes.

11   Q    Were you aware of what, if anything, Daniel Stanford had

12   said about his relationship to the RCA?

13   A    That he wasn't part of that RCA.

14   Q    Did you in fact have information to the contrary?

15   A    Yes.

16   Q    At some point prior to the April interview, were you

17   aware -- did Daniel Stanford become aware, if you know, that DEA

18   was involved in the investigation of this case?

19   A    In April?

20   Q    Prior to April.

21            THE COURT:  Wait, wait, wait.  The April interview of

22   who?

23   BY MR. WALKER:

24   Q    Prior to the April interview of Mr. Buswell, were you aware

25   that Daniel Stanford knew that DEA was involved in the
```

1    investigation of this case?

2            MR. STANFORD:  I object, Judge.  That calls for

3    speculation.  How could he know what I know or don't know.

4            MR. WALKER:  I'll reask the question.

5            THE COURT:  I was going to say you need to rephrase

6    that.

7    BY MR. WALKER:

8    Q    Did anything occur to your knowledge in the investigation

9    that would have demonstrated to Daniel Stanford that DEA was

10   involved in the case?

11   A    Yes.  I believe in the *Garcia* hearing I mentioned that what

12   we were told by witnesses, by individuals, didn't make any sense

13   as it relates to -- it didn't coincide with what Richard Buswell

14   on a certain date stated as it relates to what these witnesses

15   stated.  It's kind of confusing, but there appeared to be a

16   turning point shortly after we made it known that we were

17   involved.

18   Q    Let me ask you this.  You were listening to jail calls after

19   he goes to jail?

20   A    Yes.

21   Q    And in listening to those jail calls, were there

22   conversations about Daniel Stanford and his relationship to RCA

23   and to this ongoing group?

24   A    Yes.  And also Mr. Stanford probably realized that we were

25   involved when I was in front of his house next to the Mercedes.

1   We didn't seize that, but I was there.  I think that happened in

2   January.

3   Q    After that occurred, did you notice a significant difference

4   in the telephone calls and the way Daniel Stanford was discussed

5   in those calls?

6   A    Yes.  Mr. Stanford was involved -- after the revocation

7   hearing, he was involved with some of the franchisees on getting

8   a new product on the market, and that happened probably early

9   January at least.

10       There were some phone calls between, I think, Bonnie

11  and maybe Paul with Richard discussing the fact that they weren't

12  real happy -- they were trying to get the product back on the

13  shelves.  They weren't real happy with Mr. Stanford at that time

14  for not doing -- for doing that.

15       Richard at some point in time shortly in that time

16  frame, shortly after we became involved, stated that

17  Daniel Stanford was never involved in the potpourri business,

18  that he was never a potpourri attorney, was never involved with

19  any of that stuff, which we knew that not to be the case.

20  Q    As a result of that, were you concerned about what, if

21  anything, Daniel Stanford might be doing in connection with the

22  investigation of this case?

23  A    Yes.

24  Q    And after those phone calls had continued, was there still

25  an ongoing investigation?

```
1    A     Yes.

2    Q     After Alan Haney told you that he had to be served

3    personally -- wait.  Let me back up first.  Do you know if --

4    well, first of all, did you go to Alan Haney prior to the service

5    of these documents?

6    A     No, sir.

7    Q     Did you ask Alan Haney to allow either you or Will White to

8    serve the documents?

9    A     No, sir.

10   Q     Do you know how it came that Will White was the person that

11   was chosen?

12   A     I believe because he was the agent for the assets, handling

13   all the asset matters.

14   Q     Federally the only thing that -- the only criminal case

15   related to Richard Buswell was a securities fraud case; is that

16   correct?

17   A     Yes.

18   Q     When you discovered the matter of Alan Haney and the fact

19   that he wanted personal service on Richard Buswell, you testified

20   previously that you went and spoke to people at the U.S.

21   Attorney's Office?

22   A     Yes.

23   Q     Did you speak to Collin Sims?

24   A     Yes.

25   Q     Did you speak to Kelly Uebinger?
```

1    A    Yes.

2    Q    Thereafter, are you aware if Collin Sims contacted anyone

3    else at the U.S. Attorney's Office to determine whether it was

4    legal under the Fifth and Sixth Amendment and ethical for him to

5    allow y'all to go talk to him?

6    A    I believe he spoke to Bill Flanagan.

7    Q    Do you know who Bill Flanagan is at the office?

8    A    I believe he's the PRE attorney for ethics.  PRE is an

9    acronym.

10   Q    It's Professional Responsibility and Ethics?

11   A    Yes.  He spoke to Bill Flanagan.

12   Q    And after he spoke to Bill Flanagan, was there a discussion

13   about what could not under any circumstances be discussed in any

14   way, shape, or form?

15   A    Yes, the securities fraud case.

16   Q    And after that discussion with Bill Flanagan, was there any

17   discussion about whether you should read him his rights?

18   A    Yes.

19   Q    And what was the consensus?

20   A    To read him his rights.

21   Q    And was there any discussion about whether you should record

22   the conversation?

23   A    Yes.

24   Q    And why was it recommended that you record the conversation?

25   A    To protect ourselves.  Initially I stated that I would

1    prefer not to record it, and it was brought up that we should

2    record it to protect allegations potentially later, so we went

3    ahead and recorded it.

4    Q    When you made that decision in speaking with the

5    U.S. Attorney's Office, was it your decision to go and actively

6    attempt to get him to engage and discuss things about

7    Curious Goods?

8    A    I mean, once we were there and he decided he wanted to talk

9    to us, we would listen, and we were interested in part of that

10   investigation, obviously the folks in Georgia, yes.

11   Q    When you go to the Iberia jail, do you remember about what

12   time of the day it was?  Was it morning or afternoon?

13   A    I believe it was afternoon.

14   Q    The room that you spoke to him in, was it a small room?

15   A    Not a typical jail room.  It was a nice size room, like a

16   classroom.

17   Q    Did it have numerous chairs in it?

18   A    It had chairs, windows.  Yes.  You access it -- it's where

19   we do our interviews.  You don't actually have to go inside the

20   pods.  You can access it from an administrative office.

21   Q    When he was -- well, in terms of the room, does it have

22   doors?

23   A    Yes.

24   Q    Multiple doors?

25   A    Yes.

```
 1   Q    Are they locked or does a person have the ability to go in
 2   and out of those doors?
 3   A    No.  Part of it is you can walk in and out.  It's not
 4   locked.
 5   Q    When he came in, did he have handcuffs on?
 6   A    No.
 7   Q    In your conversation with him, was it an aggressive or a
 8   nonaggressive conversation?
 9   A    It was very nonaggressive.
10   Q    Was there ever a time where you and he were -- he and
11   Mr. White were in kind of a heated discussion?
12   A    Absolutely not.
13   Q    Was the entire conversation recorded?
14   A    Yes.
15   Q    When you go to the April 24th delivery of paper, did you
16   have anything to do with that?
17   A    Other than Will White telling me he was going and he had to
18   serve the paperwork.  I just said -- I didn't get involved.  I
19   said do what you have to do.  Just go -- my recommendation is go
20   and leave.
21   Q    And did anybody at the U.S. Attorney's Office get involved
22   in it?
23   A    No, sir.
24   Q    To your knowledge was anybody at the U.S. Attorney's Office
25   even aware that he was going to serve that second set of
```

```
 1   paperwork?

 2   A    I don't believe so, no.

 3   Q    Was anybody at the U.S. Attorney's Office aware that there

 4   was some kind of defect in the first paperwork?

 5   A    No, I don't think so.

 6   Q    To your knowledge did you know there was any kind of defect

 7   in the paperwork?

 8   A    No.

 9   Q    Did you have occasion to read the affidavits that were

10   submitted in connection with the motion to dismiss for

11   prosecutorial misconduct?

12   A    Yes.

13   Q    And were there two affidavits submitted from Paul Buswell?

14   A    Yes.

15   Q    I'm showing you -- and I've marked this for identification

16   as United States Exhibit 5.  Can you read that document?

17   A    Yes, I can see.

18   Q    And do you see the first one?  It says, "I never told

19   Agent Donald DeSalvo with DEA that my brother, Richard Buswell,

20   wanted to talk to either him or any law enforcement agent about

21   Pinnacle Products or NutraGenomics or anybody else about

22   anything."

23             THE COURT:  No.  "Or anyone else or anything else."

24             MR. WALKER:  Thank you for correcting me.

25   BY MR. WALKER:
```

1    Q    Do you see that?

2    A    Yes.

3    Q    Is that an accurate statement?

4    A    No.

5    Q    Now, the defense showed you the transcript of the 15th,

6    and I have a transcript of a portion of the 15th.

7            MR. STANFORD:  Before you go any further, can I just

8    ask who transcribed this portion?

9            MR. WALKER:  Actually Greg Harbourt transcribed it.

10   BY MR. WALKER:

11   Q    Have you had occasion to review United States Exhibit 1?

12   A    Yes.

13   Q    And is United States Exhibit 1 an accurate transcript of the

14   audio recording?

15   A    Yes.

16   Q    It's not the entire audio recording; is that correct?

17   A    That's correct.

18           MR. STANFORD:  And when was this transcribed?

19           MR. WALKER:  I don't know the relevance of when it was

20   transcribed.  It was transcribed in the last month.

21   BY MR. WALKER:

22   Q    Have you had occasion to compare this transcript to the

23   audio recording?

24   A    Yes.

25   Q    And is it accurate?

```
 1   A    Yes.

 2   Q    First of all, when you look, do you see where there's an RCA

 3   in Louisiana and there's the director and co-director?  Stanford

 4   is the director and Dan Francis is the co-director?

 5   A    Yes.

 6   Q    That was a statement he made to you -- Paul Buswell made to

 7   you on 2/15 of '12?

 8   A    I believe that's me making that statement.

 9   Q    That's true.  And how did he respond?

10   A    I believe he agreed.

11   Q    In connection with him asking the question about whether

12   he's going to talk -- I'm sorry.  Let me move it up a little bit.

13   "Let me ask you this.  Not saying it's going to happen.  Would

14   Richard be willing to talk about this?"  Do you see that?

15   A    Yes.

16   Q    And what was Paul Buswell's response?

17   A    He said, "I would think so."

18   Q    On the 16th was there a subsequent interview?

19   A    Yes.

20   Q    And in the subsequent interview --

21        MR. STANFORD:  Judge, before we go any further, I'm

22   going to object to this being admitted.  And I've talked to other

23   defense counsel.  We don't have a February 16th, 2012, recorded

24   interview between Paul Buswell and Will White and Don DeSalvo.

25        MR. WALKER:  And I was concerned about that when he
```

```
 1   mentioned that previously.  If I could have one moment,

 2   Your Honor.

 3                        (CONFERRING)

 4        MR. WALKER:  Your Honor, having spoken to the chief of

 5   the criminal division, Richard Willis, what he informed me, his

 6   conversation with Laura Bourque, is that on March 22nd a CD was

 7   provided to the defense which had 11 recordings.  They've gone

 8   through and listened to the 11 recordings, and at this moment

 9   Laura Bourque cannot absolutely verify that this is on the

10   recording.  It was my belief that it's on the recording and that

11   they had a copy of it, but Ms. Bourque can't verify it at this

12   time.

13        THE COURT:  I'm not going to let you ask any questions

14   about that until we get the answer to that.

15        MR. STANFORD:  Judge --

16        THE COURT:  Wait.  Don't stand up yet.

17        And if it is on there, we will recess until the defense

18   have had an opportunity to look at the transcript of that

19   recording, and if they have any questions about it, then they

20   will get the recording and we'll come back.

21        MR. WALKER:  Thank you, Your Honor.

22        THE COURT:  All right.  Satisfactory, Mr. Stanford?

23        MR. STANFORD:  Yes, Judge.  I also wanted to note for

24   the record -- I've had this discussion with Mr. Walker via

25   e-mail -- that there are two or three discs that we've received
```

1    that we can't open up because it's encrypted, and it's either --

2    we don't know how to open it up.  We've tried to work with Laura

3    and with Erol Catalan.  And that's still kind of a pending issue,

4    so I don't know if this is on one of those discs.

5            MR. WALKER:  And it's not encrypted.  What it is, for

6    some reason -- I had Mr. Catalan speak to Mr. Stanford's legal --

7    I guess it's his secretary or legal assistant, and we've gone

8    through the process of what you have to do to open it up.  I

9    can't explain why they can't open it up because we've gone back

10   and reopened them to make sure that they work.  It is our

11   intention to have Erol Catalan just go to their office and sit

12   with the person so that he can open it up with her.  We can't

13   explain why it won't open up.

14           THE COURT:  I had the same problem in my office the

15   other day, so I understand your pain, Mr. Stanford, but if you

16   don't get the relief that you're asking for, let me know.

17           MR. STANFORD:  Thank you, Judge.

18   BY MR. WALKER:

19   Q    You do know that there was a second conversation on the

20   16th?

21   A    Yes.

22   Q    In the second conversation on the 16th, do you have an

23   independent recollection of what was or was not said?

24   A    Yes.

25   Q    What, if anything, was said about whether Richard Buswell

1   would want to speak to agents of the Drug Enforcement

2   Administration or either Will White or yourself?

3   A    He said that he wanted to speak to us specifically about

4   Boyd Barrow and Josh Espinoza and Pinnacle Products.

5   Q    During the conversation on the 15th, was there -- in one

6   of the affidavits there was mention of the fact that money was

7   paid to -- or was not paid to Daniel Stanford by Paul Buswell.

8   Do you remember that in the affidavit?

9   A    Yes.

10  Q    Did you have occasion to go back and look at the recording

11  of February 15th, 2012?

12  A    Yes.

13  Q    And I'm showing you the second page of United States

14  Exhibit 1, and it says -- first of all, this is an accurate

15  representation?  Is it accurate, the transcript?

16  A    Yes.

17  Q    It says, "Did you pay him any amount of money?"  And

18  Paul Buswell said, "I never did." And you said, "Daniel?  Or

19  hand him any type of money or anything?" "Uh, Dan, yeah."  That

20  was Paul Buswell.  You responded, "Dan Francis?"  He said, "No,

21  no, I never paid Francis."  "Dan Stanford?"  "Correct."  "What

22  did you pay Dan Stanford for?"

23  A    Yes.  And he said, "Uh, well, I gave him money, and a lot of

24  that helped for bail and with everything else for the retainer."

25  Q    "For the retainer for?"  What was his response?

1  A    "From what I understand, the criminal case."  "The criminal

2  case that's moving forward or the criminal case with your

3  brother?"  That was my question.  "The case moving forward, you

4  know, from my knowledge."  "How much money?"  "Let me get with

5  him before (he laughs) I tell you anything."

6              MR. WALKER:  Your Honor, in connection with the

7  testimony, I would offer into evidence United States Exhibit 1.

8              THE COURT:  Any objection?

9              MR. STANFORD:  No objection.

10              THE COURT:  Mr. Hipwell?

11              MR. HIPWELL:  No, Your Honor.

12              THE COURT:  Without objection, let it be admitted.

13  BY MR. WALKER:

14  Q    On February 16th of 2012, was the matter of money brought

15  up in that conversation with Paul Buswell?

16  A    Yes.

17  Q    And did he say how much money had been paid for the retainer

18  and for bail?

19  A    He indicated $80,000.

20  Q    And did he say when he had given that money?

21  A    I think it was the day of the search warrants, December

22  the 8th.

23  Q    And during the conversation, did he say where it was given?

24  A    I believe Mr. Stanford's office.

25  Q    And did he say why it was given?

1   A     Yeah.  He was a little guarded in the first interview.  The

2   second interview he opened up slightly and said that it wasn't

3   his wishes for that money to be used for the bail and for the

4   retainer, that in fact what I believe he said was individuals

5   were realizing that their money was being seized by the

6   government, the state or federal.  They weren't sure.  And that

7   Mr. Buswell had monies, life savings stashed somewhere.  I don't

8   know where.  He went and got the money, came back, and basically

9   said his intention was to, in so many words, hide the money from

10  the government to keep it safe and that it was used later, that

11  that wasn't his intention for it, that it was used to pay

12  Mr. Stanford and to pay bail money.

13  Q     Did he say anything about the fact that accounts were being

14  frozen?

15  A     Yes.  And we had information about that from other

16  witnesses, that they were in Mr. Stanford's office or in the

17  lobby area checking their bank accounts and they started to

18  realize that the bank accounts were frozen, so he started to

19  somewhat panic, Mr. Buswell, is my recollection.

20  Q     During the conversation when he was talking to y'all, the

21  second conversation, did he say that he had physically directly

22  handed the money to Daniel Stanford or to somebody else?

23  A     He said -- my recollection is -- I think he said his -- my

24  impression was he gave it to Mr. Stanford and then I think he

25  clarified that he handed it over to -- he said he handed it over

1    to Barry Domingue first, but he made it clear that Mr. Stanford

2    was the recipient.

3    Q    And that all occurred on the day of the raids at

4    Daniel Stanford's office?

5    A    Yes.

6    Q    Have you had occasion to listen to jail phone calls both

7    between Paul Buswell as well as Bonnie Buswell, the mother of

8    Paul and Richard Buswell?

9    A    Yes.

10   Q    And in those conversations are there discussions about the

11   fact that the money was turned over to Daniel Stanford and that

12   Paul wasn't happy about it?

13   A    Yes.

14   Q    Were there also discussions about the fact that Paul Buswell

15   had confronted Daniel Stanford about the money?

16   A    I believe so, yes.

17   Q    When you look at United States Exhibit 6, which is the

18   second affidavit that was attached --

19          MR. WALKER:  And I'm offering this into evidence as

20   United States Exhibit 6.

21          THE COURT:  Any objection, Mr. Stanford?

22          MR. STANFORD:  No, sir.

23          THE COURT:  Mr. Hipwell?

24          MR. HIPWELL:  No, sir.

25          THE COURT:  Let it be admitted.

1  BY MR. WALKER:

2  Q    The first paragraph of the affidavit says he had never

3  given -- delivered or given or asked Daniel Stanford individually

4  or in his capacity as a lawyer to hold any U.S. currency or

5  anything of value for me nor have I ever asked him to hold

6  anything of value, including U.S. currency, in his trust account

7  or any other account; is that correct?

8  A    That's what it says, yes.

9  Q    And what does the second one say?

10  A    As a businessman I would never deliver or give U.S. currency

11  or anything of value to an attorney without first requesting and

12  receiving a receipt in return.

13  Q    So based on the affidavit, either Daniel Stanford would have

14  given him a receipt or Barry Domingue would have given him a

15  receipt based on what he said?

16  A    Based on what he said, yes.

17  Q    And have you received a receipt reflecting that he gave

18  either of those people money?

19  A    No, sir.

20  Q    You testified previously -- and I'm only going to touch on

21  this very briefly.  When Will White -- when you first were

22  bringing Will White in to DEA, before that Kane Marceaux had been

23  there; is that correct?

24  A    Yes, sir.

25  Q    Had he been with y'all for a while?

```
 1   A     Yes.
 2   Q     And had you had a good working relationship with him?
 3   A     Yes.
 4   Q     When he was removed, was that something that y'all weren't
 5   happy about?
 6   A     That's correct.
 7   Q     Did y'all need to get somebody to replace him if possible?
 8   A     Well, at some point in time I didn't think they were going
 9   to replace him because we had some issues, some serious issues
10   between our agencies, and we requested that he be replaced, yes,
11   and they told us they'd get back with us.
12   Q     And at some point did you negotiate to get Will White to be
13   placed on the task force?
14   A     Well, that was my preference, but I was told that it would
15   be a person of their choosing.
16   Q     Did you agree to a concession in return for him working with
17   y'all?
18   A     Yes.  They had stated that they would send him, but he would
19   remain working the asset part of the investigation, that he was
20   there from the beginning.  They said that he would have to
21   continue to work that and if I would agree to that.  I said I
22   would.
23   Q     When you deliver -- typically when you deliver this
24   forfeiture paperwork, is that typically something that two people
25   do or is that something that maybe one person will go do or do
```

1    you know?

2    A    As it relates to the state case, I don't know.  I assume now

3    that I've seen this and I see a witness -- there's obviously a

4    part for the witness.  Can it be done without a witness?  I don't

5    know.

6    Q    Okay.  Your understanding was, though, that Will White was

7    the person primarily responsible for resolving it?

8    A    Yes.  That's what Agent White told me and that's what his

9    supervisor at the police department told me.

10   Q    The defense asked you about a letter to the Attorney General

11   and he discussed apparently a letter that was sent to the

12   Georgia Attorney General.  Do you remember Mr. Stanford asking

13   you questions about that?

14   A    Yes.

15   Q    Did you have a conversation with Boyd Barrow about specific

16   conversations he had had with Daniel Stanford?

17   A    Yes.

18   Q    And what, if anything, did Boyd Barrow tell you about this

19   letter to the Attorney General?

20   A    I mean, he told me that Mr. Stanford represented that he had

21   a letter from the Attorney General.  Mr. Domingue also told me

22   that.

23   Q    At some point was Mr. Stanford confronted about they want to

24   see that letter?

25   A    Yes, I believe so.

1   Q    And what, if anything, were you told?  How did

2   Mr. Daniel Stanford respond to that?

3   A    That he had a phone call with a representative from the

4   Attorney General's Office as opposed to a letter.

5   Q    He was claiming in the phone call and in the letter that he

6   had a conversation with them in which they agreed that AM-2201

7   wouldn't be prosecuted under state law?

8   A    Yes, something to that effect, that they were not going to

9   be held liable criminally based on that, but the specifics of the

10  letter, I don't know if I have that.

11  Q    Because you never actually saw the letter?

12  A    Because I never saw the letter.

13  Q    Because it didn't exist?

14  A    Correct.

15  Q    Did Barry Domingue in his conversation with you talk about

16  the fact that Daniel Stanford had told him he had a letter?

17  A    Yes.

18  Q    Did he in fact tell you about a text that he had from

19  Stanford about the letter?

20  A    I don't remember if he said he had a text, but I do recall

21  stating that he was fully aware that Mr. Stanford had stated he

22  had a letter, and I believe Mr. Domingue said he confronted him

23  about it at some point in time.  Whether it was a text or not, I

24  don't recall.

25  Q    Was there any confusion about which Daniel Stanford he was

1   talking about?

2   A    No.

3   Q    Was it the Daniel Stanford involved in this case?

4   A    Yes, sir.

5   Q    The defense talked to you about forfeiture in connection

6   with the other participants in this case.  You're aware that

7   Mr. Green pled guilty?

8   A    Yes.

9   Q    Did he forfeit a condominium and a vehicle?

10  A    I believe so, yes.

11  Q    Was it also, as part of the plea, that he would have to

12  forfeit all the proceeds of his criminal activity that we could

13  find?

14  A    Yes.

15  Q    As a result of that, was Greg Harbourt given the duty of

16  attempting to find assets that we can forfeit?

17  A    Yes.

18  Q    When Mr. Malone pled guilty, did he have the same plea as it

19  relates to forfeiture?

20  A    Yes.

21  Q    Now, the defense brought up 13, 14, and 17.  Could I see

22  those three exhibits?  I can actually get my copies if you don't

23  have yours.

24          Do you recognize seeing those documents before?

25  A    Yes.

1   Q    And do those documents relate to monies that were

2   transferred directly or indirectly to Boyd Barrow?

3   A    Yes.

4   Q    After --

5           THE COURT:  Directly or indirectly or both?

6           THE WITNESS:  Well, I think some of them say

7   Jimmy Barrow, but we believed it was Boyd Barrow's.

8   BY MR. WALKER:

9   Q    Was that his dad?

10  A    Yes.

11  Q    So to your knowledge was money that was proceeds of the drug

12  trade, was part of what Boyd Barrow got he transferred over to

13  his mother and father?

14  A    Yes.

15  Q    And is that the documents, the Regions Bank documents?

16  A    Yes.

17  Q    After we went forward with the prosecution, the

18  investigation and prosecution of Boyd Barrow as part of that, did

19  we have occasion to seize assets from the accounts of Boyd Barrow

20  as well as the other Regions Bank?

21  A    Yes.

22  Q    Approximately $300,000?

23  A    Yes, sir.

24  Q    And the fact that he transferred the money to his father,

25  that didn't cause it to escape us seizing it; is that correct?

1   A    That's correct.

2   Q    So we seized his money as well as the money that he

3   transferred to other parties?

4   A    That's correct.

5   Q    And overall in connection with this case, whether people

6   plead guilty or go to trial, is there a rule that we have in

7   connection with what, if anything, we're going to do with the

8   assets that they have obtained as a result of the criminal

9   activity?

10  A    Seek seizure and forfeiture.

11  Q    The defense brought up the fact that there were other

12  lawyers out of -- I believe one was out of New York State that

13  had received money from another group; is that correct?

14  A    Yes.

15  Q    In order to seize it, we have to be able to show that

16  they're not an innocent third party.  Is that your understanding

17  of the law?

18  A    Yes.

19  Q    And were we able to do that to your knowledge?

20  A    I don't believe so.

21  Q    Are you aware of Greg Harbourt -- during the defense's

22  direct examination, there were conversations about the RCA dues

23  that were paid?

24  A    Yes.

25  Q    And specifically those collected prior to November 25th of

1    2011; is that correct?

2    A    Yes.

3    Q    I show you what's been marked for identification as

4    United States Exhibit 3.  Do you see the "Dan Stanford" and,

5    right before, the bolded "Dan Stanford"?  Do you see that?

6    A    Yes.

7    Q    Do you see, first of all, if the check had a memo on it?

8    A    Yes.

9    Q    And what did the memo say?

10   A    RCA dues.

11   Q    And the amount?

12   A    $6,250, the first one.  The second one, $12,500.

13   Q    Does it show who the payer of the $6,250 was?

14   A    Yes.  Pinnacle Products.

15   Q    And the $12,500?

16   A    Curious Goods.

17   Q    And based on your interviews with witnesses, did you

18   understand that they were paying Daniel Stanford the RCA dues?

19   A    Yes.

20          MR. WALKER:  I would offer into evidence United States

21   Exhibit 3.

22          THE COURT:  Any objection?

23          MR. STANFORD:  No objection.

24          THE COURT:  Mr. Hipwell, any objection?

25          MR. HIPWELL:  No, Your Honor.  Thank you.

1           THE COURT:  Okay.  Without objection, let it be

2    admitted.

3    BY MR. WALKER:

4    Q    The defense brought up the fact that during the *Garcia*

5    hearing you were asked questions about whether y'all had done a

6    DEA-6 of the interview of Richard Buswell.

7    A    Yes.

8    Q    And also --

9           THE COURT:  Which one?

10          MR. WALKER:  The *Garcia* hearing, and it would be the

11   Richard Buswell interview of April the 5th.

12   BY MR. WALKER:

13   Q    And your response to that was no; is that correct?

14   A    That's correct.

15   Q    And was that accurate?

16   A    Yes.

17   Q    And they asked about notes and you said you didn't know,

18   correct?

19   A    Yes.

20   Q    And was that accurate?

21   A    Yes.

22   Q    The defense asked you questions about --

23   A    Well, I think what I said was that it was recorded.

24   Q    Correct.  You say it was recorded, but you didn't say it was

25   recorded at the *Garcia* hearing; is that correct?

1    A    Right.  My understanding was -- and generally Mr. Stanford

2    has asked me this before.  They ask if you've done a DEA-6.

3    Usually we accompany our handwritten notes with a DEA-6.  That

4    was my understanding of what he was asking.

5    Q    But you didn't have any notes and you didn't have a DEA-6;

6    is that correct?

7    A    That's correct.

8    Q    At that moment was there an ongoing investigation of which

9    Daniel Stanford was the subject?

10   A    Yes.

11   Q    If you had been asked directly if it was recorded, what, if

12   anything, would you have said?

13   A    That it was recorded.

14   Q    Because in fact it was recorded?

15   A    Yes.

16   Q    Getting that information to Daniel Stanford, what effect, if

17   any, would it have had in your ongoing investigation of which he

18   was the subject?

19   A    It would probably have hampered the investigation.

20         THE COURT:  Let me interrupt you right there.  What

21   about the status of the investigation as to the folks from

22   Georgia, Mr. Green, Mr. Malone, Mr. Reece?

23         THE WITNESS:  The overall investigation, yes.

24         THE COURT:  That wasn't out there at that time?  You

25   were in the middle of that?

1        THE WITNESS:  No.  We hadn't even decided who was going

2   to be indicted or anything like that.  It was an ongoing

3   investigation.  We were in communication with Georgia and we were

4   concerned about many things.

5   BY MR. WALKER:

6   Q    And that recorded conversation, essentially if you had to

7   turn that over, you would have been turning it over to a subject

8   of the investigation and you would have been essentially

9   potentially telling the other subjects of the investigation

10  around the United States that they were also being targeted by

11  the DEA?

12  A    Yes.

13       THE COURT:  Do you remember when the recorded statement

14  was given to Mr. Hipwell?

15       THE WITNESS:  I didn't give it to him.  I turned it

16  over to the U.S. Attorney's Office.  I'm not sure.  I don't know.

17  It wasn't given by me, so...

18       THE COURT:  Do you know if it was before or after the

19  superceding indictment was issued?

20       THE WITNESS:  I don't know.  I thought it was before.

21       MR. WALKER:  And Mr. Hipwell has just whispered behind

22  me, "I think he's right."

23       THE COURT:  He's nodding.

24       MR. HIPWELL:  He is, Your Honor.

25       THE COURT:  Mr. Foster, on the other hand, is there

1    with his head down.

2              MR. WALKER:  He doesn't want to answer.

3    BY MR. WALKER:

4    Q    So in connection with the two affidavits that you had

5    occasion to read from Paul Buswell that were submitted, in each

6    of the affidavits, were there statements that were factually

7    inaccurate?

8    A    Yes, sir.

9    Q    And is that based on the interviews that you had with

10   Paul Buswell?

11   A    Yes.

12   Q    Is it also based on the phone calls in which he specifically

13   discussed that with other members of his family?

14   A    Yes.

15   Q    And is it also demonstrated to be inaccurate based on the

16   fact that other members or other co-conspirators who have

17   subsequently been interviewed have also verified the payment of

18   the money?

19   A    Yes.

20             MR. WALKER:  Could I have one moment, Your Honor?

21             THE COURT:  You may.

22                       (CONFERRING)

23             MR. WALKER:  That's all I have, Your Honor.

24             THE COURT:  Redirect?

25             MR. STANFORD:  Yes, sir.

```
 1            THE COURT:  Briefly, Mr. Stanford.  Ms. Bourque is
 2    tired.
 3                    REDIRECT EXAMINATION
 4    BY MR. STANFORD:
 5    Q    The first thing I want to clear up is what Mr. Walker said
 6    about the December -- I guess December 15th, the last hearing
 7    or the revocation hearing.  There was a discussion about the news
 8    report from November 8th and --
 9            MR. WALKER:  I object, Your Honor.  I didn't mention
10    anything about a news report.
11            MR. STANFORD:  I'm just trying --
12            THE COURT:  He's saying that's what happened at the
13    revocation hearing.  There was a discussion about the news
14    report.  I remember that.
15    BY MR. STANFORD:
16    Q    And I think Ms. Uebinger was saying that I was -- the news
17    report -- and I'll show you what I've marked as S-26.  It has
18    been introduced before in court where it talks about
19    representatives from the Retail Compliance Association told us.
20            The issue, as I understood it, was whether or not I
21    was -- I had formed the Retail Compliance, the Louisiana version,
22    by November 8th, and I had stated that based on the Articles of
23    Incorporation, it wasn't formed until November 28th, that this
24    was a different -- there were two different RCA organizations,
25    which you testified to earlier; isn't that correct?
```

1    A    That's not correct.  There was -- like I said before, there

2    was a combination of those Retail Compliance Associations.  I

3    spoke to the news reporter.  The news reporter said you contacted

4    him as a representative from the RCA.  That was my understanding.

5    Q    Well, didn't the news reporter also tell you that

6    Dan Francis -- that I asked Dan Francis to contact

7    Doug McDermott, the reporter, when he asked specific questions

8    that I couldn't answer and that Mr. Francis did in fact contact

9    him and talk to him?

10   A    He didn't state that regarding things that he couldn't

11   answer.  He stated that you contacted him and then follow-up

12   conversations was when Mr. Francis contacted Mr. McDermott.

13   Q    But on the date of this report, November 8th, the

14   Louisiana RCA had not been formed, correct?

15   A    You were receiving news from the RCA.

16           THE COURT:  Wait, wait.  We have the document in

17   evidence, Mr. Stanford.  I know when the date was.  You don't

18   need to keep asking him that.

19           MR. STANFORD:  Okay.  I would just offer, file, and

20   introduce this as S-26.

21           THE COURT:  This is the news report?

22           MR. STANFORD:  Yes.

23           THE COURT:  Any objection, Mr. Walker?

24           MR. WALKER:  Can I see it?

25           THE COURT:  It's the same one that everybody keeps

```
 1   showing me that, frankly, I don't think has that much relevance.
 2             MR. WALKER:  I don't have any objection.
 3             THE COURT:  Let it be admitted.
 4   BY MR. STANFORD:
 5   Q    Now, on the transcript that Mr. Walker was referring to, the
 6   February 15th, 2012, recording of Paul Buswell, Paul Buswell
 7   never says that he gave Daniel Stanford money.  He says, "Uh,
 8   well, I -- I gave money and a lot of that helped out for bail and
 9   with everything else for the retainer."  Paul Buswell never told
10   you that he gave me money directly, did he?
11   A    Yes, he did.
12   Q    When?
13   A    He stated that -- our conversations, most of it occurred on
14   the 16th.  He said he gave you money.
15   Q    And I thought you said on the 16th he indicated that he
16   gave Barry Domingue money?
17   A    Well, he passed money to Domingue who then passed it to
18   Stanford is my understanding.
19   Q    My question was specific.  Paul Buswell never told you that
20   he gave me money directly, he handed me money, did he?
21   A    Our conversations were --
22             THE COURT:  Wait.  You need to answer it first.
23             THE WITNESS:  I would have to look at the transcript on
24   the 16th.  On that on the 15th, he was very limited on what
25   he discussed with regard to handing the money over or giving the
```

1    money.  We had information from other witnesses that stated that

2    they observed the money being handed over.  I believe we

3    mentioned that.  I'm not sure 100 percent.  We initiated the

4    subject on the 15th.  On the 16th he went into more detail.

5    And there was no -- from all three of us, there was no -- it's

6    very clear that one person received the money and it wasn't Barry

7    Domingue who received the money.  Was it handed?  I don't know.

8    Who was handed it first?  I don't know.

9    BY MR. STANFORD:

10   Q    Okay.  You said that you had some witnesses who said that it

11   was -- that he handed over the money to me.  Which witnesses said

12   that?

13   A    There were two witnesses.

14   Q    Who are they?

15   A    Johnny Cosper and Josh Espinoza.

16   Q    Okay.  Can I direct your attention to the *Garcia* hearing

17   transcript at page 27.

18   A    Okay.

19   Q    At lines 2 through 15.  Probably line 11.  This is you

20   testifying at the *Garcia* hearing.  "So Paul Buswell made a

21   statement that he had some money, and I believe that his wife

22   retrieved the money, returned back to the office, and Mr. Buswell

23   said he didn't know what to do with it.  It was a large sum of

24   cash.  One person told --

25           THE COURT:  Slow down.

1    BY MR. STANFORD:

2    Q    "One person told me $100,000.  Paul told me $80,000.  And he

3    said he asked what could he do with it, and Mr. Stanford said, I

4    can put it in my trust account and keep it safe, and according to

5    Paul Buswell, he handed it over."

6           Now, Paul Buswell never told you that, did he?

7    A    And I didn't say he did, not that -- what you put in that

8    affidavit for Paul to sign was a --

9    Q    I'm talking about your testimony.

10   A    Yeah.  My testimony -- Ms. Uebinger asked me, "Did you speak

11   to various individuals who were present at the meeting?"  "Yes, a

12   few of them."  And I did, Johnny Cosper for one, Josh Espinoza,

13   Boyd Barrow, various -- well, at that point it was Johnny Cosper.

14   We did speak to Barry Domingue as well.

15          And her question was, "Did Daniel Stanford take

16   possession of a large sum of money at that meeting?"  "Yes."  At

17   that point I don't state that Paul Buswell told me that.  I'm

18   basically telling her what these individuals were telling me, and

19   I'm describing Boyd Barrow was there and Josh Espinoza at the

20   point they realized their assets were frozen, that there was a

21   search warrant and that the assets were seized, some of the

22   Pinnacle accounts and some of Curious Goods' accounts.

23          So Paul Buswell made a statement -- I'm not saying Paul

24   made that statement.  I'm stating that -- the story I'm telling

25   is from a number of people, that he had some money and he asked

1   his wife to retrieve the money.  He returned back to the office

2   with a large sum of cash.  Again, a number of people are telling

3   me this.  One person told me $100,000.  That was Johnny Cosper.

4   Then I clarify and I say, "Paul told me in our interview that it

5   was $80,000."

6           Again, I go back in to what everyone was telling me

7   because Johnny Cosper specifically stated he asked what he could

8   do with it.  Now, in there I didn't clarify that it was

9   Johnny Cosper, but that's what it was, and he stated -- Cosper is

10  the first person that told us that the trust account was offered

11  and to keep it safe.  When we went back to talk to Paul, that's

12  what he stated, that his intention was to keep it safe, so it

13  made sense to us, and then at the end I state that Mr. Buswell

14  handed it over.

15  Q    Well, I'll just read the last sentence verbatim starting

16  with, "Paul told me $80,000."  That was your testimony.  "Paul

17  told me $80,000, and he said that he asked what he could do with

18  it and Mr. Stanford said, I can put it in my trust account and

19  keep it safe, and according to Mr. Buswell, he handed it over."

20  Not Mr. Cosper, Mr. Buswell.

21  A    No.  What I said here, my testimony here, is from a number

22  of people.  I clarified a few things that Paul stated.  No one

23  came back and asked me to clarify.  I wasn't -- I was telling a

24  story from what the question was, "And did you speak to various

25  individuals who were present at the meeting?"  "Yes, a few of

1    them."  "To your knowledge."  My knowledge, I told the story.

2    Should I have clarified what each and every person told me?  I

3    wasn't asked.  I don't think I was even asked any question by

4    you, Mr. Stanford, in this regard, and you could have easily said

5    who said what.  I was never asked.  I don't think the subject was

6    broached by you.

7    Q    Well, this is on direct examination with Ms. Uebinger.

8    A    And I'm saying after the fact it was not -- I was not asked

9    to clarify anything.

10   Q    Well, that's not what's on the table.  What is is what you

11   said.

12   A    And I'm saying I told a story.

13            THE COURT:  All right.  Y'all are arguing.  I know what

14   the point is.  Move on.

15            MR. STANFORD:  Yes, sir.

16   BY MR. STANFORD:

17   Q    You said that Boyd Barrow told you that I supposedly told

18   him that I had a letter from the AG?

19   A    That there was a -- there was something from the AG.

20   Q    Well, in your July 19th, 2012, interview of Boyd Barrow at

21   Tim Meche's office, Boyd Barrow specifically talks about his

22   lawyer or friend, Jim Peters, contacting the Attorney General's

23   Office in Georgia?

24   A    Yes, but there's also an AG in Louisiana that was contacted

25   is what we were told.

1   Q    That's not in -- I only have what I have in discovery.  Did

2   you do a DEA-6 of the interview that contains this information?

3              MR. WALKER:  Objection.

4              THE WITNESS:  I didn't, no, sir.

5              THE COURT:  Okay.  When he stands up to object, you

6   don't answer.

7              THE WITNESS:  Yes, sir.

8              MR. WALKER:  And actually he's answered, so I withdraw

9   it.

10  BY MR. STANFORD:

11  Q    Isn't it true -- answer if you know, but the

12  April 5th recorded interview was turned over to Mr. Hipwell in

13  July of 2012 shortly after I was removed from Mr. Buswell's case,

14  correct?

15  A    I didn't turn it over to him.  I don't know who did and the

16  dates.  We turned it over to the U.S. Attorney's Office.

17  Q    And by August 20th -- well, prior to that -- by

18  August 20th Judge Haik had issued a ruling ordering a rehearing

19  on the *Garcia* matter and basically got the newly produced

20  evidence, the audiotape.  Are you aware of that?

21  A    I mean, I'm not.  That may have been the case.

22             THE COURT:  When was the original indictment in this

23  case handed down?

24             MR. STANFORD:  May 18th.

25             THE COURT:  All right.  And when was Mr. Hipwell

1    appointed to Mr. Buswell's representation after the original

2    indictment?

3              MR. STANFORD:  I think he was kind of provisionally

4    appointed during the *Garcia* process, Judge.

5              MR. WALKER:  That is correct.

6              MR. STANFORD:  What I understood is he wanted

7    Mr. Buswell to have separate counsel to discuss conflict issues

8    and whatnot.

9              MR. HIPWELL:  I was there for the conflict, Your Honor.

10   I believe the Court was away, and I believe Magistrate Judge Hill

11   appointed me on the Curious Goods case on a week that you were

12   out, Your Honor.

13             THE COURT:  All right.  And did you get the recorded

14   interview after that appointment or before the superceding?

15             MR. HIPWELL:  It was definitely before the superceding.

16   It was sometime that summer.  I believe Ms. Uebinger and

17   Collin Sims both together arranged to get that to me pretty

18   quickly, yes, sir.

19             THE COURT:  All right.  Thank you.

20   BY MR. STANFORD:

21   Q    So if Mr. Hipwell would have had had that in July, the

22   summer prior to the superceding indictment, apparently that

23   didn't inhibit or affect the investigation, did it?  Do you have

24   any information that it did?

25   A    I think we had an indictment at that point.

```
 1   Q    Did you have the indictment in July, the superceding
 2   indictment?
 3   A    No.  In September, I believe.
 4   Q    Right.  If the transcript -- or if the audio was turned over
 5   in July, you don't have any information that the turning over of
 6   the transcript affected your investigation in any way, do you?
 7   A    Well, in July is when we conducted the nationwide takedown
 8   Operation Log Jam, so at that point it would be a moot issue.
 9   Everyone knew that we were involved because we executed about 500
10   search warrants and arrested a number of people.  The case was
11   exposed.
12   Q    Did you have conversations with Paul Buswell where you asked
13   him -- or you told him that you would rather meet with his
14   brother, Richard Buswell, without his lawyer, Daniel Stanford,
15   being present, otherwise, it would be a waste of time and you
16   would just be -- and I'm quoting -- spinning your wheels?
17            MR. WALKER:  I object, Your Honor.  It's beyond the
18   scope of cross examination.
19            MR. STANFORD:  He introduced this affidavit which has
20   that information in it.
21            THE COURT:  Answer the question, please.
22            THE WITNESS:  I mean, if I said that, I haven't -- I
23   don't know if I used those exact words.  What I told Paul Buswell
24   was that obviously there was a conflict based on what he was
25   telling us about -- I'm not saying that this conflict would be
```

1    ruled upon or anything like that, but that it would be hard for

2    us to talk to him with you there because there was -- potentially

3    both of you guys were witnesses in the same case.

4    BY MR. STANFORD:

5    Q    And on my alleged involvement in trying to get potpourri

6    back on the shelves, the jailhouse calls that you were monitoring

7    evidenced that Paul Buswell was upset because I was not doing

8    anything with regards to potpourri; isn't that true?

9    A    That's correct.

10   Q    And you have no evidence at all to suggest that I ever

11   attempted to get potpourri back on the shelves for Curious Goods,

12   do you?

13   A    No, to the contrary.

14   Q    What do you have?

15   A    I have the audiotape of you meeting with Brady Becker, with

16   Chris Quibodeaux, with Paul Buswell discussing getting the

17   product on the shelves.

18   Q    Didn't I tell them that if they were going to do that, that

19   they should have it at least tested by two labs, and prior to

20   putting it back on the shelves, deliver the lab reports along

21   with the samples to local law enforcement and have them

22   independently test it before they even thought about putting it

23   on the shelves?  Isn't that true?

24   A    There were a lot of discussions.

25   Q    I'm asking you about that one.  That's what I told them at

1   that meeting.  When they were asking about putting it back on the

2   shelves, I told them, if you're going to go in that direction,

3   you need to get at least two independent lab reports.  Correct?

4   A    You may have said that.

5   Q    Didn't I say, in addition to that, you need to bring the

6   product and the lab reports to law enforcement and let them check

7   it out and give them a certain amount of time to get back to you

8   and let you know whether or not they think it's okay?  Isn't that

9   true?

10  A    Yes.

11  Q    So I was merely giving them advice, if you're going to do

12  that, this is how you should do it, contrasted with I, myself,

13  was not trying to get potpourri back on the shelves, true?

14  A    No.  That's not true.

15  Q    What did I do to get potpourri --

16       MR. WALKER:  I object.  It's beyond the scope of cross

17  examination.

18       THE COURT:  It is.

19       And, Mr. Stanford, that whole issue is not lost on me,

20  that you were giving advice.  If you remember, I got to see all

21  of those jailhouse call transcripts.

22       MR. STANFORD:  That's just a minor fraction, Judge, of

23  the --

24       THE COURT:  The ones that were at the *Garcia* hearing.

25       MR. STANFORD:  Yeah.  That's five of thousands.

1          And I'm just checking my notes to make sure.

2          That's all the questions I have.

3          MR. HIPWELL:  Your Honor, may I have one more?

4          THE COURT:  You may.

5          Here's a grand test.  Does he really mean one?

6          MR. HIPWELL:  I know, Your Honor.

7                        RECROSS EXAMINATION

8    BY MR. HIPWELL:

9    Q    The subject matter, though, is whether or not there was any

10   kind of a report of interview, whether it's a DEA-6 or any other

11   document, of the April 5th recorded, that is audio recorded,

12   conversation with my client before a transcript was produced.  Do

13   you know if there was one or not?

14   A    Yeah.  I think I answered that there was.

15   Q    That there was.  I thought perhaps you had said that there

16   wasn't.

17   A    No.  I'm fairly confident I said that there was a document

18   prepared.  I don't know at that point in time if it was a DEA-6

19   or a --

20   Q    Forgive me, sir.  If I put this on the stand -- forgive

21   me -- on the ELMO and just --

22          THE COURT:  I knew he couldn't keep it to one.

23          MR. HIPWELL:  Thank you, Judge.

24   BY MR. HIPWELL:

25   Q    Is that your handwriting at the bottom or is that

```
1    Will White's?
2    A    That's not my handwriting.  I think that may be White's.
3    I'm not sure.
4    Q    But would you accept, by looking at this for a second, that
5    it appears to be a summary of the conversations?
6    A    Yes.
7              MR. HIPWELL:  All right, sir.
8              That's all I have, Judge.  Thank you.
9              THE COURT:  Thank you, Mr. Hipwell.
10             MR. WALKER:  I have no questions.  I simply want to
11   offer a document.  It is a portion of the Garcia hearing in which
12   Mr. Stanford discusses the RCA and that he's not a part of it.
13             MR. STANFORD:  Can I see it?
14             THE COURT:  I believe his exact words were, "That's not
15   mine."
16             MR. WALKER:  "That's not me."
17             THE COURT:  "That's not me."
18             MR. STANFORD:  This is from --
19             THE COURT:  The Garcia hearing.  That's part of the
20   transcript.
21             MR. WALKER:  It's 12/12/11.  It's actually the
22   detention hearing.
23             MR. STANFORD:  As I recall, Judge, we had approached at
24   sidebar concerning the news report, and, in my opinion, there was
25   confusion about when the articles were filed with regards to the
```

1  date of November 8th and November 28th and I'm trying to

2  clarify that.

3              THE COURT:  Do you have any objection to his offering?

4              MR. STANFORD:  No, sir.

5              THE COURT:  All right.  Let it be admitted.

6              Are we done with this witness?

7              MR. WALKER:  We are, Your Honor.

8              THE COURT:  Is he released?

9              MR. STANFORD:  Judge --

10             MR. WALKER:  I would ask -- well --

11             MR. STANFORD:  I thought the Court stated earlier that

12  we were going to get a copy of the February 16th.

13             THE COURT:  That's why I'm asking.

14             MR. WALKER:  I'm going to get them a copy of the

15  recording of the 16th and that should be done by tomorrow.

16             MR. STANFORD:  And I would just like to keep him under

17  the rule until we have that and have a chance to review the

18  transcript in its entirety, Judge.

19             THE COURT:  All right.  You can't talk about your

20  testimony to anybody, but you can go back to Dallas.

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Thank you, Agent DeSalvo.

23             LaRae, you need a break.

24             Off the record.

25                       (OFF THE RECORD)

1          THE COURT:  Court will come to order.  Everybody please

2     be seated.

3          First of all, what I intend to do on the motion for

4     prosecutorial misconduct, at such time as Mr. Stanford and

5     whichever other defendant wishes to receive the transcript of the

6     February 16, 2012, interview with Mr. Paul Buswell, five days

7     from their receipt they will notify me as to whether they wish to

8     reconvene the hearing or what their intentions are with that

9     transcript.  I just need to know.  And that can happen by

10    telephone or by e-mail.  Once that determination is made, if we

11    come back and have some more testimony, there will be an

12    opportunity for the defendant to file a post trial brief on that

13    motion only.

14         And what we will do now is I will take up arguments,

15    since we haven't had any, on Mr. Buswell's motion to produce

16    Grand Jury transcripts.  That was Document Number 293.  And

17    followed by Mr. Reece's motion to produce Grand Jury transcripts.

18    That's Document 295.

19         I will also say before I go any further that I have not

20    yet even opened the Grand Jury transcripts of Agent DeSalvo's

21    testimony.  I intend to do that and read them and I will let you

22    know what my response is on that once I complete it.  It is my

23    appreciation from my prior ruling that the law is such that

24    unless the government calls Agent DeSalvo on direct, that that is

25    not properly *Jencks*, and there is a question, at least in my

1  mind, although it's not that large a question, whether this

2  constitutes a hearing within the definition of the statute, but I

3  will look through those transcripts based on Agent DeSalvo's

4  testimony for information I think may or should be disclosed to

5  the defendants.

6         All right.  With that, Mr. Hipwell?

7         MR. HIPWELL:  Your Honor, I'm going to defer to

8  Mr. Foster first.  I think he's the one that needs to go if you

9  don't mind.

10        THE COURT:  I don't mind.

11        Do you want to take your other things, too?

12        MR. FOSTER:  I will, Judge.  It all sort of runs

13  together.

14        THE COURT:  It does.  I understand.

15        MR. FOSTER:  Thank you.  Thank you to counsel for

16  trying to accommodate us, and to the Court, of course.

17        THE COURT:  Public servant.  I'm here to serve.

18        I am going to call you out on one thing before you

19  start.  On page 9 of your brief you have an ellipsis.  I know

20  what goes in that ellipsis.  I don't know if that was intentional

21  or if it's your position that the standard is the same under

22  6(e)(3)(E)(i) as 6(e)(3)(E)(ii), but the words that go where that

23  ellipsis is supposed to go -- if you ever do that again,

24  Mr. Foster, put the words in there so I don't have to wonder why

25  they were taken out.  The words are "in another judicial

1    proceeding."  Do you know where I'm talking about?

2                    MR. FOSTER:  I see it.

3                    THE COURT:  All right.  If you wrote that or if

4    somebody else in your firm wrote that, tell them don't do that

5    anymore.

6                    MR. FOSTER:  Yes, sir.  Thank you.

7                    Judge, the issue on this Grand Jury transcript, it was

8    really something I was going to follow up with, the question I

9    was going to ask Agent DeSalvo, and this relates also to the

10   motion to dismiss.

11                   The question is whether or not the state of the

12   pharmacological evidence in particular was such that the

13   Grand Jury was fully informed of what the state of that evidence

14   information was at that time just as the question is whether or

15   not a reasonable person would have been on notice that another

16   substance such as AM-2201 could have or did or could be compared

17   to JWH-018 to determine whether the effects on the human central

18   nervous system are substantially similar to or are greater than

19   the effects on the central nervous system of JWH-018.

20                   And, Judge, we went through the CFR.  I think we

21   admitted this as an exhibit or we discussed it last time.  I

22   believe that I pointed out the portion of the testimony there.

23   This is the DEA administrator's finding that there is little

24   information regarding the pharmacology, toxicology, and safety of

25   these substances in humans given that there is minimal amount of

1    pre-clinical investigations undertaken regarding these

2    substances.

3              And, of course, she didn't have to determine what the

4    pharmacological effect was because, under the temporary ban, all

5    she had to figure -- all she had to certify was that there was an

6    imminent threat, but that's different in the Grand Jury because

7    in the Grand Jury, an element of the analogue statute is that

8    it's substantially similar chemically and then you have the

9    alternative.  I submit to the Court that that is the standard

10   that's being applied around the country.  I believe the judge in

11   *Fedida* adopted *Turcotte*, that they have to show chemically

12   similar plus pharmacologically.

13             THE COURT:  I am going to apply -- I do not read

14   *Granberry* as saying that it is disjunctive.  I read *Granberry* as

15   not saying that at all.  And I concur that it is a conjunctive

16   reading of the statute.

17             MR. FOSTER:  Thank you.

18             And so, Judge, that means two things actually.  It

19   means, first of all, that the Grand Jury would have had to have

20   been instructed on that.

21             THE COURT:  I refer you to Count 1, paragraph 1A.

22             MR. FOSTER:  Of the indictment, sir?

23             THE COURT:  Of the superceding indictment.

24             A controlled substance analogue is a designer drug that

25   resembles, resembles, a controlled substance in molecular

1  structure and actual or intended physiological effect.

2          Does that place your client on notice of the charge

3  against him so that he can adequately plead double jeopardy?

4          MR. FOSTER:  For double jeopardy purposes, I suspect --

5  well, it doesn't track the -- well, the citation to the statute,

6  it probably could be argued that we would have reference to the

7  statute so we could read the statute for ourselves, but the

8  question is what, if anything, was the Grand Jury told they had

9  to find in order to be convinced by a majority -- I don't know

10 how many grand jurors sat, the 13 or however many were needed --

11 what were they told they needed to determine and what evidence

12 did they get.

13          If we use as a baseline the administrator's statement

14 in March of 2011, they're starting at zero because this isn't

15 about what effect this drug has on a rat and it's not about what

16 effect JWH-018 has on a rat.  The essence of proof is that they

17 have to prove that the effect that JWH-018 has on a human central

18 nervous system is substantially similar to the effect that

19 AM-2201 has on a human central nervous system.  There's no proof

20 of that and there was none then.

21          In fact, Agent DeSalvo testified today -- I think the

22 testimony previously in the *Garcia* hearing under questioning by

23 Mr. Stanford was that Agent DeSalvo learned sometime in the

24 fall -- he said he looked at it and he could tell in 30 seconds

25 it was an analogue, but the testimony we heard today was that he

1    got -- he learned about this sometime after December 5th or

2    December 8th, I forget the date, and he called DEA.  He said, I

3    talked to a couple of chemists.

4            So on the record of what's in front of us or what's

5    available, there's no information whatsoever that there is any

6    pharmacological information, testing, evidence, proof,

7    whatsoever, so then there's a real failing as to the second

8    element of the crime.

9            I understand and I appreciate the Court's determination

10   that you're viewing the statute in the conjunctive, chemical and

11   pharmacological, and the pharmacological is in the disjunctive

12   because it could be as represented.  There's nothing whatsoever

13   in the discovery that there was any representation by Mr. Reece

14   certainly that JWH-018 and AM-2201 have similar pharmacological

15   effects on the human central nervous system.  He had never been

16   here.  He had never been to Curious Goods.  He wasn't involved in

17   the manufacturing, the packaging, the sales.  None of these

18   gentlemen in the courtroom knew him.  He was acquainted with two

19   of the people who have pled guilty, but he had nothing to do with

20   any representation.

21           THE COURT:  Why is that not a sufficiency of the

22   evidence argument?

23           MR. FOSTER:  It would be a sufficiency of the evidence

24   argument, but I think in the Grand Jury context -- and that's the

25   *Strauss* case, which is really the lead case in the Fifth Circuit.

1          And what the *Strauss* case says -- of course, the facts

2     of *Strauss* is they found out after the fact that somebody had

3     said something in an unrelated civil case, and the Fifth Circuit

4     says, well, you know, you can't put that at the government's

5     feet.  If this fellow said something in an unrelated civil case,

6     it's certainly not the government's issue.  They had no control

7     over it.

8          But if you have a set of facts or a set of

9     circumstances which are presented to the Grand Jury -- if the

10    Grand Jury is told, okay, this is an analogue and that means that

11    it meets the chemical standard of the statute and it meets the

12    pharmacological standard of the statute, and if in fact there's

13    no evidence or proof available at that time -- I mean, based upon

14    what we've seen, I don't really think there was.

15         So that was the question I was going to ask

16    Agent DeSalvo.  What did you know about the pharmacological

17    effect of AM-2201 as compared to JWH-018 on the human central

18    nervous system at the time you testified before the Grand Jury?

19    That was the question I was going to ask him.  I suspect -- I

20    don't know what he was going to say.

21         THE COURT:  You would be speculating.

22         MR. FOSTER:  I would be speculating.  That's right.  So

23    that's my point there.

24         And, Judge, if we go back, you know, the initial

25    disclosure we got from the government on the pharmacology was

1    a -- this is in the record.  It's a declaration of the

2    pharmacologist, Dr. Walker, and this was filed by the government.

3    It's already in the record.  It was filed by us, rather, an

4    attachment, but this is the declaration of Michelle Walker who's

5    their pharmacologist in this trial.  She never says that JWH-018

6    has the same effect on the human central nervous system as

7    AM-2201.  She makes another statement.  For example, in

8    paragraph 2, she says that it has been determined that AM-2201

9    produces canniba -- canniba -- I can't say that -- effects

10   similar to those produced by JWH-018 based upon pharmacological

11   studies and activity reports.  That's on rats.

12         THE COURT:  That's for your *Daubert* hearing.

13         MR. FOSTER:  That's for my *Daubert*, yes, sir, it is,

14   but preliminarily, though, what my concern was with the

15   Grand Jury is since there was really nothing out there -- and I

16   don't know if you've had a chance to look at the order of

17   Judge Dalton in *Fedida*, but he says, listen, guys, you better

18   tighten up your pharmacology.  I know you're trying to do some

19   pharmacology comparisons to JWH-018 so you can prove these

20   things, but he says as of right now, you know, you're really not

21   there.  And if we go back to September of 2012, they were further

22   away from there than they are today in May of 2013.

23         So that was the point I was trying to make in the

24   Grand Jury.  I just wanted to see what type of evidence and

25   probably, more importantly, what was the quality, what was the

 1    representation made to the Grand Jury as to the quality of the

 2    evidence on pharmacology, which is an essential element of the

 3    charge.  And of course the Title 21 charge is the foundation for

 4    the money laundering charge, so it seems to me it would go to

 5    both.  So if the Court were to look at that, that was my area of

 6    inquiry.

 7            And, Judge, the other thing -- I don't have much

 8    argument to add much to the surprise of Mr. Walker, but the thing

 9    I was going to ask -- and I think you've already said that this

10    isn't something that you would want to entertain.  I was going to

11    ask for leave to file maybe a five-page or a seven-page brief,

12    and from what I understood, the Court does not want us to file a

13    reply, which we received the government's response to our motion

14    to dismiss a day or two before the hearing.  We had plenty of

15    time.  I got to read it, so, you know, that wasn't an issue.

16            But the time to file a reply has not yet expired, and

17    what I was going to ask the Court was in lieu of a reply, if you

18    would permit us just to file a limited brief because I would like

19    to discuss -- because I knew you were interested in *Fedida*.  You

20    had mentioned from the bench once if anybody knew whether the

21    decision had come down.  So that's what I would ask the Court.

22            THE COURT:  Do you still want to file another brief?

23            MR. FOSTER:  Well, you know, one page is the

24    certificate of service, you know, but --

25            THE COURT:  I tell you what.  I wanted to be able to

1   get as many of these to Judge Foote as I can because I am very

2   sure, regardless of whose ox gets gored by whatever my

3   recommendation is, the other side is going to object.  That's the

4   nature of the beast.

5            Because all but two of my rulings on these motions

6   besides the discovery motion will be in the nature of reports and

7   recommendations, she will have de novo review, which you could

8   bombard her with more 31-page briefs and you can put that reply

9   in there because after digesting -- and I have a transcript of

10  everything that was said last week.  I'm not sure that a reply

11  would make any difference to me.

12           Like I said, I appreciate being given the *Fedida*

13  opinion.  It really didn't make me see anything any differently.

14  So I would suggest save the trees for Judge Foote.  I'm sure

15  she's going to appreciate that.

16           MR. FOSTER:  All right, sir.  Well, that would be --

17  there's really nothing I have really to add to that argument, but

18  I really do think that the notice -- what Judge Dalton did in

19  *Fedida*, he said that the two-dimensional comparison is sufficient

20  to satisfy notice, at least for due process grounds, and he did

21  not address pharmacology because he said in that case there was

22  evidence that the defendant actually knew.  In a post-arrest

23  statement, he said something along the lines, oh, yes, you know,

24  I knew that this was just like the other chemical and had the

25  same effect.

1          So he didn't have to address the issue, which I think

2     is squarely before you, that is, whether or not there was

3     sufficient notice that there's a standard of the effect on the

4     human central nervous system for drug A, JWH-018, and how do I

5     measure that against the effect of AM-2201 on the central -- on

6     the human central nervous system when there's no testing on that

7     either.  So you have nothing compared to nothing and how do you

8     have notice whether they're substantially similar.  So I think

9     that pretty much encapsulates our argument.

10          Thank you, sir.  May we be excused?

11          THE COURT:  You may be excused.

12          Mr. Hipwell, do you want to talk about the Grand Jury?

13          MR. HIPWELL:  Your Honor, Mr. Belanger is going to

14     briefly.

15          MR. BELANGER:  Good afternoon, Your Honor.  This will

16     only take a few seconds.

17          Since the Court has Agent DeSalvo's testimony and will

18     be reviewing it to see what portions can be disclosed, if any, to

19     the defense, we would deem the request for testimony satisfied

20     with that.

21          Regarding production of the instructions, you know,

22     today the Court is indicating that it reads the statute to be

23     read conjunctively as opposed to disjunctively.  It looks like

24     the government has, you know, conceded to that reading within the

25     last couple of hearings, but was that the government's position

```
 1    at the time of the Grand Jury and how was the Grand Jury
 2    instructed on how to apply the Analogue Act?
 3             THE COURT:  Do you agree that Count 1, paragraph 1A,
 4    the way it is written is in the conjunctive?
 5             MR. BELANGER:  I would agree that that is how it reads,
 6    Your Honor.
 7             THE COURT:  Okay.
 8             MR. BELANGER:  But I guess the only thing I'm asking is
 9    for the actual instructions to be provided to the Court for
10    review.  I don't necessarily myself need to see them, but just to
11    make sure that they were legally sufficient, and the basis on
12    that is, you know, even though this reads this way, our concerns
13    were with the *Granberry* case conflicting with some of the others
14    and the possibility of the interpretation of that statute.  I do
15    not see what the prejudice would be in forwarding that to the
16    Court for review, and I really don't see how that would infringe
17    upon the rules for Grand Jury.
18             That's really all I have to say.  Thank you,
19    Your Honor.
20             THE COURT:  Mr. Walker, do you want to talk?
21             MR. WALKER:  Very, very, very briefly.  One, concede, I
22    hate that word because we didn't concede anything.  It should be
23    read conjunctively.
24             About 3:00 o'clock in the morning I began thinking
25    about this argument and began researching it in a different way.
```

1    One, the instructions were given absolutely correctly.  Two, the

2    indictment expresses what the state of the law is absolutely

3    correctly.

4           *United States vs. Linetsky*, L-I-N-E-T-S-K-Y,

5    533 F.2d 1992.  In that case the defendant was charged with

6    obscenity.  The thing is the Miller test came out between when it

7    was indicted and when it went to trial, so there was no question

8    that the Grand Jury was instructed improperly because pre Miller

9    obscenity was different than post Miller obscenity.

10          The Supreme Court in saying there was absolutely

11   nothing wrong said this.  I take it back.  The Fifth Circuit.

12   And it's a 1976 case.  A Grand Jury need not be convinced beyond

13   a reasonable doubt that a defendant is guilty.  If an indictment

14   is valid on its face, it is enough to call for trial of the

15   charge on the merits.

16          In this case there's no question that when the

17   Grand Jury looked at the indictment, the indictment itself

18   correctly stated the law, so we've done everything that we have

19   to do in order to then present the case for trial.

20          THE COURT:  All right.  I'll give you an insight

21   into -- and I combined 293 and 295 in one memorandum ruling.

22   That one is not an R and R.  It is a memorandum ruling.

23          First of all, in terms of the witness statements, we

24   have a scheduling order for the production of *Giglio*.  Although I

25   personally have reservations about this as a matter of fairness,

1    compliance with *Jencks* is compliance.  If *Brady* is in the *Jencks*,

2    then you've complied.  I don't particularly think that's fair.

3    It has been the policy and practice of the government in this

4    division that they turn over *Brady* as promptly as they can.  I

5    don't see any reason why that should not continue.  I encourage

6    them to do that, but the rule is that if you comply with *Jencks*

7    and your *Brady* materials are in the *Jencks*, you've complied.  So

8    there's nothing -- no special set of circumstances that would

9    persuade me to deviate from the custom and policy in this

10   district, the scheduling order, Rule 16(a)(2), and/or the

11   Jencks Act.  I'm sorry.  Rule 26.2.

12           The second thing is the production of Grand Jury

13   transcripts under 6(e)(3)(E)(i).  The way I read the law -- and

14   there is some disagreement about this -- it's to prevent

15   injustice in another proceeding.  That's the particularized need

16   test.  You will see that the *Douglas Oil* case involved a separate

17   proceeding.  *In re Grand Jury Testimony* of the Fifth Circuit

18   involved a separate proceeding.

19           And the second subparagraph of 6(e)(3)(E) deals with

20   really what is before me with these motions, is there something

21   that may indicate the case should be -- the indictment should be

22   dismissed, which puts you into prosecutorial abuse or sufficiency

23   of the evidence.  I haven't -- it is a catch-22 for the

24   defendant.  They need to be able to show with particularized

25   facts to support their claim that something happened in the

1    Grand Jury, but they can't get the Grand Jury testimony to show

2    it.  Again, not particularly fair, but far be it for me to

3    deviate from what the courts say.

4           I will follow *Bank of Nova Scotia vs. United States* and

5    I will deny the motions for the production of the Grand Jury

6    transcripts, and, like I said, you will have a formal written

7    opinion to that effect.

8           All right.  Anybody else want to talk about any other

9    motions before we go on?  Mr. Domingue?

10          MR. DOMINGUE:  Your Honor, you had invited

11   Mr. Washington and I to speak and I'm not sure as to the time of

12   that, if now is a good time.

13          THE COURT:  Now is a good time.

14          MR. DOMINGUE:  Thank you, Your Honor.

15          Your Honor, at the hearing last Friday, four motions

16   got -- well, our two motions were heard with Mr. Stanford's

17   motion and Mr. Foster's motion.  We filed our motions on two

18   particular issues, and I think because they were taken up all

19   together with the other motions, they kind of got lost in the

20   mix.  Our motion, 273, was on a very precise issue, is it proper

21   to apply the Analogue Act to an existing patented substance, and

22   it seems like it got lost in the mix, and the judge in the *Fedida*

23   case seems to have glossed over that as well.

24          So the case -- let me back up.  The judge in *Fedida*

25   said that -- he found the Analogue Act to be ambiguous.

 1    Therefore, I look at the legislative history.  When you look at

 2    the legislative history, the purpose of the Analogue Act is to

 3    target newly created substances designed to circumvent the

 4    Controlled Substances Act.  Here you have AM-2201 which has been

 5    in existence since at least 1999, so you can't say in one breath

 6    that the Analogue Act applies to new substances and then turn

 7    around and apply it to an existing patented substance.

 8                THE COURT:  How do I get past *Granberry* which says in

 9    no uncertain terms that this statute is not vague?

10                MR. DOMINGUE:  I think it is, Your Honor.

11                THE COURT:  They're the Fifth Circuit.  The last time I

12    went against the Fifth Circuit, I got scowled upon.

13                MR. DOMINGUE:  Well, that's good.  You know,

14    Your Honor, if you look at *Granberry*, it says the statute makes

15    plain that drugs which have been chemically designed to be

16    similar to controlled substances, but which are not, that's what

17    it applies to.  That's *Granberry*.  I would ask -- I would

18    encourage the Court to follow *Granberry* in that regard.

19                THE COURT:  Here's where my problem is.  And I

20    understand your argument, it wasn't lost, and we included all

21    four of them at once for a reason, because that's what the

22    R and R is going to deal with, all four of them at once, because

23    it seemed to me to make perfect sense to do it that way.

24                If *Granberry* says the statute is not vague, I do not

25    look to the congressional intent.  I am not to look to the

1     congressional intent.  It's plain on its face.  Some courts have

2     said it's ambiguous, but the controlling court in this circuit

3     says it's not and I'm going to follow that.

4          MR. DOMINGUE:  Okay.  But *Granberry* also said the

5     statute applies to newly created substances, and if we follow

6     *Granberry*, how do we even get the Grand Jury to issue an

7     indictment if they're instructed properly on the law?  Were they

8     told that AM-2201 was not a new substance created to circumvent

9     the Controlled Substances Act or the attempted temporary

10    scheduling order?  I think that's important.  If *Granberry* is

11    controlling, then *Granberry* says what it says.  The Analogue Act

12    applies to newly created substances.

13         THE COURT:  And where does the newly created

14    substances, or what I'm going to call your temporal component,

15    come in to play in the clear language of the statute?

16         MR. DOMINGUE:  And that's why we would say the statute

17    is not clear, but the Fifth Circuit has told us what it says

18    without even resorting to the legislative history.  The statute

19    makes it clear.  It applies to new substances, period.  You don't

20    need it for an existing substance.

21         We know full well that the DEA was quite aware of

22    AM-2201 when it initiated the temporary scheduling action.  It's

23    in his reports.  They knew about it.  The proper way to control

24    it was to exercise -- was to use 811(h), its temporary scheduling

25    authority, not two months later to start issuing secret reports

1    talking about ways to entrap people.

2           And in response to one of the motions, I believe it was

3    our second motion, 314, the government even suggested if the DEA

4    was trying to set a trap, they would have never added 2201 to the

5    Controlled Substances Act.  Well, they didn't.  The DEA did not

6    do that.  Congress did it.  In fact, the DEA issued a notice of

7    permanent scheduling on March 1st, 2012, only for the five

8    original substances in its temporary action.  So even when it

9    seeks to permanently schedule substances, it doesn't include

10   AM-2201 in that, so the government tacitly admitted the DEA was

11   trying to entrap people.

12          In response to our motions, we pointed out that they

13   didn't address the statement of the DEA spokesperson,

14   Ms. Carino (phonetic), who it was her opinion that it only

15   applied to the five named substances.  If the government wanted

16   to -- if the DEA intended that it apply to other things, they

17   should have said so.  That's what public notice is for and that's

18   what is required.  They didn't do that.

19          I would encourage Your Honor to look at the Ohio case

20   that I presented this morning.

21          THE COURT:  I am going to do that, and I am going to

22   read *Fedida* more carefully because I didn't get a chance to read

23   it.

24          MR. DOMINGUE:  Thank you, Your Honor.

25          The other thing --

```
 1                THE COURT:  That was a Daubert ruling, wasn't it, the
 2     Ohio case?
 3                MR. DOMINGUE:  It went through a Daubert analysis,
 4     right.
 5                THE COURT:  Did he have an evidentiary hearing?
 6                MR. DOMINGUE:  He did.  He had testimony from the
 7     two -- only -- what's important, he only had testimony from the
 8     State's experts.  The defense put up no experts and they still
 9     won.
10                THE COURT:  Well, you know, I seem to recall at the
11     last hearing with Judge Foote your co-counsel said how concerned
12     he was for the Daubert hearing.  I tend to agree that that is
13     going to be a very significant point in this case given the state
14     of the law and the state of the science.  What's before me is a
15     sufficiency of the indictment which is a different standard
16     altogether.  It's a very different standard altogether.  I don't
17     have the Daubert in front of me.
18                Go ahead.
19                MR. DOMINGUE:  But I guess the point is, Judge, I just
20     don't want -- I can't reconcile in my mind how the courts, and,
21     in particular, the Fifth Circuit in Granberry, can say that the
22     Analogue Act applies to newly created substances, you know,
23     developed for whatever reason, and then turn around and apply it
24     to an existing patented substance.  By virtue of the patent, the
25     United States Government has said it is a new novel substance not
```

```
 1   like anything else.
 2           THE COURT:  How do you distinguish the GBH, the date
 3   rape drug, cases?
 4           MR. DOMINGUE:  I don't believe the defense attorneys in
 5   those cases did their job.  They should have raised that issue.
 6   And, you know, Your Honor, it was raised in the Fedida case, but
 7   in his opinion the judge absolutely ignored it.  I don't believe
 8   it's something that can be ignored.  You can't have the
 9   United States Government issuing a patent saying this is
10   different, this is new, this wasn't designed to be like anything
11   else.
12           In fact, in the patent applications for the AM
13   chemicals, including AM-2201, the patent office had the benefit
14   of the Huffman articles.  JWH-018 is even mentioned on the patent
15   application.  So the U.S. Patent Office was clearly aware of
16   JWH-018 and all the other chemicals, but, nonetheless, issued
17   patents on AM-2201, so I think that's significant.  I didn't want
18   those things to be lost with all the other things we started
19   talking about.
20           I don't think we can get to the point where you're
21   talking about what does substantially similar mean because the
22   first hurdle is does the Analogue Act apply and should the DEA
23   have used 811(h).  I think the answer is yes.  The Analogue Act
24   was not the way to go.  They left people with no notice as to
25   what their intent was.  Even people with the DEA didn't know.
```

1          Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Washington, did you want to

3    say anything else?

4          MR. WASHINGTON:  Not at this time, Your Honor.  Thank

5    you very much for the opportunity.

6          THE COURT:  No other defense counsel rises to speak.

7          Mr. Walker?

8          MR. WALKER:  Briefly.

9          I'm going to first address what Mr. Domingue had to

10   say, and then I'm going to address one other general area that

11   relates to the motions to dismiss.

12         You are correct that when you look at *Granberry*, it's

13   unambiguous on its face.  The statute says it has to be

14   chemically similar.  Plus it has to be pharmacologically

15   substantially similar or intended or represented to be.  There's

16   nothing temporal in the statute.

17         And I understand that the different cases talk about

18   that, talk about that it was -- they talk about the legislative

19   history, but that's not in the statute and the statute is not

20   unambiguous.  The Court asked, how do you reconcile it with the

21   date rape drug cases, and he said, the defense didn't do their

22   job.  I submit that's wrong.

23         I think that when you look at the *Roberts* case and

24   the -- it begins with a "W" and I think it's the *Washam* case.

25   They specifically talk about the fact that it doesn't have to be

1    a newly created drug.  So when they were faced with that

2    situation, they said it doesn't have to be.  So apparently the

3    defense attempted to do their job.  The Court looked at the

4    unambiguous statute and said that's not what the statute says.

5    So that's my response.

6          The other thing that the Court brought up previously

7    was notice, and the defense has argued notice, and when I stood

8    up to argue the motions to dismiss talking about the fact that

9    Mr. Sims kept writing down facts he wanted me to argue, I said

10   this is not the appropriate time to argue facts.  At trial we're

11   going to be submitting facts that demonstrate that they knew what

12   they were doing.

13         With Mr. Reece, we're going to submit that he was

14   having material that was seized coming into the United States and

15   that he did nothing about it.  He recognized that that was a part

16   of the cost of doing business because what he was bringing in was

17   this illegal substance.  Employees actually received direct

18   written notice that the substances seized were analogues and one

19   of those substances was AM-2201.

20         So we're going to submit evidence at the time of

21   trial and I'm sure the defense is going to attempt to submit

22   evidence that contradicts what we're saying at the time of trial,

23   but that's what the jury's job is going to be, to decide whether

24   these people knew they were selling an analogue.  That's what the

25   elements require.

```
 1              THE COURT:  And it's a specific intent.

 2              MR. WALKER:  It absolutely is a specific intent crime

 3    as we have demonstrated in the motions that we submitted to the

 4    Court, and when you do that, any argument about notice, as the

 5    Supreme Court says, has to be looked on with skepticism.

 6              We have equally strong evidence against the defendants

 7    who were in Louisiana, including Mr. Domingue, Mr. Stanford, and

 8    Mr. Buswell, the fact that they're mislabeling the material and

 9    that they're meeting with employees teaching them what you can

10    and can't say so that they can circumvent the law.

11              If it wasn't an analogue, it's legal.  That's really

12    what it comes down to.  If what they're selling is not an

13    analogue, it's an absolutely legal substance, why did they feel a

14    need not only to intentionally misbrand the substance, which

15    would be a way to circumvent the analogue statute or at least

16    attempt to do so, but also to have specific meetings to teach how

17    to evade law enforcement?

18              They know that every kid that's coming around the block

19    who's buying the stuff, everybody 18 and older who they're

20    selling hundreds of thousands of dollars of material to, they're

21    all smoking it, but they put the documents -- and the evidence we

22    intend to argue, circumstantial and direct, is the reason why it

23    was on there is to circumvent the analogue statute.

24              So we have a tremendous amount of information that will

25    demonstrate that they knew what they were doing.  It's just this
```

1    is not the appropriate time for it.

2         So when the Court previously said, I'm concerned about

3    notice, my response was in my head, well, Collin was right and I

4    was wrong.  I should have argued more about the facts in this

5    case because at trial the facts will demonstrate that they did

6    have notice.

7         THE COURT:  All right.  I am going to read the cases,

8    Mr. Domingue, those two that were brought to me today, in detail.

9    I don't think it's going to change the outcome.

10        All of these four motions -- 238, 273, 314, and 315 --

11   basically deal with the sufficiency of the indictment.  I cannot

12   fit in my head that all of these factual issues that are being

13   raised by the defense constitute preliminary findings of fact

14   necessary to decide questions of law.  They are questions of

15   fact.  If the experts are disqualified, this case will have a

16   much different outcome than it will if they're not.  That

17   requires a full evidentiary hearing.  That's not for me to

18   decide.

19        The government alleges that AM-2201 is a controlled

20   substance analogue.  That is a question of fact I have to assume

21   as true for purposes of the sufficiency of the indictment.  I

22   don't know if it is or not.

23        The question of law is what I can take up and I can

24   take up the factual predicate for that or the preliminary facts

25   if they are undisputed, and if there is anything that's been

1    clear in the last two days in this courtroom, almost everything

2    is disputed when it comes to this stuff.

3            On the notice, I think the notice is present, but as

4    the Supreme Court says, where there is a specific intent crime,

5    notice is something that's going to -- the government is going to

6    have a heavy burden on.

7            I'm going to follow *Granberry*.  I am going to interpret

8    *Granberry* the way I think it actually is which is it's

9    conjunctive.  If the statute is not ambiguous on its face, I

10   don't need to go to the congressional intent.  I don't think it's

11   ambiguous on its face.  I don't think the term "substantially

12   similar" renders it unconstitutionally vague for purposes of a

13   motion to dismiss the indictment.

14           I will follow *Turcotte*.  The omission of AM-2201 from

15   the March, 2011, order I don't think renders it

16   unconstitutionally vague for a couple of reasons.  One is there

17   were only a few instances of reported incidences.  My memory from

18   that NFLIS report is there were 8 in 2010 whereas there were

19   2,000 of JWH-018 or 1,887, some large number.  The reasoning for

20   the temporary emergency ban was to address that kind of problem,

21   and if you say, well, you've still got to put AM-2201 in there,

22   then the controlled substance analogue statute is essentially

23   rendered meaningless.

24           I will follow *Roberts*.  I will follow *Washam*,

25   W-A-S-H-A-M.  There is a case that we will also follow on your

1    argument, Mr. Domingue, *United States vs. Niemoeller*,

2    N-I-E-M-O-E-L-L-E-R, that deals with that in part.  And there's

3    more.

4            The long story short is I'm very tired at this point in

5    the day, but the recommendation will be that those four motions

6    to dismiss be denied on various grounds.

7            As I told you when we started off, until they are

8    actually filed, that's when your 14-day objections -- or 14-day

9    period for objections begins to run.  They still use the mailbox

10   rule, and so if I say 14 days, you will see in CM/ECF it's

11   actually 17 days, so there you have it.

12           And Judge Foote knows all of this is coming.  I wanted

13   to try to get as much of it to her as I could so that when you

14   have your hearings with her on May 17th, you will at least know

15   where I'm coming from and that will give you the ability to have

16   hopefully the most constructive hearings you can on the *Daubert*

17   issues and that sort of thing.

18           MR. WALKER:  We're not having any of those hearings on

19   May 17th.  They're in July.

20           THE COURT:  In July.  I'm sorry.  Whatever hearings

21   you're having in May.

22           Okay.  Anything else that needs to come before the

23   Court at this time?

24           MR. WALKER:  No, Your Honor.

25           THE COURT:  Oh, I do have one other thing.  Since you

```
 1    stood up, you made me remember.  Thank you.
 2            Mr. Walker, I am very troubled by this and I might
 3    actually ask for another brief on this.
 4            Mr. Stanford's motion --
 5            MR. WALKER:  Which one?
 6            THE COURT:  I knew you were going to ask me that.  It
 7    might be 256, but I don't remember.  I think it's 256.
 8            As I understand the problem that Mr. Stanford has, and
 9    it seems inherently unfair to me, there are people out there that
10    supposedly say that he did all the wrong things that the
11    government says he did.  He cannot investigate -- and I
12    understand the whole Jencks Act thing.  He cannot investigate who
13    are the people that said nothing and who are the people that said
14    something because he doesn't even know who they are.
15            Now, it's my appreciation that I can order the
16    production of a witness list in advance of trial, so that would
17    at least give him some ability to go conduct an investigation
18    into the allegations against him, because, as I appreciate what I
19    heard last week, his name is not on the roster at the
20    December 8th, 2011, meeting, but he knows if he was there, who
21    was there, what he said, so on and so forth, so that one doesn't
22    give me quite as much concern.  You know, all he knows as he sits
23    here trying to prepare his defense is he's accused of training
24    these people, educating these people.  He has no idea who these
25    people are or how to go investigate and prepare his defense.
```

1           Can you respond to that?

2           MR. WALKER:  I can.  This case is unique.  And I would

3    rather do this in writing because I think it's probably more

4    appropriate in writing.  There are specific factual allegations

5    that have occurred in this case from, let's say, the nurse who

6    testified at the hearing in connection with his detention forward

7    where there has been evidence of manipulation of witnesses.  I

8    think that under some circumstances you ultimately have to

9    balance.  In this case --

10          THE COURT:  I presided over that for record purposes.

11          MR. WALKER:  I know you did.  And that's not the only

12   thing that we have had happen that has suggested the manipulation

13   of witnesses, including the two affidavits that were submitted in

14   connection with the motion to dismiss of Paul Buswell, both of

15   which had clearly factually inaccurate statements.  I don't call

16   it a lie because to call it a lie goes to the person's intent,

17   and I think that's -- I just don't think that's appropriate,

18   though clearly there's no doubt that the statements that were

19   submitted by Daniel Stanford, the defense attorney, in connection

20   with those motions were factually inaccurate.

21          And even in the February -- the first interview, the

22   interview on the 15th, Paul Buswell talks about the possibility

23   of his brother talking to federal agents.  And the Court's got

24   that transcript, so you can see it.

25          There are things about this case and the actions of

```
 1    Mr. Stanford in connection with this case as well as other
 2    matters that can be briefed that make it such that I have a deep
 3    concern about either the manipulation or -- I don't want to use
 4    the word "threats" because I think it's too strong, but I think
 5    it's somewhere between manipulation and threats of witnesses that
 6    could put the government at a disadvantage in this case and could
 7    also put the witnesses at a disadvantage in this case.
 8              And there is case law specifically out there that says
 9    under those circumstances, that allows for not turning over
10    Jencks Act material.  If it's possible that witnesses are going
11    to be manipulated or witnesses are going to be subject to any
12    kind of intimidation or manipulation, that's a basis not to turn
13    over the Jencks Act material until the trial is going on.
14              To give early disclosure of witnesses in this case,
15    based on what's occurred in this case up to this point and other
16    information that we have, it subjects witnesses to potential
17    abuse, and so because of that, I would ask that the Court not
18    make that order or at least allow us to brief the issue before
19    the Court considers that.
20              THE COURT:  Mr. Stanford?
21              MR. STANFORD:  I'm not sure what Mr. Walker is talking
22    about on the nurse issue.
23              THE COURT:  I heard that.  I know all about that.
24              MR. STANFORD:  But from my perspective, Judge, this is
25    a person who contacts me for an interview or for a conference and
```

1   I meet with her.  When I find out she's represented, I stop it

2   and call her -- I'm the one who called the lawyer.  Somehow

3   that's inappropriate?

4          Just like with Mr. Haney.  Out of an abundance of

5   caution, not to like -- I wanted to give him a professional

6   courtesy of this is what's coming down the pike, here it is

7   upfront.  I asked Mr. Goode to call so that the government can't

8   say that I'm trying to manipulate or do anything and that gets

9   twisted around.

10         THE COURT:  Well, Mr. Goode's e-mail is a little --

11   lacked a little discretion if you ask me.

12         MR. STANFORD:  But as far as me -- how can I -- what

13   can I do to manipulate or threaten a witness?  I can either ask

14   them if they want to talk to me or not.  If they say no, that's

15   it.  And I can't make them say anything.  I have no power to

16   assert any kind of threat.  What am I going to do?  Arrest them?

17   Indict them?  Investigate them?  I can't do any of that.

18         If I do anything improper, I'll get reported to the

19   U.S. Attorney's Office or to some law enforcement agency, and,

20   you know, that wouldn't do me any good with Your Honor given the

21   fact that I'm on pretrial release because I understand that you

22   take all of that very seriously.

23         All I'm asking for is an opportunity to defend myself,

24   to know who is making these accusations.  Just like Your Honor

25   noted earlier, it's very difficult to raise misconduct when the

 1  people or the entity you're raising it against holds all the

 2  cards and they get to play the cards the way they see fit.  I'm

 3  being accused of a lot of things and, you know, I have no idea

 4  where it's coming from.  There's no documentary evidence.  It's

 5  apparently all witness statements, but I don't know who's saying

 6  what or were they manipulated, were they pressured, were they

 7  given promises.

 8          What I tried to show today with Mr. Barrow or Mr. Green

 9  or Mr. Malone, there seems to be something going on in that

10  they're being treated a little bit differently than --

11          THE COURT:  They've all pled guilty already.  You can

12  consider them cooperating witnesses.

13          MR. STANFORD:  But, Judge, out of fairness I think that

14  you're directly on point.  I should at least know who are the

15  witnesses and be given the opportunity in some way to try to

16  investigate in defense of my case.

17          THE COURT:  All right.  This is what I'm going to do.

18  I'm going to -- you want to say something, Mr. Washington?

19          MR. WASHINGTON:  Yes, Your Honor, if I may.

20          THE COURT:  On this subject?

21          MR. WASHINGTON:  I think, unless I'm mistaken, we're

22  also talking, in part, about a motion that Mr. Stanford filed

23  essentially for a Bill of Particulars to also get the same

24  information.  During the hearing last week we talked about the

25  specific paragraphs in the indictment, and at that time I also

1    rose to remind the Court that Mr. Domingue adopted that motion.

2    He did not adopt the motion for prosecutorial misconduct, but

3    that particular motion he did.

4              And as the Court is -- well, maybe the Court is

5    unaware, but Mr. Domingue has no history of witness manipulation

6    or anything of that sort, and the adoption that we filed in that

7    particular -- for that particular motion made clear that we

8    wanted the same kind of consideration except we wanted it

9    specifically for Barry Domingue so that we would know who these

10   witnesses are that are stating that Mr. Domingue trained them to

11   evade law enforcement or Mr. Domingue was somehow involved in the

12   sale and distribution of Mr. Miyagi.  As Mr. Stanford just

13   argued, Mr. Domingue feels equally as strong that he, too, is

14   entitled to know who's making these accusations against

15   Mr. Domingue.

16             THE COURT:  All right.  Would you agree with me,

17   Mr. Washington, that in a normal circumstance -- setting aside

18   *Brady* and *Giglio*, in a normal circumstance that would be governed

19   by the Jencks Act?

20             MR. WASHINGTON:  In a normal circumstance it would.

21             THE COURT:  And your point -- both of your points is

22   this isn't really a normal circumstance because there's this

23   universe of people out there that you have no idea who they are.

24             MR. WASHINGTON:  That's correct.

25             THE COURT:  And if they may have been taught in a group

1    setting, for example, in an auditorium classroom, you might not

2    even know what their names are.  I'm not suggesting that they

3    are, but that makes this a little different --

4              MR. WASHINGTON:  That's right.

5              THE COURT:  -- as opposed to just Mr. Barrow or

6    Mr. Green, et cetera, et cetera.

7              I tell you what I'm going to do.  Mr. Walker, I know I

8    said I wasn't going to make you brief anymore, but I am.

9              MR. WALKER:  You did, and I'm disappointed.

10             THE COURT:  Well, today is the 2nd of May.

11             MR. WALKER:  Your Honor, the only issue with

12   briefing -- and I will gladly brief.

13             THE COURT:  I want you to distinguish the cases that

14   say I can give them that witness list because my research

15   suggests that under certain circumstances I can require you to

16   give them a witness list.  I am leaning that way.  That's one of

17   my ones that's sitting on my back burner because I think this

18   case does present a unique set of circumstances as it pertains to

19   those two defendants, you know, and perhaps Mr. Francis as well.

20   I don't know if he's in the same boat.

21             And having presided over all the hearings involving

22   Mr. Stanford, I know where the government is coming from with

23   regard to him, but I haven't heard anything like that about

24   Mr. Domingue or Mr. Francis for that matter, and they adopted his

25   motion.  I think it is the one with the Bill of Particulars,

 1    whichever one that is.

 2            MR. WALKER:  The only issue is they have a joint

 3    defense agreement, so as a result of that, if you say, okay,

 4    Mr. --

 5            THE COURT:  Well, I might be able to undo that.  That

 6    might be a way to make this work.  What I'm trying to do is get a

 7    level playing field here.

 8            And I fully understand that they don't need the name of

 9    Boyd Barrow, Josh Espinoza, any of the named co-conspirators, but

10    it just strikes me as a bit unfair to hear there's been, you

11    know, tens, if not dozens, of interviews of people.  There is an

12    allegation that says they trained, so on and so forth, and they

13    don't even know where to start to find out who's leveling those

14    accusations.  Then they get to trial and here comes Joe Smith.

15    It's the first time they ever see him.  He walks up here, gets on

16    the witness stand and says, Daniel Stanford trained me and

17    Barry Domingue taught me, and they can't even cross-examine him.

18    They don't know anything about him.  And perhaps there is some

19    protective order I can fashion.

20            Hang on, Mr. Hipwell.

21            I don't know.  I just want you all to understand where

22    my head is before I decide that motion because I have a genuine

23    concern about that.  It just doesn't seem fair to me in the

24    circumstances of this particular case.

25            MR. WALKER:  Your Honor, because the next matter --

1  well, one, the trial is in October, so we have plenty of time.

2         Two, the next matter I know Mr. Hipwell and I are going

3  to be arguing on the 17th.  We're only arguing Mr. Hipwell's

4  motions.  Would it be possible that it be the week after the

5  17th, the Friday after the 17th, whatever that Friday is?

6         THE COURT:  It would be possible for me because this is

7  one that doesn't have to be taken up that quickly.

8         MR. WALKER:  There you go.

9         THE COURT:  Any objection to that, Mr. Stanford?

10        MR. STANFORD:  That would be May 24th, Judge.

11        THE COURT:  Are you okay with that?

12        MR. STANFORD:  Yes, sir.

13        THE COURT:  Mr. Washington?

14        MR. WASHINGTON:  Your Honor, we're okay with that also.

15        THE COURT:  All right.  Mr. Hipwell, I didn't mean to

16  cut you off.

17        MR. HIPWELL:  And I rise, Your Honor, just with a final

18  point.

19        I fully understand the Court is convinced that *Jencks*

20  given at the time of *Brady* -- that *Brady* given at the time of

21  *Jencks* is sufficient.  We're bitterly disappointed to hear that.

22        THE COURT:  I don't know that it's sufficient,

23  Mr. Hipwell.  I didn't say that.  I said that's what the law is.

24        MR. HIPWELL:  Well, you know, Your Honor, I just -- and

25  I'll sit down in a second, but having done this for 31 years,

```
 1    I've had judges as varied and as different as John Parker,

 2    Frank Polozola, and Ralph Tyson tell me as a prosecutor that I'm

 3    going to give you enough rope to hang yourself.  What we don't

 4    want, Your Honor, is a documents dump at the last minute where we

 5    don't have time.

 6              MR. WALKER:  Judge --

 7              MR. HIPWELL:  And if I could -- and I'll be through in

 8    a second, Judge.  That is just in the context of whenever we get

 9    our Jencks material, I don't want to be before Judge Foote and

10    say, Judge, I have not had a chance to read this.  And whether

11    it's another week or another two weeks or whatever, I don't know.

12    I trust ultimately it will be something that the Court can share

13    with Judge Foote at least as a concern that we have.

14              Thank you, Your Honor.

15              THE COURT:  I told you that I would do exactly that and

16    I intend to do exactly that.

17              MR. HIPWELL:  Thank you, Your Honor.

18              THE COURT:  And you also have a unique circumstance of

19    which I am painfully aware which might call for a modification of

20    Jencks as well, so don't give up the ship.

21              MR. HIPWELL:  Yes, sir.

22              MR. WALKER:  And Your Honor, as it relates to Brady and

23    Giglio material, when we get that, we identify it and we turn it

24    over.  We're not going to hold that until the week before trial.

25    We never do that.
```

1          MR. HIPWELL:  Thank you, Mr. Walker.

2          THE COURT:  That's on the record.  He said they never

3     do that.

4          MR. WALKER:  It's true.  We don't.  You know that.

5          MR. STANFORD:  Judge, May 24th is going to be for

6     Mr. Walker to file his -- I think the Court directed that he

7     distinguish the cases that --

8          THE COURT:  I want a brief.  I don't want a motion.

9     There are cases that I am aware of that suggest that I can order

10    the early production of a witness list.  He has concerns about

11    that and he tells me he has cases that say I should not.  I want

12    to know what those cases are and why I should not.

13         All right.  Mr. Washington?

14         MR. WASHINGTON:  Your Honor, just following up on

15    something that Mr. Walker said a minute ago and you as well.  You

16    indicated that you could fashion an order appropriate for the

17    sharing of this kind of information, and I think I understand

18    what you were saying about that, but I just want to make sure

19    that the Court is aware that there is to my knowledge no joint

20    defense agreement amongst these parties.

21         Now, that's not to say that we haven't cooperated with

22    each other or we haven't shared this and that and the other, but

23    at the end of the day this is not a joint defense.  As we go

24    forward here, we are separate and independent.

25         THE COURT:  All right.  I know exactly how that works.

1   If Mr. Stanford were to ask you for something, you can say pound

2   sand if you want to, but if you don't see any prejudice in doing

3   it, you can give it to him.  I know how that works.  That doesn't

4   necessarily mean it's a joint defense agreement, but if I need to

5   fashion some protection and you want to tell me a suggestion,

6   I'll take that on the 24th as well.

7               MR. WASHINGTON:  Thank you, Your Honor.

8               MR. WALKER:  Thank you, Judge.  I sure hope we get to

9   stop talking.

10              THE COURT:  Mr. McCann, do you want to say anything?

11              MR. MCCANN:  No, sir.

12              THE COURT:  Anybody else want to say anything?

13              MR. DOMINGUE:  I would like to say something off the

14  record.

15              THE COURT:  All right.  We're adjourned.

16                          (Proceedings adjourned.)

17                          —  —  —

18

19                          Certificate

20  I hereby certify this 23rd day of May, 2013, that the foregoing
    is, to the best of my ability and understanding, a true and
21  correct transcript from the record of proceedings in the
    above-entitled matter.
22

23  _____   /s/ LaRae E. Bourque

24                                    Official Court Reporter

25