IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA
        RESPONDENT

V.                                        CRIMINAL NO: 12-CR-00146
                                          DSC NO: _____

DREW T. GREEN
        PETITIONER

-------------------------------------------------------------------------------------------------------

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PETITION TO
VACATE, CORRECT, OR SET ASIDE
THE PETITIONER'S CONVICTION AND SENTENCE
PURSUANT TO 28 U.S.C. § 2255**

-------------------------------------------------------------------------------------------------------

Now comes petitioner, Drew T. Green (hereinafter "Green"), through

undersigned counsel, who submits the following Supplemental Memorandum in

support of Green's petition for a writ of Habeas Corpus. Green's petition respectfully

submitted that the events which transpired surrounding his trial counsel's advice and

performance constituted a denial of Green's constitutionally protected right to the

effective assistance of counsel, as specifically guaranteed by the Sixth amendment to

the United States Constitution. For the additional reasons set forth herein, Green

urges that the errors and omissions of which he complains are not merely procedural,

but substantive, and ones that substantially infringed upon the his constitutional right

to competent counsel and a complete defense.  In furtherance and development of

#

these claims, Green reiterates his request that this Court conduct an evidentiary hearing into the issues raised herein. Green's 28 U.S.C. § 2255 motion was filed under the penalties of perjury and thus the allegations set forth therein are deemed competent evidence of his claims, warranting an evidentiary hearing.[1] This memorandum is in supplement to, not *in lieu* of, the *pro se* memorandum previously filed by Green. *See* Rec.Doc. 1229. Consequently, the factual recitations and arguments advanced therein, and the exhibits adhibited thereto, are adopted as if fully set forth and copied *in extenso*.

## PRELIMINARY STATEMENT

At issue before this Court is whether trial counsel was ineffective. An attorney renders constitutionally ineffective assistance if his performance is deficient and that deficient performance prejudices the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A § 2255 movant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Id. at 687–88, 694. In the context of a guilty plea, a movant shows prejudice by establishing "that there is a reasonable probability that, but for counsel's errors, he

########################################

[1] Due to unforeseen severe winter weather issues in Louisiana, Green, an inmate at the Federal Correctional Institution, Oakdale, was delayed in getting notarized affidavits and a verification to undersigned counsel append to this Supplemental Memorandum. From prison, Green has mailed to undersigned counsel the notarized affidavits and verification and they will be filed immediately upon undersigned counsel's receipt thereof. Meanwhile, counsel is contemporaneously filing all documents in blank.

#

would not have pled guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Record evidence and the undisputed extraordinary circumstances surrounding Green's case demonstrate that his counsel rendered assistance that fell below any objective measure of reasonableness and that is reasonably probable that but for this deficient performance, Green would have chosen to proceed to trial and hold the Government to its burden of proving his guilty beyond all reasonable doubt. Green, fully aware that the grant of habeas relief is an extraordinary remedy, urges that such relief is warranted by the extraordinary circumstances of his case.

## GENERAL FACTUAL BACKGROUND

Green pleaded guilty to one count of conspiracy to distribute and possess with the intent to distribute AM-2201, in violation of 21 U.S.C. §§ 846, 841(b)(1)(c), 813, 802(32)(A). The District Court sentenced Green to 117 months of imprisonment followed by three years of supervised release.

Green was a co-owner of NutraGenomics Mfg. L.L.C. Prior to March 2011, NutraGenomics distributed JWH-018 throughout the United States. When new Federal and state laws banned this substance, NutraGenomics discontinued its distribution and began selling several new synthetic cannabinoids, one of which was AM-2201. Green was advised by trial counsel, Stuart Mones, prior to Green's

#

indictment, that AM-2201 was legal.[2] Green sold AM-2201 as part of a product called "Mr. Miyagi"- a mixture of AM-2201 and vegetable material that visually resembled marijuana. JWH-018 was never used in Mr. Miyagi. A Federal grand jury in the Western District of Louisiana returned a superseding indictment charging Green, and several co-defendants with one count of conspiracy to distribute and possess with the intent to distribute AM-2201, a controlled substance analogue, one count of conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce, and one count of conspiracy to commit money laundering. Despite paying Mones a $230,000 in fee retainer to represent Green and take this matter to trial, counsel immediately advised Green to enter into a plea agreement he had negotiated with the Government.

Just three days after being indicted, Green pled guilty to one count of conspiracy to distribute and possess with the intent to distribute a Schedule I Controlled Dangerous Substance, in violation of 21 U.S.C. §§ 846, 841(b)(1)(c), 813, 802(32)(A). As part of his plea, Green admitted to distributing not less than 1400 kilograms of AM-2201, and earning not less than $10,000,000 from the conspiracy. Because AM-2201 was not listed in either the Drug Quantity Table or the Drug Equivalency Tables, the PSRs had to "determine the base offense level using the marijuana equivalency of the most closely related controlled substance" to AM-2201.

##########################################
[2] The DEA ultimately banned AM-2201 in July 9, 2012; but Green had no more sales of AM-2201 beyond May 1, 2012.

#

The PSR determined that Tetrahydrocannabinol, or THC, was the "most closely related controlled substance" to AM-2201. This possibility was never discussed between Green and his counsel. The Drug Equivalency Tables specify a 1 to 167 ratio for converting THC into marijuana; that is, the Sentencing Guidelines treated one gram of THC as equivalent to 167 grams of marijuana. That ratio yielded the conclusion that Green was responsible for 233,800 kilograms of marijuana. His corresponding base offense level was 38, the highest level set forth by the Drug Quantity Table.

Green objected to the use of a 1:167 ratio to convert the 1400 kilograms of AM-2201 into marijuana. Instead, he advocated for a 1:1 ratio, arguing that marijuana, not THC, was the "most closely related controlled substance" to AM-2201. Two experts—one for the Government and one for the defense—testified at length in the resulting evidentiary hearing on Green's objection about the available scientific data on AM-2201. The Government's expert, Dr. Jordan Trecki, offered testimony to support his opinion that THC was the "most closely related substance" to AM-2201. The defense expert, Dr. Nicholas Cozzi, devoted much of his testimony to criticizing the evidence relied upon by Dr. Trecki. Importantly, both experts agreed, however, no scientific basis supported the use of the 1:167 ratio to convert THC into marijuana. The District Court concluded that the Government had demonstrated by a preponderance of the evidence that THC was the "most closely related controlled substance" to AM-2201.

#

On direct appeal, Green challenged the District Court's conclusion that THC was the "most closely related controlled substance" to AM-2201. Rejecting Green's appeal, the United States Fifth Circuit distinguished the contours of admission of expert testimony at trial as compared to a sentencing hearing. Elaborating, the Court explained that the appropriate standard regarding the admissibility of evidence at sentencing was substantially lower than that governing admissibility at trial. Under the Sentencing Guidelines, evidence admitted during sentencing need not meet the familiar *Daubert* standard. Instead, such evidence need only have "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). By that metric, the Fifth Circuit was constrained to affirm the District Court's conclusion that THC was the "most closely related controlled substance" to AM-2201.

Green timely applied for a writ the Supreme Court of the United States. The High Court denied the petition for writ of certiorari on November 28, 2017. Accordingly, Green's judgment of conviction became final on November 28, 2016.

## SPECIFIC FACTUAL BACKGROUND PERTINENT TO INEFFECTIVE ASSISTANCE OF COUNSEL

Green hired Mones to represent him in this case on July 25th 2012, which was the day authorities raided Green's warehouse in Georgia. In furtherance of this objective, Green delivered a retainer of just over $230,000 (*See* Attached Exhibit 1 – In Globo) with the full and mutual understanding that Green wanted to go to trial

6

#

and hold the Government to its burden of proving him guilty beyond all reasonable doubt. Mones, who worked for the Bruce Harvey Law firm, had previously represented Green and his company NutraGenomics since March 10th of 2011 relative to a Kansas FDA subpoena. In that connection, Mones, in his professional judgment, opined and advised Greene that neither he nor his company had committed any crime as of August 25th 2011. Pertinently, Mones was also billing fees against a $30,000 retainer paid by Green on March 10th 2011. In connection with those services, Mones was providing expert advice on Green's business structure, marketing, branding, agreements, disclaimers, tax shelters and various chemical opinions including AM-2201. After Kansas FDA subpeona was resolved, Mones continued to represent NutraGenomics and was paid an average of an additional $7,000 per month for his continued legal advice surrounding Green's business. At no time did Mones ever inform or advise Green that he had ever committed a crime. That advice was not rendered until after Green paid and Mones accepted in excess of $230,000.00. It was only after the payment of this retainer that Mones shifted away from his previous advice and demanded that Green enter a plea. At no point did Mones acknowledge his actual conflict of having rendered legal advice to Green about the suitability and legality of his business structure and corresponding conduct – conduct which now formed the basis of the Government's indictment against Green. Moreover, at no point did Mones advise Green that he had a viable "advice-of-counsel" defense which had the potential to clear Green of the charges facing him.

7

#

Mones never had a discussion with Green on either of these topics. He only advised Green that on or about May 1st 2012, that the laws were getting "murky" and thus advised Green to cease operating NutraGenomics. Heeding this advice, Green asked Mones for legal guidance as to what he should do with the remaining cannabinoids in the California warehouse. Mones advised Green to hold onto them all unless and until Mones advised otherwise.

Green made repeated attempts to obtain his Discovery material from Mones over the past several months. (*See* Attached Exhibit 2 – In Globo). Green was consistently confronted with resistance from Mones who used evasive statements as to why obtaining and delivering discovery was so difficult. A fact capable of verification is that on November 6, 2012, Mones filed a motion for discovery. The Government's production included a minimum of 13 discovery discs which had approximately 61,000 pages of documents. Mones could have provided Green with these documents on August 11th 2017 when Green asked. Mones claimed that he did not get Discovery in the traditional sense at a time when he knew that he had filed the motion for discovery in 2012. Additionally Counsel called Green's ex-wife Lara Burgard on August 11th and told her that he did not have to provide Green with the Government's discovery discs. (*See* Attached Affidavit of Lara Burgard). (*See* Attached Exhibit 3).

#

## STATEMENT OF ISSUES

I.      Green was denied his Sixth Amendment right to effective assistance of counsel was when his defense counsel unreasonably advised him to enter a guilty plea. This advice was not premised on sound defense strategy, but instead was based on a patent failure to request discovery from the Government to accurately determine the weight and probative value of the evidence against Green, and because counsel operated under an actual and irreconcilable conflict of interest.

II.     Green was deprived of his Sixth Amendment right to effective assistance of counsel because defense counsel's assistance misled Green into entering an unknowing, involuntary, and unintelligent plea.

## STATEMENT OF JURISDICTION

Federal law provides an avenue for those whose sentences have been lengthened and/or   convicted unconstitutionally. Title 28 U.S.C. § 2255 is a statute that provides an avenue for redress of Federal Constitutional violations in a Federal Court.   Green feels that his best opportunity to obtain fair and substantial justice regarding his conviction and sentence is through this petition. This Court's authority to review this petition is granted under Article III and 18 U.S.C. § 3231. The Petitioner is well within the limit of the 2255 statute of limitation.

## LEGAL STANDARDS

In order to succeed in a §2255 motion, the a petitioner, such as Green, must show that the adjudication of a claim in Federal Court resulted in a conviction or sentence that was imposed in violation of the Constitution or laws of the United States, or that the Courts was without jurisdiction to hear the case or to impose such a

#

sentence, 28 U.S.C § 2255: the Constitution, as the frame work from which all Federal law emanates, must not be violated as applied to the petitioner.

The Sixth Amendment to the United States Constitution guarantees that criminal defendants are entitled to the Assistance of Counsel in presenting their defense. U.S. Constitution, Amendment VI. The High Court has stated, "[T]he right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy of our adversary process." *Kimmelman v. Morison*, 477 US 365, 374 (1986). Further, the Court recognized that "the right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 97 US 759, 771 (1970). The right to effective assistance of counsel at any critical stage, encompasses the right to have an advocate for one's cause. *Avery v. Alabama*, 308 US 444, 446, 60 S.CT. 321, 84 L.ED 377 (1940).

The duty of a defense counsel to a defendant who desires to enter a plea of guilty is to ascertain that the plea is voluntarily and knowingly made. *Diaz*, 733 F.2d at 731. The Sixth Amendment right to counsel 'is the right to the effective assistance of counsel.'" *Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). For Green to prevail on his ineffective assistance claim, he must satisfy the two familiar *Strickland* prongs: he "must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice." *Id.* (citing *Strickland*, 466 U.S. at 687).

10

#

To meet *Strickland's* second prong, Green "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Proof of both prongs in this case turns on whether evidence known to counsel before advising Green to enter his plea of guilty would have precluded the Government from proving, beyond all reasonable doubt, that the crime for which Green was indicted involved only 17 kilograms, not 1400 kilograms, of AM-2201. Still, counsel advised his client to plead guilty and admit to distributing not less than 1400 kilograms of AM-2201. Because the conduct contemplated by Green's indictment involved only 17 kilograms of AM-2201, counsel further advised Green to stipulate that his crime earned not less than $10,000,000 from the conspiracy. Counsel's performance in this regard therefore was deficient. Green had every right to expect that his attorney would use every skill, expend every energy, and tap every legitimate resource in exercise of independent professional judgment on behalf of defendant and in undertaking representation. *See Frazer v. United States*, 18 F.3d 778, 779 (9th Cir. 1994).

"Defense counsel must do his utmost to bring his legal acumen to bear on the behalf of the defendant; keep the defendant fully informed of development in the case and consult with the defendant on all major decisions to be made; conduct a reasonable pre-trial investigation, which should include contacting potential witnesses; prepare adequately and professionally for trial; conduct the trial to the best of his

11

#

ability; and, at the bottom, serve as a vigorous and devoted advocate of the defendant's cause." *United States Ex. Rel. Partee v. Lane*, 926 F.2d 694, 702 (7th Cir. 1991).

The "Sixth Amendment right to counsel extends to sentencing in federal cases." *Mempha v. Rhay*, 398 U.S. 128, 134 (1967); *Ladd v. Cockrell*, 311 F.3d 349 (5th Cir. 2002). Courts have often recognized that one of the important functions of defense counsel at sentencing is to ensure that the defendant is sentenced on the basis of accurate information. In *Townsend v. Burke*, 334 U.S. 736 (1948), the United States Supreme Court stated that "[c]ounsel would have been under a duty to prevent the court from proceeding on such false assumptions and, perhaps, under a duty to seek remedy elsewhere if they persisted." *Id.* at 740. "A failure to investigate, participate in, and prepare for the sentencing proceedings fails to satisfy an objective standard of reasonable representation and therefore falls below Sixth Amendment standards for effective assistance of counsel." *Arrendondo v. United States*, 178 F.3d 778 (6th Cir. 1999); see also *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir.)

As the Supreme Court recognized in *Strickland*, "counsel bears a duty to make a "reasonable" investigation of the law and facts in his client's case." *Strickland*, 466 U.S. at 691. Of particular relevance in this case and Green's attendant claim of ineffective assistance of counsel, the ABA standards relating to the Administration of Criminal Justice also state:

#

[d]efense counsel should present to the court any ground which will assist in reaching a proper disposition favorable to the accused. If a presentence report or summary is made available to the defense lawyer, he or she should seek to verify the information contained in it and should be prepared to supplement or challenge it if necessary.

The Supreme Court recently addressed the prejudice issue in *Lee v. United States*, 137 S. Ct. 1958, 1962 (2017), in which it considered whether an attorney's misinformation about the consequences of a guilty plea on immigration status prejudiced the defendant, a question not addressed in *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010). Lee, an immigrant from South Korea, was charged with "possessing ecstasy with intent to distribute[.]" *Lee*, 137 S. Ct. at 1962–63. During plea discussions, "Lee informed his attorney of his noncitizen status and repeatedly asked him whether he would face deportation as a result of the criminal proceedings." *Id.* at 1963. The attorney "told Lee that he would not be deported as a result of pleading guilty."*Id.* This was incorrect: "[A] noncitizen convicted of such an offense is subject to mandatory deportation."*Id.* At a hearing on Lee's § 2255 motion, "both Lee and his plea-stage counsel testified that deportation was the determinative issue in Lee's decision whether to accept the plea."

The Court noted that likelihood of success at trial was a strong indicator whether a defendant would plead guilty, but also concluded that "where [a

13

#

court is] . . . asking what an individual defendant would have done, the possibility of even a highly improbable result may be pertinent to the extent it would have affected his decisionmaking." *Id.* at 1966–67. The Court also explained that "[c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pled but for his attorney's deficiencies[,]"and that they "should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id.* at 1967. The Court noted that "Lee's claim that he would not have accepted a plea had he known it would lead to deportation [wa]s backed by substantial and uncontroverted evidence[,]" *id.* at 1969, and concluded that Lee had therefore shown a "reasonable probability that, but for [his] counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Id.* (alteration in the original).

## ARGUMENT

**Mones's Assistance was Ineffective Inasmuch as Mones Advised Green to Enter a Guilty Plea. This Advice Was Objectively Unreasonable Because it was Compromised by an Actual Conflict of Interest and Offered without Reading and Reviewing the Indictment with the Client or Receiving Discovery from the Government Thereby Depriving Green of an Advice of Counsel Defense.**

In an effort to convince to get Green to plead guilty, Mones told Green that he would "wrap up" and obviate any potential charges from 26 other states related to the same activities charged in Green's superseding indictment. Once incarcerated pursuant to his plea, Green, in mentioning this fact to a fellow inmate, was advised as

14

#

to the impossibility of what Mones had told Green. This prompted Green to reach out to Mones and inquire about the veracity and validity of what Mones had told Green. Specifically, on July 19, 2017, Green called Mones and for the first time realized Mones had made factual misrepresentations to him. Green asked Mones to share documents the Government provided in discovery. Mones equivocated. This precipitated Green's investigation into the details of his alleged crime and Mones's attendant advice that has encountered an abundance of evidence from which Mones could have and should have advised Green relative to possible weaknesses in the Government's case and the corresponding difficulty facing the Government in discharging its burden of proving Green's guilt to the charges advanced in the indictment against him.

It bears repeating that Green paid Mones just over $230,000 for him to defend him at a trial against the charges levelled by the Government. After receipt of this payment, Mones, rather than explain the charges facing Green, or formulate a sound defense strategy, or pursue lines of defense, immediately commenced counselling Green to plead guilty. Without having received any discovery from the Government, Mones advised Green that he should plead guilty. According to Green's earlier filing, Mones utilized coercive tactics aimed at intimidating him into entering a plea of guilty.

At the outset, Mones, upon learning of the indictment against Green, should have reviewed the substance of the indictment and advised Green that Mones harbored an actual and irresolvable conflict of interest that prevented him from

15

#

representing Green against these charges. As related earlier in the fact section of this memorandum, Mones had been retained and paid to advise Green and NutraGenomics regarding its products. In this connection, Mones advised Green that his products were in full compliance with all applicable state and federal laws. Having had received this clean bill of business health from Mones, Green, in strict reliance on that advice, was confident that he was not in violation of any laws.  Put otherwise, Mones led Green believe that his acts did not violate any state or federal laws. Separate and apart from the more than $230,000 Green paid to Mones for his criminal defense, Green had paid Mones handsome fees for a professional consultation and opinion specifically as to the legality of the products being distributed by NutraGenomics, including AM-2201. Further, Mones should have advised Green that based on the advice Mones had rendered apropos the legality of the products being distributed by NutraGenomics, an advice-of-counsel defense was available to Green.

This deficiency of counsel, standing alone, rendered Green's proceeding fundamentally unfair. The advice of counsel defense may be relevant to a defendant's intent to violate the law, namely that the defendant, on the basis of counsel's advice, believed his conduct to be lawful and thus could not be found to have had unlawful intent, but correspondingly, where defendants know that their conduct is violative of state law, their wrongful purpose, *ab initio*, established beyond a reasonable doubt, leaves them in no position to utilize the advice of counsel defense to claim that they

16

#

had no intention of violating a federal statute which, in fact, denounced the unlawful conduct as also constituting a federal crime. Fed. Rules Evid. Rule 401. Here, Green, on the basis of Mones's advice, believed the conduct for which he was indicted was lawful. Thus, this advice prevented Green from formulating the intent necessary to connect his conduct to criminal activity.

As with all evidence, the advice of counsel defense may only be presented during trial if it is relevant. *See* Fed. R. Evid. 401. As a general rule, "[a]dvice of counsel, when given on full disclosure of all the facts and followed in good faith, may be a matter to be considered by the jury in determining the [defend]ant's guilt." *United States v. Thaggard*, 477 F.2d 626, 632 (5th Cir.1973). The defense may be relevant to the defendant's intent to violate the law, namely that "the defendant, on the basis of counsel's advice, believed his conduct to be lawful and thus could not be found to have had unlawful intent." *United States v. Beech-Nut Nutrition Corp.*, 71 F.2d 1181, 1194 (2d Cir.1989).

Fifth Circuit case law shows that the advice of counsel defense may only be presented to refute a defendant's intent to willfully violate the law. The Fifth Circuit has stated that "[r]eliance on counsel's advice excuses a criminal act only to the extent it negates willfulness and to negate willfulness counsel's advice must create (or perpetuate) an honest misunderstanding of one's legal duties." *United States v. Mathes*,151 F.3d 251, 255 (5th Cir.1998); *see also United States v. Moran, 4*93 F.3d 1002,

1012 (9th Cir.2007)(permitting testimony regarding legal advice received by defendant where willfulness is an element of the offense). An honest misunderstanding of one's legal duties negates the willfulness requirement because willfulness, as historically defined, means "that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." 5th Cir. Pattern Jury Instructions (Criminal) 1.38 (West 2001). Fifth Circuit case law similarly holds that "willfulness simply means a voluntary, intentional violation of a known legal duty." *United States v. Masat*, 948 F.2d 923, 932 (5th Cir.1991) (defining willfulness in a tax evasion case); *see United States v. Charroux,* 3 F.3d 827, 831 (5th Cir.1993)(same). In this case, a reasonable juror certainly could have concluded that based on Mones's advice, Green held an honest belief that negated the willfulness and intent requirement of his alleged crime.

In *United States v. Ragsdale*, 426 F.3d 765, 778 (5th Cir.2005). the Fifth Circuit affirmed the district court's refusal to allow the defendant to present an advice of counsel defense where the alleged offense, mailing obscene materials, did not require "that the defendant have knowledge of the legal status of the materials." Instead, the defendant "need only know the character and nature of the materials," and therefore the crime was complete when the materials were deposited in the mail "by one who knew or had notice at the time of its contents ... 'although the defendant himself did not regard the [materials] as one that the statute forbade to be carried in the mails.' " *Id.,* quoting *Hamling v. United States*, 418 U.S. 87, 120, 94 S.Ct. 2887, 2909, 41

18

#

L.Ed.2d 590 (1974).Thus, the Fifth Circuit held that, because the relevant statute "does not require an intent to violate the law, [the defendant] could not assert as a defense that he relied on advice from counsel that the materials were not illegal." *Ragsdale*, 426 F.3d at 778.  In order to use the advice of counsel defense, therefore, the defendant must be charged with a crime that requires willfulness, *i.e.*, an "intentional violation of a known legal duty." *Masat*, 948 F.2d at 932. Green was charged with such a crime and the advice of counsel defense was a viable and plausible line of defense in his case. Mones's failure to advise of this equates to ineffective assistance of counsel.

Bolstering this claim, and Green's knowledge and intent requirement, is the Fifth Circuit's recent decision in *United States v. Stanford*, 823 F.3d 814 (5th Cir. 2016). Daniel Stanford, one of the defendants in the same series of cases involving a synthetic-marijuana distribution ring, appealed his conviction and sentence on charges of conspiracy to distribute and to possess with intent to distribute a controlled substance analogue ("CSA") (in violation of 21 U.S.C. §§ 846, 841(b)(1)(C), 813, and 802(32)(A)); conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce (in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 331, 333(a)(2), and 352(a), (b), and (f)); conspiracy to engage in money laundering (in violation of 18 U.S.C. § 1956(h)); and money laundering (in violation of 18 U.S.C. § 1957). Based on the intervening decision in *McFadden v. United States*, ⸺ U.S. ⸺, 135 S.Ct. 2298, 192 L.Ed.2d 260 (2015), announced after this trial, the Fifth Circuit reversed his conviction of conspiracy to distribute a CSA because the district court's

#

error, in ruling that the government was not required to prove that Stanford knew the synthetic marijuana compound distributed by the conspirators was a CSA, was not harmless, despite the decision to send the issue to the jury via a special interrogatory.

Stanford prevailed on his contention that the district court erred by determining that knowledge that AM–2201 was a CSA was not a required element under Count One. In *McFadden*, 135 S.Ct. at 2303–05, the Supreme Court held that in order to be convicted under the Analogue Act, 21 U.S.C. § 813, and the Controlled Substances Act, 21 U.S.C. § 841(a)(1), which the Analogue Act incorporates by reference, "the Government must prove that a defendant ***knew*** that the substance with which he was dealing" was a CSA. (emphases added). Application of this principle to the instant facts demonstrates that the Government, at trial, would have had to prove beyond all reasonable doubt that Green knew that AM-2201was a CSA at all pertinent times as charged in his indictment. The advice of counsel defense would have been more than ample to raise reasonable doubt that Green had formed such intent or possessed such knowledge in light of the advice he solicited and received from Mones that his business operations were lawful.

Green was charged and pled guilty in the current proceeding with, *inter alia*, a violation of 21 U.S.C. § 841(b)(1)(c).  Section 841 provides, in relevant part:

**(a)UNLAWFUL ACTS** Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

#

(1)   to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

Thus, had Green elected to proceed to trial, the Government would been burdened to prove Green's actual knowledge or intent to violate the law. Thus, these *mens rea* elements required that Green intended for his actions to violate the law. Under *Ragsdale,* the advice of counsel defense would have been unavailable to Green. Green's constitutional right as guaranteed by the Sixth Amendment included the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. It is plain that Mones abrogated Green's right when he, rather than advise Green as to the availability and viability of an advice of counsel defense, advised his client to plead guilty.

**Alternatively, Mones's Assistance was Ineffective Inasmuch as Mones Advised Green to Enter a Guilty Plea to a Weight of Chemicals for Which Green Was Not Responsible.**

Originally, many makers of synthetic marijuana used a chemical known as JWH-018, but as the industry grew, the federal government announced a ban of JWH-018, forcing producers to switch to a chemical known as AM-2201. This was the entire crux of the alleged Mr. Miyagi conspiracy against Green and his codefendants. Fatal to the Government's case was that at no time ever did the mixture known as Mr. Miyagi contain JWH-018. Green, Barrow and Ackerman are interviewed and testify

21

#

that prior to the March 2011 Ban of JWH-018 that JWH-081 and/or JWH-250 were used in Miyagi and switch to AM-2201. (*See* Attached Exhibit 4 – In Globo). Thus there was never an agreement or conspiracy to switch from JWH-018 to AM-2201.

Green's superseding indictment alleged that Green, beginning on or about March 1, 2011, and continuing until on or about July 25, 2012, "did knowingly combine, conspire, confederate and agree together, and with other persons known and unknown to the Grand Jury," "to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of AM-2201, JWH-081, JWH-250, and UR-144, Schedule I controlled analogues as defined in 21 U.S.C. § 802(32)(A), knowing that the substance was intended for human consumption as provided in 21 U.S.C. § 813." That same superseding indictment tethers the Government's allegation to the following "Overt Acts":

> A. From on or about March 1, 2011 to on or about December 31, 2011, CURIOUS GOODS L.L.C., including CURIOUS GOODS L.L.C. franchise store locations, deposited approximately $5,000,000.00 into their business checking accounts. During this same time period, CURIOUS GOODS L.L.C. paid Pinnacle Products L.L.C. and Pinnacle Group ("Pinnacle"), through a series of checks and wire transfers, approximately $1,500,000.00.

> B. From on or about March 1, 2011 to on or about December 31, 2011, Pinnacle paid THOMAS WILLIAM MALONE, Jr. approximately

\#

$900,000.00 in exchange for synthetic cannabinoids utilized to manufacture "Mr. Miyagi."

C. From on or about March 1, 2011 to on or about December 31, 2011, THOMAS WILLIAM MALONE, Jr. paid DREW T. GREEN approximately $500,000.00 from the monies he received from Pinnacle.

Thus, the alleged conspiracy, as charged by the government is related to the distribution of Mr. Miyagi, Not bulk chemicals. As stated on page 89 of the Grand Jury minutes when DEA special agent Desalvo is asked "And through your investigation were these various accounts as a result from the proceeds acquired from the sale of Mr. Miyagi, AM-2201, JWH-081, JWH-250 and UR-144?" Desavlo states "yes." Assistant United States Attorney Collin J. Sims proceeds to the next question statinng, "Now, I want to focus on counts 4 through 16." Green was only responsible and indicted on counts 1 through 3. (*See* Attached Exhibit 5 – In Globo). NutraGenomics exclusively supplied the synthetic cannabinoids to Pinnacle who was the manufacturer of Mr. Miyagi.

Invoices provided to Mones and in his possession prior to Green`s plea (*See* Exhibit G to Green's Pro Se Memorandum) reflected that NutraGenomics forwarded only 17 kilograms of AM-2201 to Pinnacle for the manufacture of Mr. Miyagi. Hence,

\#

the conduct alleged to be criminal and that formed the basis of the indictment against Green to involved only 17 kilograms of AM-2201.

Compounding that failure was the plea agreement that Mones recommended Green to enter contemplated him accepting responsibility for 1400 kilograms of four synthetic cannabinoids sold in bulk quantities which included JWH-081, JWH-250 & UR-144 rather than just the AM-2201 sold to Pinnacle for the Mr. Miyagi potpourri mixture. None of the other chemicals were being prosecuted in this instant case. The difference in weight between the AM-2201 NutraGenomics sent to Pinnacle for the manufacture of Mr. Miyagi and the four synthetic cannabinoids sold in bulk quantities for ALL customers ever sold throughout the United States prejudiced Green beyond reasonable doubt as the corresponding disparity in sentencing is irrefutable and significant.

It is plain that had Mones studied the indictment and discussed it with Green, tow things would have been obvious. One, that JWH-018 was never in Miyagi, thereby destroying the government's conspiracy theory. And two, that the weight of AM-2201 attributable to Green's alleged criminal conduct was only 17 kilograms. In either event, Green would have persisted in his desire to defend himself against these charges at a trial as he would have sensibly believed that he stood a reasonable possibility of successfully defending himself against the charges brought by the government.

#

In light of the foregoing, Mones's representation of Green was deficient. As the Supreme Court recognized in *Strickland*, "counsel bears a duty to make a "reasonable" investigation of the law and facts in his client's case." *Strickland*, 466 U.S. at 691. Here, no such investigation was made. To the contrary, Green, without being explained the charges against him, was advised to plead guilty just three (3) days after his indictment was filed.

The Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options. To be sure, counsel's investigatory decisions must be assessed in light of the information known at the time of the decisions, not in hindsight. Here, it is abundantly clear that Mones needed little more than the superseding indictment and the invoices showing what NutraGenomics had sold to Pinnacle for the manufacture of Mr. Miyagi to know, and know for sure, that Green's supposed criminal conduct was capable of successful challenge based on JWH-018 never having been in Mr. Miyagi. What is more, is that the Mr. Miyagi manufactured and distributed under the relevant time frame of the indictment involved no more than 17 kilograms of AM-2201. While the amount of pretrial investigation that is reasonable defies precise measurement, it is beyond debate that what Mones did here, or more precisely what he did not do, fails to comport with what the Sixth Amendment requires of counsel.

\#

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. 689. That presumption does not obtain in this case. The duty Mones's owed Green to advise him regarding the advice of counsel defense comes within the basis duties counsel owes a defendant. Green has asserted, and reiterates here, that Mones was conflicted inasmuch as he was the attorney who had advised Green that his conduct – the very conduct that got him indicted – was lawful.

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Cf. United States v. Morrison,* 449 U. S. 361, 449 U. S. 364-365 (1981). One type of actual ineffectiveness claim warrants a presumption of prejudice. In *Cuyler v. Sullivan,* 446 U.S. 335, 345-350 (1980), the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Here, Mones's conflict arose between being Green's advocate, and earning a $230,000 fee, or being a witness to testify that he had in fact advised Green as to the lawfulness of the conduct for which the Government sought to prosecute Green. Thus, Green enjoys a

#

presumption of prejudice that allows him to clear *Strickland's* second prong. Presumption aside, Green nonetheless was prejudiced by Mones's deficient performance. Had Green been properly advised, he would have elected to proceed to trial and thus otherwise clears the standard set forth in *Lee v. United States*.

## **CONCLUSION**

For the reasons advanced in Green's *pro se* motion, as well as those offered and set forth herein, Green's guilty plea resulted from his receipt of ineffective assistance of counsel. Consequently, Green moves this Honorable Court to vacate his convictions and attendant sentences under the provisions of 28 U.S.C. § 2255.

Respectfully submitted:

*s/Walter R. Woodruff, Jr.*
Walter R. Woodruff, Jr.
State of Louisiana Bar
No. 25305
Bopp Law Corporation
101 Brookside Dr.
Mandeville, LA 70471
985.727.6022 (phone)
985.727.6023 (facsimile)

Attorney for Petitioner,
Drew T. Green

#

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2018, I caused the foregoing Supplemental Memorandum to be electronically filed using the Court's CM/ECF system. Copies of this Memorandum will be served through the Court's electronic system.

January 24, 2018

*s/Walter R. Woodruff, Jr.*
Walter R. Woodruff, Jr.

Attorney for Petitioner,
Drew T. Green

.

\#